JONMARC BUFFA, CA Bar No. 217324
JEFF LE RICHE, *pro hac vice pending*
CLEMON D. ASHLEY, *pro hac vice pending*
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108
Telephone: (816) 960-7700
Facsimile: (816) 960-7750
jbuffa@cftc.gov
jleriche@cftc.gov
cashley@cftc.gov

## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

COMMODITY FUTURES
TRADING COMMISSION, and

ALABAMA SECURITIES
COMMISSION, ARIZONA
CORPORATION COMMISSION,
ARKANSAS SECURITIES
DEPARTMENT, CALIFORNIA
DEPARTMENT OF FINANCIAL
PROTECTION & INNOVATION,
STATE OF CONNECTICUT
DEPARTMENT OF BANKING,
STATE OF FLORIDA, OFFICE
OF FINANCIAL REGULATION,
STATE OF HAWAII,
DEPARTMENT OF COMMERCE
AND CONSUMER AFFAIRS,
STATE OF IDAHO,
DEPARTMENT OF FINANCE,
OFFICE OF SECRETARY OF
STATE, ILLINOIS SECURITIES
DEPARTMENT, INDIANA

Civil Action No. 2:22-cv-00691

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF**

**DEMAND FOR JURY TRIAL**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECURITIES DIVISION,
KENTUCKY DEPARTMENT OF
FINANCIAL INSTITUTIONS,
STATE OF MARYLAND EX REL
MARYLAND SECURITIES
COMMISSIONER, ATTORNEY
GENERAL DANA NESSEL ON
BEHALF OF THE PEOPLE OF
THE STATE OF MICHIGAN,
MISSISSIPPI SECRETARY OF
STATE, MISSOURI
COMMISSIONER OF
SECURITIES, NEBRASKA
DEPARTMENT OF BANKING &
FINANCE, NEW MEXICO
SECURITIES DIVISION, THE
PEOPLE OF THE STATE OF
NEW YORK BY LETITIA
JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,
NORTH CAROLINA
DEPARTMENT OF THE
SECRETARY OF STATE,
OKLAHOMA DEPARTMENT OF
SECURITIES, OREGON
DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES,
SOUTH CAROLINA ATTORNEY
GENERAL, SOUTH DAKOTA
DEPARTMENT OF LABOR AND
REGULATION, COMMISSIONER
OF THE TENNESSEE
DEPARTMENT OF COMMERCE
& INSURANCE, VERMONT
DEPARTMENT OF FINANCIAL
REGULATION, WASHINGTON
STATE DEPARTMENT OF
FINANCIAL INSTITUTIONS, and
THE STATE OF WISCONSIN,

Plaintiffs,

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

v.

SAFEGUARD METALS LLC and
JEFFREY SANTULAN a/k/a
JEFFREY HILL,

Defendants.

Plaintiffs Commodity Futures Trading Commission ("CFTC" or "Commission"), Alabama Securities Commission ("State of Alabama"), Arizona Corporation Commission ("State of Arizona"), Arkansas Securities Department ("State of Arkansas"), California Department of Financial Protection & Innovation ("State of California"), State of Connecticut Department of Banking ("State of Connecticut"), State of Florida, Office of Financial Regulation ("State of Florida"), State of Hawaii, Department of Commerce and Consumer Affairs ("State of Hawaii"), Idaho Department of Finance ("State of Idaho"), Office of the Secretary of State, Illinois Securities Department ("State of Illinois"), Indiana Securities Division ("State of Indiana"), Kentucky Department of Financial Institutions ("Commonwealth of Kentucky"), State of Maryland Ex Rel the Maryland Securities Commissioner ("State of Maryland"), Attorney General Dana Nessel on Behalf of the People of the State of Michigan ("People of the State of Michigan"), Mississippi Secretary of State ("State of Mississippi"), Missouri Commissioner of Securities ("State of Missouri"), Nebraska Department of Banking & Finance ("State of Nebraska"), New Mexico Securities Division ("State of New Mexico"), The People of the State of New York by Letitia James, Attorney General of the State of New York ("State of New York"), North Carolina Department of the Secretary of State ("State of North Carolina"), Oklahoma Department of Securities ("State of Oklahoma"), Oregon Department of Business and Consumer Services ("State of Oregon"), South Carolina Attorney General ("State of South Carolina"), South Dakota Department of Labor & Regulation ("State of South Dakota"), Commissioner

of the Tennessee Department of Commerce and Insurance ("State of Tennessee"), Vermont Department of Financial Regulation ("State of Vermont"), Washington State Department of Financial Institutions ("State of Washington"), and the State of Wisconsin ("State of Wisconsin") (collectively "the States"), by and through their undersigned attorneys, hereby allege as follows:

## I.     SUMMARY

1.     From at least October 2017 and continuing through at least July 2021 ("Relevant Period"), Safeguard Metals LLC ("Safeguard Metals") and Jeffrey Santulan a/k/a Jeffrey Hill ("Santulan") (collectively "Defendants") have engaged and continue to engage in a scheme to defraud people throughout the United States, including in this District and in each of the States.

2.     Defendants fraudulently solicited customers to purchase precious metals, primarily consisting of gold and silver coins, that the company marketed and classified as either bullion, semi-numismatic, and numismatic precious metals (collectively "Precious Metals").

3.     Defendants grossly misrepresented, among other things, the amount of markup the company would charge customers on silver coins that Safeguard Metals claimed possess semi-numismatic and numismatic value ("Silver Coins"). Specifically, from at least October 2017 to January 2021, Safeguard Metals charged customers a markup on Silver Coins that exceeded the maximum possible markup disclosed to customers by almost 50% on average.  And from January 2021, after receiving notice of a law enforcement investigation into Safeguard Metals' operations, and after Safeguard Metals modified its customer agreements to reflect that the maximum markup on Silver Coins could be 42% in certain circumstances; Safeguard Metals continued charging customers a markup on Silver Coins that still exceeded the maximum possible markup disclosed to customers by nearly 10% on average.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

4. Safeguard Metals, by and through its sales representatives or other agents, made other material misrepresentations, half-truths, and omissions to convince customers to purchase Precious Metals. For example, Safeguard Metals misrepresented the size, scale, experience, background and history of the firm, its agents, and representatives. Safeguard Metals also made materially false and misleading statements to customers about the risk and safety of their traditional retirement accounts in order to instill fear and convince customers to purchase Precious Metals.

5. Central to its scheme to defraud, Safeguard Metals targeted and continues to target and prey on a vulnerable population of mostly elderly or retirement-aged persons with little experience investing in Precious Metals. Safeguard Metals defrauded customers into transferring proceeds from retirement accounts, often consisting of funds from liquidated securities, to self-directed individual retirement accounts ("SDIRAs") for the purchase of Precious Metals. Safeguard Metals also fraudulently induced some customers to purchase Precious Metals through cash and credit sales ("Cash Accounts").

6. Safeguard Metals' customers, particularly customers who purchased Silver Coins, generally and almost immediately suffered substantial losses on their investments due to the fraudulently overpriced Silver Coins. In total, Defendants fraudulently solicited approximately $68 million from more than 450 members of the public to purchase Precious Metals. Of that $68 million, $66 million was derived from purchases of fraudulently priced Silver Coins. And Safeguard Metals charged its customers approximately $26 million dollars in markups on those purchases, as part of Defendants' fraudulent scheme.

7. To perpetuate the fraud and disguise the nearly immediate and substantial losses suffered by customers, Safeguard Metals also attempted to conceal its fraud and lull its customers by, among other things, making additional misrepresentations about the value of the customers' Precious Metals accounts.

8.     Defendants knowingly or recklessly misled customers into purchasing Precious Metals, knew or recklessly disregarded that most customers significantly overpaid for Silver Coins, and knew or recklessly disregarded that representations about customer account values were false.

9.     The acts, misrepresentations, omissions, and failures of Santulan and other officers, employees, and agents acting for Safeguard Metals occurred within the scope of their employment, agency, or office with Safeguard Metals. Safeguard Metals is therefore liable under Section 2(a)(1)(B) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2021), as a principal for Santulan's violations of the CEA and CFTC Regulations.

10.     By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in, either intentionally or recklessly, violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021).

11.     Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), the CFTC and States bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin them from engaging in any commodity-related activity, as set forth below.  Plaintiffs also seek civil monetary penalties and remedial ancillary relief, including, but not limited to, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the

CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

13.     Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations.

14.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business in violation of the CEA and CFTC Regulations occurred, are occurring, or are about to occur within this District, among other places.

## III.   THE PARTIES

### A.   PLAINTIFFS

15.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and CFTC Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

16.     Plaintiff State of Alabama, State of Arizona, State of Arkansas, State of California, State of Connecticut, State of Florida, State of Hawaii, State of Idaho, State of Illinois, State of Indiana, Commonwealth of Kentucky, State of Maryland, People of the State of Michigan, State of Mississippi, State of Missouri, State of Nebraska, State of New Mexico, State of New York, State of North Carolina, State of

Oklahoma, State of Oregon, State of South Carolina, State of South Dakota, State of Tennessee, State of Vermont, State of Washington, State of Wisconsin are authorized under Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), and their respective State laws, to bring this action on behalf of their State and their citizens to enforce the CEA and CFTC Regulations.

### B.   DEFENDANTS

17.   **Defendant Safeguard Metals LLC** initially registered as a Wyoming limited liability company on October 13, 2017, with its principal office located at 30 N Gould St., Suite R, Sheridan, Wyoming.  Subsequently, on March 26, 2019, Safeguard Metals registered as a California limited liability company with its principal place of business located at 21550 Oxnard St., 3rd Floor, Woodland Hills, California.  Safeguard Metals has never been registered with the Commission in any capacity.

18.   **Defendant Jeffrey Santulan a/k/a Jeffrey Hill** is the sole owner and sole manager of Safeguard Metals LLC.  Santulan is the only signatory on Safeguard Metals' bank accounts.  During the Relevant Period, Santulan owned and controlled Safeguard Metals, supervised (directly and indirectly) its employees and agents, and made hiring and firing decisions on behalf of the company.  A resident of Tarzana, California, Santulan has never been registered with the Commission in any capacity.

### IV.   FACTS

### A.   Safeguard Metals' Operations

19.   Safeguard Metals is a company that marketed, promoted, and sold Precious Metals, including, but not limited to, Silver Coins.  The firm placed advertisements on financial media and websites, and promoted its products on social media platforms and websites linked to media personalities and financial gurus. Safeguard Metals also marketed and promoted Precious Metals through its company website, https://www.safeguardmetals.com/.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

20.     Safeguard Metals used the advertisements, social media platforms, and websites to generate leads, which resulted in solicitations by telephone to potential customers.

21.     Safeguard Metals operated a call center located in Woodland Hills, California, staffed by sales representatives known as "Openers" and "Closers." Safeguard Metals distributed lists of potential customers to Openers and Closers which permitted the sales representatives to contact potential customers by telephone. Using the leads, Openers marketed and promoted Precious Metals to potential customers.  Once an Opener confirmed a potential customer's interest in purchasing Precious Metals, the potential customer was transferred over to the Closer, and the Closer executed the sale of Precious Metals with the customer.

22.     Safeguard Metals operated as an intermediary, essentially controlling all buy and sell aspects of customer transactions to maximize its profits.  Safeguard Metals, by and through its sales representatives or other agents, recommended customers form SDIRA accounts and that customers hold Precious Metals at a depository instead of taking delivery of the metals themselves.  Safeguard Metals told customers storing Precious Metals in a depository was the safest way to store the precious metals and economically better because the depository was purportedly federally insured.

23.     In reality, these representations served as a way for Safeguard Metals to control the transaction.  Once a customer opened a SDIRA account, often through a custodian and depository recommended by Safeguard Metals, Safeguard Metals was initially the only party authorized to buy or sell Precious Metals in customer SDIRAs. Unless a customer knew to remove Safeguard Metals as the designated representative on their SDIRA account, the customer could not liquidate their Precious Metals holdings without going through the very firm that defrauded them to unwind their investments.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

24.     Safeguard Metals' core strategy for profitability was to charge an exorbitant markup on sales of Precious Metals, and in particular, on Silver Coins to customers.  Safeguard Metals purchased Precious Metals from a wholesale distributor, and generated nearly all of its profits through what it represented, though falsely, to customers as "operating margins"—the difference between Safeguard Metals' cost of acquiring Precious Metals from a wholesale distributer and the prices paid by customers, i.e., markup.

25.     To benefit its own self-interest, Safeguard Metals directed the vast majority of SDIRA funds into coins that Safeguard Metals typically marked up excessively, notwithstanding the customer's individual investment needs.  Safeguard Metals accomplished this by pressuring customers to purchase coins that it claimed had numismatic or semi-numismatic value.

26.     Numismatic precious metals are rare, of limited availability, and have significant broad-based market demand and so have a value substantially more than the prevailing market price of the precious metal contained in the bullion.  Semi-numismatic precious metals refers to bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

27.     Safeguard Metals offered coins with purported semi-numismatic or numismatic value in addition to the bullion value and coins with only bullion value. In particular, the Silver Coin known as the 1.25 oz Silver Rose Crown Guinea was the individual coin most frequently sold to customers.  Safeguard Metals claimed the Silver Coins it sold to customers, including the 1.25 oz Silver Rose Crown Guinea, had semi-numismatic or numismatic value and sold them to customers at a premium far above Safeguard Metals' acquisition cost and the melt value of the bullion.

28.     In regards to gold coins, Safeguard Metals, by and through its sales representatives or other agents, most frequently sold the 0.1 oz Gold American Eagle to customers.  Contrary to Silver Coins, which Safeguard Metals claimed to have

semi-numismatic or numismatic value, most gold coins were sold as common bullion products that lacked external value above and beyond the melt value of the bullion.

29.     Consequently, Safeguard Metals pressured customers to purchase Silver Coins and sold vastly more Silver Coins to customers than gold coins. Approximately 97%, or $66 million of the $68 million in total revenue Safeguard Metals fraudulently solicited from customers was used to purchase Silver Coins.

30.     Safeguard Metals also levied transaction fees to liquidate the Precious Metals held in SDIRA accounts.  So after fraudulently overcharging customers on the front end when the Precious Metals transaction was executed, Safeguard Metals also imposed storage fees and a 1% to 3% liquidation fee upon the sale of Precious Metals within SDIRA accounts, significantly contributing to customers' overall transaction costs.

**B.    Defendants Defrauded Mostly Elderly Customers into Establishing SDIRAs and Cash Accounts to Purchase Precious Metals.**

31.     Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons.  Many of these individuals had little experience investing in Precious Metals.  Nonetheless, Defendants fraudulently solicited them to open SDIRAs or Cash Accounts in order to purchase Precious Metals.

32.     Defendants instructed their sales representatives or other agents to concentrate their fraudulent solicitations on elderly or retirement-aged persons in order to gain access to their retirement savings, including but not limited to, money market accounts and retirement savings held in tax advantaged accounts such as: Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; annuities; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

33.     As part of the scheme to gain access to customers' retirement accounts and other savings, Defendants published misinformation on Safeguard Metals' website in 2019 and 2020.  Defendants made numerous false and misleading

statements of material fact, omitted to state material facts necessary to make the statements made not untrue or misleading, or made statements in reckless disregard about the firm's business activities on their website, including, but not limited to, the following:

  a. Safeguard Metals is rated number one among wealth protection firms (with no basis for this assertion);

  b. Safeguard Metals oversees more than $11 billion in assets under its management (when, in reality, the firm has sold substantially less than $75 million in Precious Metals and Silver Coins since it has been in business);

  c. Safeguard Metals has been in business for more than twenty years (when, in truth, the startup formed in 2017, but did not appear to have significant operations until 2019);

  d. the number and location of Safeguard Metals' offices, including office locations in London, England and Beverly Hills, California (when in actuality, the firm only has offices in Woodland Hills, California); and

  e. the use of false and fictitious employee names, touting non-existent employees on LinkedIn, misrepresenting employee job titles, and exaggerating employee qualifications and years of industry experience.

34. Defendants admitted the foregoing statements and blatant website misrepresentations are false.

35. Based on information and belief, Defendants removed the foregoing statements and blatant website misrepresentations in or about January 2021 after becoming informed of a law enforcement investigation, and began to rely on other more nuanced misrepresentations, half-truths and omissions as part their solicitation scheme, as discussed further below.

36. Safeguard Metals utilized fraudulent solicitations designed to build trust with customers based on representations of political affinity, and through references to and statements from financial gurus.

37. In furtherance of the scheme, Santulan personally solicited customers, misrepresenting that Safeguard Metals was "the #1 name in precious metals and lead the industry as the fastest growing house, offering the cheapest and purest bullion in

the country for the benefit of our clients and we hold all proper and full accreditation from the state, federal government, and distributors alike," with no basis for these material misstatements, half-truths or omissions, and in reckless disregard for the truth.  Santulan also created sales scripts that were used to solicit customers.

38.     Defendants instructed its sales representatives or other agents to employ fraudulent solicitations designed to instill fear in elderly and retirement aged investors and other customers.  To frighten those customers about the risk and safety of their investments in Qualified Retirement Savings and traditional accounts, Safeguard Metals made repeated material misrepresentations, half-truths, and omissions regarding the Money Market Fund Reform regulation promulgated by the Securities and Exchange Commission, Money Market Fund Reform Amendments to Form PF, 70 Fed. Reg. 47,736 (Aug. 14, 2014), and more recently, the Orderly Liquidation Authority promulgated pursuant to Dodd Frank, 12 U.S.C. §§ 5381-5394. Safeguard Metals played on the customers' fears and materially misrepresented these provisions, omitting to disclose which asset classes the Money Market Fund Reform applies to, and making false and misleading statements about each law's or regulation's effects, and the extent to which these and other investor protections applied.  For example, during fraudulent solicitations over the telephone, via email and in its sales scripts, Safeguard Metals made the following misrepresentations:

a.     financial institutions can "freeze you out of your retirement accounts if there was ever a market crash or correction again," and either "confiscate" or freeze all of the holdings in your retirement or investment accounts, particularly during either a liquidity or financial crisis.  "Banks then will use people's money to bail themselves out.";

b.     an investor is "just a beneficial owner" and "leases" securities and funds held in Qualified Retirement Savings, and further, the government "owns" the certificates on securities and funds held in these accounts; and

c.    "you're pretty much in these [Quality Retirement Savings] accounts with no types of insurance," but "the good news is that there are loopholes within the law to help protect . . . from it" through safe and conservative investments in Precious Metals through SDIRAs.

39.    Defendants misrepresented that the Money Market Fund Reform and/or the Orderly Liquidation Authority regulations apply to stocks and certain bonds held in Qualified Retirement Savings.  They do not.

40.    Safeguard Metals misrepresented that the government, not the investor, owns the certificates on securities and funds held in a Qualified Retirement Savings account.  This is false.  The beneficial owner is the true owner of an asset or security that is under a different legal name and the government does not own the certificates on securities and funds held in these accounts.

41.    Safeguard Metals misrepresented that Qualified Retirement Savings are uninsured.  In reality, investor protections and insurance are offered through the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation.

42.    In 2021, Safeguard Metals misrepresented to customers that a change to Rule 22e-3 under the Money Market Fund Reform permits financial institutions to permanently freeze the liquidity in accounts, confiscate funds and will never pay participants back if the market fails.  Furthermore, Safeguard Metals has maintained the goal of investment firms is "to stop you from being able to redeem your shares, or redeem the funds that you have in your retirement and stock accounts, by any means necessary."

43.    These and similar misrepresentations made by Safeguard Metals and/or Santulan are false and misleading because Defendants failed to disclose to customers the narrow circumstances in which a money market fund can be permanently suspended, and furthermore, that liquidation follows when redemptions are

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

permanently suspended thereby returning money to shareholders and allowing investors to recover funds.

44.     Defendants knew, or were reckless in not knowing, that their communications with customers contained material misstatements, half-truths, and omissions described above.

**C.     Safeguard Metals Charged Exorbitant Price Markups on Silver Coins That Bore No Relation to the Ranges Represented to Customers.**

45.     After the SDIRAs and Cash Accounts were opened under false and fraudulent pretenses, Defendants executed their core strategy of selling customers overpriced Silver Coins with enormous price markups, which Defendants referred to as "operating margins" when they communicated about the price markups with customers.  Safeguard Metals grossly misrepresented the "operating margins" that they would charge customers in Precious Metals Shipping and Account Agreements ("Customer Agreements") and representations made during sales confirmation calls.

46.     The Customer Agreements purported to establish the terms and conditions regarding sales of Precious Metals by Defendants to their customers. During the Relevant Period, Safeguard Metals used at least two versions of the Customer Agreements – one version prior to January 2021, and subsequently, a revised version following purported attempts to implement compliance measures at Safeguard Metals.  Based on information and belief, Safeguard Metals purportedly implemented those compliance measures beginning in or around January 2021 after receiving notice of an investigation by law enforcement.

47.     Prior to January 2021, Safeguard Metals' Customer Agreements represented, in pertinent part, the following relating to Safeguard Metals' "operating margins" on metals:

        a.     "The operating margin is the difference between Safeguard's approximate acquiring cost of the Precious Metals and the price the Client pays."

b.   "Safeguard's operating margin quoted to the Client for most common bullion products . . . is typically four percent (4%) for cash, and seven percent (7%) for IRA purchases."

c.   "Operating margin on coins with semi-numismatic or numismatic value are rare coins . . . is usually twenty percent (20%) and for Proof products is twenty-three percent (23%)."

48.   Despite these representations, Safeguard Metals actually sold Silver Coins to customers at average "operating margins" of 71%. This vastly exceeded the maximum "operating margin" of 23% disclosed in Safeguard Metals' Customer Agreement. These overcharges were material misrepresentations and omissions. Further, Santulan admitted to establishing the price of these exorbitantly priced Precious Metals during Safeguard Metals' initial period of operation.

49.   During purported implementation of compliance measures in or about January 2021, Safeguard Metals revised its sales confirmation scripts, and its Customer Agreements to provide new representations about its "operating margins" for Precious Metals. While Safeguard Metals' representations about its "operating margins" varied between the sales confirmation scripts and Customer Agreements, the actual "operating margins" charged by the firm far exceeded either representation.

50.   After January 2021, Safeguard Metals represented the following "operating margins" to customers during sales confirmation calls:

SAFEGUARD METAL'S OPERATING MARGIN IS USUALLY 1% - 23%[.] THIS MAY VARY AND EXCEED 40% BASED ON MARKET CONDITIONS.

51.   After January 2021, Safeguard Metals' Customer Agreements represented to customers the following relating to "operating margins":

Current operating margins on coins with semi-numismatic or numismatic value . . . is usually 23% - 33%. . . . The actual operating margin on any particular transaction can be any amount usually within, but also could be outside this range, but not exceeding 42%.

52.   Following the purported implementation of compliance measures in January 2021, Safeguard Metals' actual "operating margin" on Silver Coins routinely

exceeded 40%, and averaged about 51%.  Consequently, despite the inconsistent disclosures between sales confirmations and Customer Agreements, the "operating margin" on Silver Coins represented in sales confirmations rarely, if ever, fell within the usual and customary ranges disclosed to customers and averaged greater than the maximum "operating margin" represented in Customer Agreements.  These overcharges were material misrepresentations and omissions.

53.    Safeguard Metals also provided inconsistent and misleading disclosures to customers during the sales confirmation process.  In at least one instance, an Opener falsely represented to at least one customer that the specified "operating margins" only applied to investments exceeding $1 million, and were therefore inapplicable to his transaction because his investment fell under that threshold.  Later, in contrast, a Closer stated during the sales confirmation call that specified "operating margins" do in fact apply because the customer is an accredited investor, resulting in ambiguous and conflicting disclosures.

54.    Safeguard Metals' core strategy of selling fraudulently overpriced Silver Coins to customers was designed to maximize its profits through "operating margins" and commissions and resulted in substantial and nearly immediate customer losses. In excess of 97%, or $66 million of the $68 million in total revenue fraudulently solicited from customers was used to purchase Silver Coins, which had significantly higher "operating margins" compared to gold coins.

55.    Safeguard Metals knowingly or recklessly failed to inform customers of the material fact that the exorbitant "operating margins" charged on Silver Coins bore no relation to the figures represented in the Customer Agreements, or otherwise stated to customers.  This had the effect of substantially depleting the values of investments held in customers' SDIRAs and Cash Accounts.  Nonetheless, Safeguard Metals continued to misrepresent to prospective and current SDIRA and Cash Account customers that Precious Metals were a safe and conservative investment

even though customers suffered immediate loss on the purchase of Precious Metals from Safeguard Metals.

**D.     Safeguard Metals Misrepresented to Customers How It Earned Profits and Lulled Customers by Making Misrepresentations About the Value of Customers' Precious Metals.**

56.     As part of the scheme, Safeguard Metals misrepresented and omitted material facts regarding how Safeguard Metals earned profits from Precious Metals transactions.

57.     During telephone sales calls, Safeguard Metals repeatedly misstated that its earnings arose solely from a 1% fee, and later in 2021, a 1% to 3% fee, that applied only when customers liquidated investments in Precious Metals.  During a sales solicitation call with a prospective customer, a Safeguard Metals employee stated, in pertinent part, that "We take 1 percent of what we liquidate . . . .  It's our only way we make money," leaving customers with the impression that Safeguard Metals did not profit in other respects from their Precious Metals transactions.

58.     In reality, and as discussed above, Safeguard Metals also made money from charging excessive premiums on Silver Coins.  For instance, Safeguard Metals earned an estimated 71% "operating margin" on Silver Coins during the 2019 to 2020 timeframe—about 48% more than the maximum permitted pursuant to the Customer Agreement.  In 2021, Safeguard Metals earned an estimated 51% "operating margin" on Silver Coins, about 9% more than the maximum permitted pursuant to the revised Customer Agreement.

59.     Safeguard Metals also falsely asserted "[i]f our clients are making money, that's when we make money."  In fact, Safeguard Metals made money on Precious Metals notwithstanding whether its customers made money, and customers incurred additional transactional costs far greater than a 1% to 3% liquidation fee. Safeguard Metals omitted the true and accurate transaction costs and "operating margins" even when customers specifically inquired.

60.     As part of the scheme to defraud, Safeguard Metals also deceived customers and concealed its fraud by hiding that customers significantly overpaid for their investments.  Instead, Safeguard Metals made further misrepresentations about the value of the Precious Metals in customer accounts to placate and calm investors who were upset about the losses shown on their SDIRA statements.

61.     Customers received account statements from their SDIRA custodians showing account values significantly below the values originally paid to Safeguard Metals.  The account statements were significantly lower because the SDIRA custodians assigned asset values to the coins held based on the melt value of the coin, ignoring any purported numismatic or semi-numismatic value.  When customers confronted Safeguard Metals' sales representatives about the disparity between their original investment and the value assigned by SDIRA custodians, the sales representatives rejected lower valuations and misrepresented to customers that values did not accurately reflect the resale value of the Precious Metals and Silver Coins, and that the actual resale value of their investments were much higher than that reported by the SDIRA custodians.  ("Post-Purchase Misrepresentations").

62.     Safeguard Metals, however, knew or recklessly disregarded that the resale price of the Silver Coins that it marketed and promoted was much lower than the amount customers paid for the Silver Coins.

63.     To further obfuscate customers' true account values, Safeguard Metals also lulled customers by telling them to wait or give it at least six months, or in some instances, three to five years, to allow their SDIRA accounts to make money.

64.     Due to the acts, omissions, and failures of Safeguard Metals, at least two SDIRA custodians terminated their business relationships with Safeguard Metals and no longer conduct business with the company.

65.     In terminating its contract with Safeguard Metals, one custodian stated, in pertinent part, that:

> It has come to our attention that certain trades made in
> accounts represented by Safeguard Metals appear to not be
> in the best interest of the IRA owner as the values of the
> accounts were significantly less after the trade activity than
> the values of the accounts prior to the trades.

**D.    Santulan Controlled the Operations of Safeguard Metals and Is Therefore Liable for Its Actions.**

66.    During the Relevant Period, Santulan was the controlling person of Safeguard Metals and held 100% ownership of the company.

67.    Santulan was the sole member of the limited liability company, and no one else has ever served as a member.  He executed the limited liability company registration using the title of "Principal."

68.    As the controlling person, Santulan made all significant business decisions on behalf of Safeguard Metals, and was authorized to make personnel decisions about hiring and firing of employees.  Prior to October 2020, Santulan created sales scripts and email templates and distributed customer leads and provided training to sales representatives at Safeguard Metals.  Santulan determined and set the prices at which Safeguard Metals sold Precious Metals and Silver Coins to the public.

69.     For the entirety of the Relevant Period, Santulan was the only signatory on Safeguard Metals' bank accounts and served as the only person authorized to enter into financial transactions on behalf of the company.

70.    Santulan did not act in good faith or has knowingly induced Safeguard Metals' fraudulent acts.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

## <u>COUNT I</u>
### Fraud

**Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021)**

*(Brought by all Plaintiffs)*

71.    Paragraphs 1 through 70 are realleged and incorporated herein by reference.

72.    7 U.S.C. § 9(1) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the commission shall promulgate . . . .

73.    17 C.F.R § 180.1(a) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

74.     By reason of the conduct described above, Defendants, by and through Santulan, its officers, employees and agents, directly or indirectly, in connection with contracts of sale of commodities in interstate commerce, intentionally or recklessly violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

75.     By reason of the conduct described above, the acts, misrepresentations, omissions, and failures of Santulan and other officers, employees, and agents acting for Safeguard Metals occurred within the scope of their employment, agency, or office with Safeguard Metals.  Safeguard Metals is therefore liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2021), as a principal for Santulan's violations of the CEA and CFTC Regulations.

76.     Santulan controlled Safeguard Metals and has not acted in good faith or has knowingly induced, directly or indirectly, the acts constituting Safeguard Metals' violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Santulan is liable for Safeguard Metals' violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), as controlling person.

77.     Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Safeguard Metals' customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3)

## VI.   RELIEF REQUESTED

78.     The CFTC and the States respectfully request that this Court, as authorized by Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1) and pursuant to its own equitable powers:

A.     Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C.

§ 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021);

B.   Enter an order of permanent injunction enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3);

C.   Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40));

2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)   Having any commodity interests traded on any Defendants' behalf;

4)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)   Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the

1          CFTC except as provided for in CFTC Regulation 4.14(a)(9),

2          17 C.F.R. § 4.14(a)(9) (2021);

3      7)     Acting as a principal (as that term is defined in CFTC Regulation

4          3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or

5          employee of any person registered, exempted from registration, or

6          required to be registered with the CFTC except as provided for in

7          17 C.F.R. § 4.14(a)(9).

8    D.    Enter an order directing Defendants as well as any third-party transferee

9        and/or successors thereof, to disgorge, pursuant to such procedure as the

10       Court may order, all benefits received including, but not limited to,

11       salaries, commissions, loans, fees, revenues, and trading profits derived,

12       directly or indirectly, from acts or practices that constitute violations of

13       the CEA or CFTC Regulations, as described herein, including pre-

14       judgment and post-judgment interest;

15    E.    Enter an order requiring Defendants, as well as any successors thereof,

16        to make full restitution to every person who has sustained losses

17        proximately caused by the violations described herein, including pre-

18        judgment and post-judgment interest;

19    F.    Enter an order directing Defendants to rescind, pursuant to such

20        procedures as the Court may order, all contracts and agreements,

21        whether implied or express, entered into between Defendants and any of

22        the customers whose funds were received by Defendants as a result of

23        Defendants' violations of the CEA or CFTC Regulations as described

24        herein;

25    G.    Enter an order directing Defendants to pay a civil monetary penalty

26        assessed by the Court, in an amount not to exceed the penalty prescribed

27        by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), as adjusted for

28        inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act

1    Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat.

2    584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each

3    violation of the CEA or CFTC Regulations, described herein;

4    H.    Enter an order requiring Defendants to pay costs and fees as permitted

5          by 28 U.S.C. §§ 1920 and 2413(a)(2); and

6    I.    Enter an order providing such other and further relief as the Court deems

7          proper.

8                        **VII.   DEMAND FOR JURY TRIAL**

9    79.   Plaintiffs hereby demand a jury trial.

10

11   I hereby attest that all other signatories listed, and on whose behalf the filing is

12   submitted, concur in the filing's content and have authorized the filing.

13

14   Dated: February 1, 2022          Respectfully submitted,

15                                     COMMODITY FUTURES
16                                     TRADING COMMISSION

17                                     By: /s/ JonMarc Buffa

18

19                                     JONMARC BUFFA
                                       California Bar No. 217324
20                                     jbuffa@cftc.gov

21                                     JEFF LE RICHE, *pro hac vice pending*
22                                     (Attorney-In-Charge)
                                       Missouri Bar No. 46557
23                                     jleriche@cftc.gov

24

25                                     CLEMON D. ASHLEY, *pro hac vice pending*
                                       Illinois Bar No. 6294839
26                                     cashley@cftc.gov

27                                     Attorneys for Plaintiff
28                                     COMMODITY FUTURES

- 25 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1 | TRADING COMMISSION
2 | 2600 Grand Boulevard, Suite 210
  | Kansas City, Missouri 64108
3 | Telephone: (816) 960-7700
  | Facsimile: (816) 960-7750
4 |
5 | FOR THE STATE OF ALABAMA
6 | By: /s/ Stephen P. Feaga
7 |
8 | STEPHEN P. FEAGA, *pro hac vice pending*
  | Assistant Attorney General
9 | Alabama Bar No. 7374A60S
  | Steve.Feaga@asc.alabama.gov
10 |
11 | ANNE W. GUNTER, *pro hac vice pending*
  | Assistant Attorney General
12 | Alabama Bar. No. 4666N91P
  | Anne.Gunter@asc.alabama.gov
13 |
14 | Attorneys for Plaintiff
  | ALABAMA SECURITIES COMMISSION
15 | 445 Dexter Avenue, Suite 12000
16 | Montgomery, AL 36104
  | Telephone: (334) 242-2984
17 | Facsimile: (334) 242-0240
18 |
19 | FOR THE STATE OF ARIZONA
20 |
21 | By: /s/ Christopher Nichols
22 | CHRISTOPHER NICHOLS, *pro hac vice*
  | *pending*
23 | Enforcement Attorney
24 | Arizona Bar No. 029958
  | cnichols@azcc.gov
25 |
26 | Attorney for Plaintiff
  | ARIZONA CORPORATION COMMISSION
27 | 1300 W. Washington Street, 3rd Floor
28 | Phoenix, AZ 85007

- 26 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Telephone: (605) 542-0639
Facsimile: (602) 714-8120


FOR THE STATE OF ARKANSAS

By: /s/ Joseph Joslin

JOSEPH JOSLIN, *pro hac vice pending*
Arkansas Bar No. 2014190
Joseph.Joslin@arkansas.gov

Attorney for Plaintiff
ARKANSAS SECURITIES DEPARTMENT
1 Commerce Way, Suite 402
Little Rock, AR 72202
Telephone: (501) 683-0806
Facsimile: (501) 324-9268


FOR THE STATE OF CALIFORNIA

By: /s/ Kelly Suk

DANIELLE A. STOUMBOS
California Bar No. 264784
Danielle.Stoumbos@dfpi.ca.gov

KELLY SUK
California Bar No. 301757
Kelly.Suk@dfpi.ca.gov

Attorneys for Plaintiff
CALIFORNIA DEPARTMENT OF
FINANCIAL PROTECTION &
INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Facsimile: (213) 576-7181

FOR THE STATE OF CONNECTICUT

By: /s/ James W. Caley

JAMES W. CALEY, *pro hac vice pending*
Assistant Attorney General
Connecticut Bar No. 430246
james.caley@ct.gov

Attorney for Plaintiff
STATE OF CONNECTICUT DEPARTMENT
OF BANKING
260 Constitution Plaza
Hartford, CT 06103-1800
Telephone: (860) 808-5461
Facsimile: (860) 808-5387

FOR THE STATE OF FLORIDA

By: /s/ George C. Bedell III

GEORGE C. BEDELL III, *pro hac vice pending*
Chief Counsel
Florida Bar No. 363685
George.Bedell@flofr.gov

Attorney for Plaintiff
FLORIDA OFFICE OF FINANCIAL
REGULATION
200 East Gaines Street
Tallahassee, FL  32399-0370
Telephone: (813) 218-5353
Facsimile: (813) 272-2498

FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

RAYNI M. NAKAMURA-WATANABE, *pro hac vice pending*
Acting Supervising Attorney
Hawaii Bar No. 9032-0
rnakamur@dcca.hawaii.gov

Attorney for Plaintiff
STATE OF HAWAII, DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS
335 Merchant Street, Room 205
Honolulu, HI  96813
Telephone: (808) 586-2740
Facsimile: (808) 586-3977


FOR THE STATE OF IDAHO

OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *pro hac vice pending*
Deputy Attorney General
Idaho Bar No. 7434
loren.messerly@finance.idaho.gov

Attorney for Plaintiff
STATE OF IDAHO, DEPARTMENT OF FINANCE
P.O. Box 83720
Boise, ID  83720-0031
Telephone: (208) 332-8093
Facsimile: (208) 332-8099


FOR THE STATE OF ILLINOIS

By:_____

PAULA K. BOULDON, *pro hac vice pending*

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Special Assistant Attorney General
Illinois Bar No. 6198150
PBouldon@ILSOS.gov

Attorney for Plaintiff
OFFICE OF THE SECRETARY OF STATE,
ILLINOIS SECURITIES DEPARTMENT
69 W. Washington St., Suite 1220
Chicago, IL 60602
Telephone: (312) 793-3164
Facsimile: (312) 793-1202


FOR THE STATE OF INDIANA

By: /s/ Jefferson S. Garn_____

JEFFERSON S. GARN, *pro hac vice pending*
Deputy Attorney General
Indiana Bar No. 29921-49
Jefferson.Garn@atg.in.gov

Attorney for Plaintiff
INDIANA SECURITIES DIVISION
302 W. Washington St.
IGCS—5th Floor
Indianapolis, IN  46204
Telephone: (317) 234-7119
Facsimile: (317) 232-7979


FOR THE STATE OF KENTUCKY

By: /s/ Gary A. Stephens

GARY A. STEPHENS, *pro hac vice pending*
Assistant General Counsel
Kentucky Bar No. 87740
Gary.Stephens@ky.gov

Attorney for Plaintiff

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1
2
3
4
5

KENTUCKY DEPARTMENT OF
FINANCIAL INSTITUTIONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9046
Facsimile: (502) 573-8787

6

FOR THE STATE OF MARYLAND

7

8

By: /s/ Max F. Brauer

9

10

11

MAX F. BRAUER, *pro hac vice pending*
Assistant Attorney General
Maryland State Does Not Use Bar Numbers
mbrauer@oag.state.md.us

12

13

14

15

16

17

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES
COMMISSIONER
200 Saint Paul Place, 25th Floor
Baltimore, MD  21202
Telephone: (410) 576-6950
Facsimile: (410) 576-6532

18

19

20

FOR THE PEOPLE OF THE STATE OF
MICHIGAN

21

By: /s/ Michael S. Hill

22

23

24

MICHAEL S. HILL, *pro hac vice pending*
Assistant Attorney General
Michigan Bar No. P73084
HillM19@michigan.gov

25

26

27

28

Attorney for Plaintiff
ATTORNEY GENERAL DANA NESSEL
ON BEHALF OF THE PEOPLE OF THE
STATE OF MICHIGAN
P.O. Box 30736

Lansing, MI  48909
Telephone: (517) 335-7632
Facsimile: (517) 335-6755


FOR THE STATE OF MISSISSIPPI

By: /s/ Seth Shannon

SETH SHANNON, *pro hac vice pending*
Mississippi Bar No. 103466
seth.shannon@ago.ms.gov

Attorney for Plaintiff
MISSISSIPPI SECRETARY OF STATE
Post Office Box 220
Jackson, MS  39205
Telephone: (769) 237-6406
Facsimile: (601) 359-4231


FOR THE STATE OF MISSOURI

By: /s/ Steven M. Kretzer

STEVEN M. KRETZER, *pro hac vice pending*
Missouri Bar No. 56950
Steven.Kretzer@sos.mo.gov

Attorney for Plaintiff
MISSOURI COMMISSIONER OF
SECURITIES
600 W. Main Street
Jefferson City, MO  65102
Telephone: (573) 751-4136
Facsimile: (573) 526-3124


FOR THE STATE OF NEBRASKA

By: /s/ Joshua Shasserre

- 32 -

JOSHUA SHASSERRE, *pro hac vice pending*
Assistant Attorney General
Nebraska Bar No. 23885
Joshua.Shasserre@nebraska.gov

Attorney for Plaintiff
NEBRASKA DEPARTMENT OF BANKING
& FINANCE
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-2682
Facsimile: (402) 471-3297


FOR THE STATE OF NEW MEXICO

By: /s/ Alissa N. Berger

ALISSA N. BERGER, *pro hac vice pending*
New Mexico Bar No. 21769
Alissa.Berger@state.nm.us

Attorney for Plaintiff
NEW MEXICO SECURITIES DIVISION
5500 San Antonio Drive NE
Albuquerque, NM 87109
Telephone: (505) 503-5987
Facsimile: (505) 222-9848


FOR THE PEOPLE OF THE STATE OF
NEW YORK

LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht

TATYANA "TANYA" TRAKHT, *pro hac
vice pending*
Assistant Attorney General

- 33 -
COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

New York State Does Not Use Bar Numbers
Tanya.Trakht@ag.ny.gov

Attorney for Plaintiff
ATTORNEY GENERAL OF THE STATE OF
NEW YORK
28 Liberty Street, 21st Floor
New York, NY  10005
Telephone: (212) 416-8457
Facsimile: (212) 416-8816


FOR THE STATE OF NORTH CAROLINA

By: /s/ Sherrell Forbes

SHERRELL FORBES, *pro hac vice pending*
North Carolina Bar No. 42830
sforbes@sosnc.gov

Attorney for Plaintiff
NORTH CAROLINA DEPARTMENT OF
THE SECRETARY OF STATE
P.O. Box 29622
Raleigh, NC 27626
Telephone: (919) 814-5532
Facsimile: (919) 814-5596


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *pro hac vice pending*
Oklahoma Bar No. 30548
rfagnant@securities.ok.gov

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF
SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 37243

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1   Telephone: (405) 280-7718
    Facsimile: (405) 280-7742
2

3   FOR THE STATE OF OREGON
4

5   By: /s/ Daniel J. Rice

6   DANIEL J. RICE, *pro hac vice pending*
7   Oregon Bar No. 084536
    Daniel.Rice@doj.state.or.us
8

9   Attorney for Plaintiff
10  OREGON DEPARTMENT OF CONSUMER
    AND BUSINESS SERVICES
11  350 Winter Street NE, Room 410
12  Salem, OR 97309
    Telephone: (503) 378-4140
13  Facsimile: (503) 947-0088
14

15  FOR THE STATE OF SOUTH CAROLINA
16

17  By: /s/ Jonathan Williams

18  JONATHAN WILLIAMS, *pro hac vice*
19  *pending*
    South Carolina Bar No. 72509
20  jwilliams@scag.gov
21

22  Attorney for Plaintiff
    STATE OF SOUTH CAROLINA
23  OFFICE OF ATTORNEY GENERAL
    P.O. Box 11549
24  Columbia, SC 29211
25  Telephone: (803) 734-7208
    Facsimile: (803) 734-7208
26

27
    FOR THE STATE OF SOUTH DAKOTA
28

- 35 -

By: /s/ Clayton Grueb

CLAYTON GRUEB, *pro hac vice pending*
South Dakota Bar No. 4642
Clayton.grueb@state.sd.us

Attorney for Plaintiff
STATE OF SOUTH DAKOTA
DEPARTMENT OF LABOR &
REGULATION
2330 N. Maple Ave. Suite 2
Rapid City, SD 57701
Telephone: (605) 773-3563
Facsimile: (605) 773-5369


FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III
Attorney General and Reporter
for the State of Tennessee

By: /s/ Kevin M. Kreutz

KEVIN M. KREUTZ
Acting Assistant Attorney General
California Bar No. 264654
Kevin.Kreutz@ag.tn.gov

Attorney for Plaintiff
Commissioner of the Tennessee Department of
Commerce and Insurance
Office of Tennessee Attorney General
Financial Division
P.O. Box 20207
Nashville, TN  37202-0207
Telephone: (615) 253-0694
Facsimile: (615) 741-8151


FOR THE STATE OF VERMONT

By: /s/ Jennifer Rood

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JENNIFER ROOD, *pro hac vice pending*
Assistant General Counsel
Vermont Bar No. 5515
Jennifer.Rood@vermont.gov

Attorney for Plaintiff
VERMONT DEPARTMENT OF
FINANCIAL REGULATION
89 Main Street
Montpelier, VT  05620
Telephone: (877) 550-3907
Facsimile: (802) 828-1919


FOR THE STATE OF WASHINGTON

By: /s/ Stephen S. Manning

STEPHEN S. MANNING, *pro hac vice
pending*
Washington Bar No. 36965
Stephen.Manning@atg.wa.gov

Attorney for Plaintiff
WASHINGTON STATE DEPARTMENT OF
FINANCIAL INSTITUTIONS, SECURITIES
DIVISION
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Facsimile: (360) 902-0524


FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
Wisconsin Department of Justice

By: /s/ Laura E. McFarlane

Laura E. McFarlane, *pro hac vice pending*

1

WI State Bar No. 1089358
mcfarlanele@doj.state.wi.us

2

3

Attorney for Plaintiff
THE STATE OF WISCONSIN

4

Post Office Box 7857

5

Madison, WI 53707-7857
Telephone: (608) 266-8911

6

Facsimile: (608) 267-2779

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF