1  JEFF LE RICHE, admitted pro hac vice
2  jleriche@cftc.gov
   CLEMON D. ASHLEY, admitted pro hac vice
3  cashley@cftc.gov
   Attorneys for Plaintiff
4  COMMODITY FUTURES
5  TRADING COMMISSION
   2600 Grand Boulevard, Suite 210
6  Kansas City, MO 64108
7  Telephone: (816) 960-7700
   Facsimile: (816) 960-7750
8

9

10           **THE UNITED STATES DISTRICT COURT**
             **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11

12

13  COMMODITY FUTURES
14  TRADING COMMISSION, and
                                        Civil Action No.: 2:22-cv-00691-
15  ALABAMA SECURITIES               JFW-SK
    COMMISSION, ARIZONA
16  CORPORATION COMMISSION,
    ARKANSAS SECURITIES
17  DEPARTMENT, CALIFORNIA           **FIRST AMENDED COMPLAINT**
    DEPARTMENT OF FINANCIAL          **FOR INJUNCTIVE RELIEF,**
18  PROTECTION & INNOVATION,         **CIVIL MONETARY**
    STATE OF CONNECTICUT             **PENALTIES, AND OTHER**
19  DEPARTMENT OF BANKING,           **EQUITABLE RELIEF**
    STATE OF FLORIDA, OFFICE
20  OF FINANCIAL REGULATION,
    STATE OF HAWAII,
21  DEPARTMENT OF COMMERCE           **DEMAND FOR JURY TRIAL**
    AND CONSUMER AFFAIRS,
22  STATE OF IDAHO,
    DEPARTMENT OF FINANCE,
23  OFFICE OF SECRETARY OF
    STATE, ILLINOIS SECURITIES
24  DEPARTMENT, INDIANA
    SECURITIES DIVISION, IOWA
25  INSURANCE COMMISSIONER
    DOUGLAS M. OMMEN,
26  KENTUCKY DEPARTMENT OF
    FINANCIAL INSTITUTIONS,
27  STATE OF MARYLAND EX REL
    MARYLAND SECURITIES
28

COMMISSIONER, ATTORNEY
GENERAL DANA NESSEL ON
BEHALF OF THE PEOPLE OF
THE STATE OF MICHIGAN,
MISSISSIPPI SECRETARY OF
STATE, MISSOURI
COMMISSIONER OF
SECURITIES, NEBRASKA
DEPARTMENT OF BANKING &
FINANCE, NEW MEXICO
SECURITIES DIVISION, THE
PEOPLE OF THE STATE OF
NEW YORK BY LETITIA
JAMES, ATTORNEY GENERAL
OF THE STATE OF NEW YORK,
NORTH CAROLINA
DEPARTMENT OF THE
SECRETARY OF STATE, OHIO
DEPARTMENT OF COMMERCE,
DIVISION OF SECURITIES,
OKLAHOMA DEPARTMENT OF
SECURITIES, STATE OF
OREGON, BY AND THROUGH
ITS DEPARTMENT OF
CONSUMER AND BUSINESS
SERVICES AND ATTORNEY
GENERAL ELLEN F.
ROSENBLUM, STATE OF
SOUTH CAROLINA, BY AND
THROUGH ALAN WILSON,
SOUTH CAROLINA ATTORNEY
GENERAL, AND MARK
HAMMOND, SOUTH CAROLINA
SECRETARY OF STATE, SOUTH
DAKOTA DEPARTMENT OF
LABOR AND REGULATION,
COMMISSIONER OF THE
TENNESSEE DEPARTMENT OF
COMMERCE & INSURANCE,
UTAH DIVISION OF
SECURITIES, VERMONT
DEPARTMENT OF FINANCIAL
REGULATION, WASHINGTON
STATE DEPARTMENT OF
FINANCIAL INSTITUTIONS, and
THE STATE OF WISCONSIN,

Plaintiffs,

v.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER
EQUITABLE RELIEF

1
2

SAFEGUARD METALS LLC and
JEFFREY SANTULAN a/k/a
JEFFREY HILL,

3

   Defendants.

4

5        Plaintiffs Commodity Futures Trading Commission ("CFTC" or

6   "Commission"), Alabama Securities Commission ("State of Alabama"), Arizona

7   Corporation Commission ("State of Arizona"), Arkansas Securities Department

8   ("State of Arkansas"), California Department of Financial Protection & Innovation

9   ("State of California"), State of Connecticut Department of Banking ("State of

10  Connecticut"), State of Florida, Office of Financial Regulation ("State of Florida"),

11  State of Hawaii, Department of Commerce and Consumer Affairs ("State of

12  Hawaii"), Idaho Department of Finance ("State of Idaho"), Office of the Secretary of

13  State, Illinois Securities Department ("State of Illinois"), Indiana Securities Division

14  ("State of Indiana"), Iowa Insurance Commissioner Douglas M. Ommen ("State of

15  Iowa"), Kentucky Department of Financial Institutions ("Commonwealth of

16  Kentucky"), State of Maryland Ex Rel the Maryland Securities Commissioner ("State

17  of Maryland"), Attorney General Dana Nessel on Behalf of the People of the State of

18  Michigan ("People of the State of Michigan"), Mississippi Secretary of State ("State

19  of Mississippi"), Missouri Commissioner of Securities ("State of Missouri"),

20  Nebraska Department of Banking & Finance ("State of Nebraska"), New Mexico

21  Securities Division ("State of New Mexico"), The People of the State of New York

22  by Letitia James, Attorney General of the State of New York ("State of New York"),

23  North Carolina Department of the Secretary of State ("State of North Carolina"),

24  Ohio Department of Commerce, Division of Securities ("State of Ohio"), Oklahoma

25  Department of Securities ("State of Oklahoma"), State of Oregon, by and through its

26  Department of Consumer and Business Services and Attorney General Ellen F.

27  Rosenblum ("State of Oregon"), State of South Carolina, by and through Alan

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER
EQUITABLE RELIEF

Wilson, South Carolina Attorney General, and Mark Hammond, South Carolina Secretary of State ("State of South Carolina"), South Dakota Department of Labor & Regulation ("State of South Dakota"), Commissioner of the Tennessee Department of Commerce and Insurance ("State of Tennessee"), Utah Division of Securities ("State of Utah"), Vermont Department of Financial Regulation ("State of Vermont"), Washington State Department of Financial Institutions ("State of Washington"), and the State of Wisconsin ("State of Wisconsin") (collectively "the States"), by and through their undersigned attorneys, hereby allege as follows:

## I. SUMMARY

1.      From at least October 2017 and continuing through at least July 2021 ("Relevant Period"), Safeguard Metals LLC ("Safeguard Metals") and Jeffrey Santulan a/k/a Jeffrey Hill ("Santulan") (collectively "Defendants") have engaged and continue to engage in a scheme to defraud people throughout the United States, including in this District and in each of the States.

2.      Defendants fraudulently solicited customers to purchase precious metals, primarily consisting of gold and silver coins, that the company marketed and classified as either bullion, semi-numismatic, and numismatic precious metals (collectively "Precious Metals").

3.      Defendants grossly misrepresented, among other things, the amount of markup the company would charge customers on silver coins that Safeguard Metals claimed possess semi-numismatic and numismatic value ("Silver Coins"). Specifically, from at least October 2017 to January 2021, Safeguard Metals charged customers a markup on Silver Coins that exceeded the maximum possible markup disclosed to customers by almost 50% on average.  And from January 2021, after receiving notice of a law enforcement investigation into Safeguard Metals' operations, and after Safeguard Metals modified its customer agreements to reflect

- 4 -

1  that the maximum markup on Silver Coins could be 42% in certain circumstances;

2  Safeguard Metals continued charging customers a markup on Silver Coins that still

3  exceeded the maximum possible markup disclosed to customers by nearly 10% on

4  average.

5      4.    Safeguard Metals, by and through its sales representatives or other

6  agents, made other material misrepresentations, half-truths, and omissions to

7  convince customers to purchase Precious Metals.  For example, Safeguard Metals

8  misrepresented the size, scale, experience, background and history of the firm, its

9  agents, and its representatives.  Safeguard Metals also made materially false and

10  misleading statements to customers about the risk and safety of their traditional

11  retirement accounts in order to instill fear and convince customers to purchase

12  Precious Metals.

13      5.    Central to its scheme to defraud, Safeguard Metals targeted and

14  continues to target and prey on a vulnerable population of mostly elderly or

15  retirement-aged persons with little experience investing in Precious Metals.

16  Safeguard Metals defrauded customers into transferring proceeds from retirement

17  accounts, often consisting of funds from liquidated securities, to self-directed

18  individual retirement accounts ("SDIRAs") for the purchase of Precious Metals.

19  Safeguard Metals also fraudulently induced some customers to purchase Precious

20  Metals through cash and credit sales ("Cash Accounts").

21      6.    Safeguard Metals' customers, particularly customers who purchased

22  Silver Coins, generally and almost immediately suffered substantial losses on their

23  investments due to the fraudulently overpriced Silver Coins.  In total, Defendants

24  fraudulently solicited approximately $68 million from more than 450 members of the

25  public to purchase Precious Metals.  Of that $68 million, $66 million was derived

26  from purchases of fraudulently priced Silver Coins.  Safeguard Metals charged its

27

28

customers approximately $26 million dollars in markups on those purchases, as part of Defendants' fraudulent scheme.

7.     To perpetuate the fraud and disguise the nearly immediate and substantial losses suffered by customers, Safeguard Metals also attempted to conceal its fraud and lull its customers by, among other things, making additional misrepresentations about the value of the customers' Precious Metals accounts.

8.     Defendants knowingly or recklessly misled customers into purchasing Precious Metals, knew or recklessly disregarded that most customers significantly overpaid for Silver Coins, and knew or recklessly disregarded that representations about customer account values were false.

9.     The acts, misrepresentations, omissions, and failures of Santulan and other officers, employees, and agents acting for Safeguard Metals occurred within the scope of their employment, agency, or office with Safeguard Metals. Safeguard Metals is therefore liable under Section 2(a)(1)(B) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2021), as a principal for Santulan's violations of the CEA and CFTC Regulations.

10.     By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in, either intentionally or recklessly, violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021).

11.     Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1), the CFTC and States bring this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin them from engaging in any commodity-related activity, as set forth below.  Plaintiffs also seek civil monetary penalties and remedial ancillary relief, including, but not limited to, restitution, disgorgement, rescission, pre- and

post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c(a) of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it appears to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

13.     Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorney General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the CEA or CFTC Regulations.  The acts and omissions in violation of the CEA occurred within each and every one of the States.  Investors from each and every one of the States were materially and substantially harmed by Defendants' violations of the CEA.

14.     This Court has supplemental and pendant jurisdiction over the State-law claims of the States pursuant to 28 U.S.C. § 1367(a).

15.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain transactions, acts, practices, and courses of business in violation of the CEA

and CFTC Regulations occurred, are occurring, or are about to occur within this District, among other places.

### III. THE PARTIES

**A.     PLAINTIFFS**

16.     **Plaintiff Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the CEA and CFTC Regulations promulgated thereunder.  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street NW, Washington, D.C. 20581.

17.     Plaintiffs State of Alabama, State of Arizona, State of Arkansas, State of California, State of Connecticut, State of Florida, State of Hawaii, State of Idaho, State of Illinois, State of Indiana, State of Iowa, Commonwealth of Kentucky, State of Maryland, People of the State of Michigan, State of Mississippi, State of Missouri, State of Nebraska, State of New Mexico, State of New York, State of North Carolina, State of Ohio, State of Oklahoma, State of Oregon, State of South Carolina, State of South Dakota, State of Tennessee, State of Utah, State of Vermont, State of Washington, State of Wisconsin are authorized under Section 6d(1) of the CEA, 7 U.S.C. § 13a-2(1), and their respective State laws, to bring this action on behalf of their State and their citizens to enforce the CEA and CFTC Regulations.

18.     Plaintiffs State of Alabama, State of Arkansas, State of California, State of Connecticut, State of Florida, State of Idaho, State of Illinois, Commonwealth of Kentucky, State of Maryland, State of Mississippi, State of Missouri, State of New Mexico, State of North Carolina, State of Ohio, State of Oklahoma, State of South Carolina, State of Utah, and State of Vermont are authorized under their respective State laws, to bring their State law claims on behalf of their State and their citizens to enforce State laws.

### B.    DEFENDANTS

19.    **Defendant Safeguard Metals LLC** initially registered as a Wyoming limited liability company on October 13, 2017, with its principal office located at 30 N Gould St., Suite R, Sheridan, Wyoming.  Subsequently, on March 26, 2019, Safeguard Metals registered as a California limited liability company with its principal place of business located at 21550 Oxnard St., 3rd Floor, Woodland Hills, California.  Safeguard Metals has never been registered with the Commission in any capacity.

20.    **Defendant Jeffrey Santulan a/k/a Jeffrey Hill** is the sole owner and sole manager of Safeguard Metals LLC.  Santulan is the only signatory on Safeguard Metals' bank accounts.  During the Relevant Period, Santulan owned and controlled Safeguard Metals, supervised (directly and indirectly) its employees and agents, and made hiring and firing decisions on behalf of the company.  A resident of Tarzana, California, Santulan has never been registered with the Commission in any capacity.

## IV. FACTS

### A.    Safeguard Metals' Operations

21.    Safeguard Metals is a company that marketed, promoted, and sold Precious Metals, including, but not limited to, Silver Coins.  The firm placed advertisements on financial media and websites, and promoted its products on social media platforms and websites linked to media personalities and financial gurus. Safeguard Metals also marketed and promoted Precious Metals through its company website, https://www.safeguardmetals.com/.

22.    Safeguard Metals used the advertisements, social media platforms, and websites to generate leads, which resulted in solicitations by telephone to potential customers.

23.     Safeguard Metals operated a call center located in Woodland Hills, California, staffed by sales representatives known as "Openers" and "Closers." Safeguard Metals distributed lists of potential customers to Openers and Closers, which permitted the sales representatives to contact potential customers by telephone. Using the leads, Openers marketed and promoted Precious Metals to potential customers. Once an Opener confirmed a potential customer's interest in purchasing Precious Metals, the potential customer was transferred over to the Closer, and the Closer executed the sale of Precious Metals with the customer.

24.     Safeguard Metals operated as an intermediary, essentially controlling all buy and sell aspects of customer transactions to maximize its profits. Safeguard Metals, by and through its sales representatives or other agents, recommended customers form SDIRA accounts and that customers hold Precious Metals at a depository instead of taking delivery of the metals themselves. Safeguard Metals told customers storing Precious Metals in a depository was the safest way to store the precious metals and economically better because the depository was purportedly federally insured.

25.     In reality, these representations disguised the way Safeguard Metals controlled the transactions. Once a customer opened a SDIRA account, often through a custodian and depository recommended by Safeguard Metals, Safeguard Metals was initially the only party authorized to buy or sell Precious Metals in customer SDIRAs. Unless a customer knew to remove Safeguard Metals as the designated representative on their SDIRA account, the customer was required to use Safeguard Metals to perform any future transactions, including if they choose to liquidate their Precious Metals holdings.

26.     Safeguard Metals' core strategy for profitability was to charge an exorbitant markup on sales of Precious Metals, and in particular, on Silver Coins to customers. Safeguard Metals purchased Precious Metals from a wholesale

distributor, and generated nearly all of its profits through what it represented, though falsely, to customers as "operating margins"—the difference between Safeguard Metals' cost of acquiring Precious Metals from a wholesale distributer and the prices paid by customers, i.e., markup.

27.     To benefit its own self-interest, Safeguard Metals directed the vast majority of SDIRA funds into coins that Safeguard Metals typically marked up excessively, notwithstanding the customer's individual investment needs.  Safeguard Metals accomplished this by pressuring customers to purchase coins that it claimed had numismatic or semi-numismatic value.

28.     Numismatic precious metals are rare, of limited availability, and have significant broad-based market demand and so have a value substantially more than the prevailing market price of the precious metal contained in the bullion.  Semi-numismatic precious metals are bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

29.     Safeguard Metals offered coins with purported semi-numismatic or numismatic value in addition to the bullion value and coins with only bullion value. In particular, the Silver Coin known as the 1.25 oz Silver Rose Crown Guinea was the individual coin most frequently sold to customers.  Safeguard Metals claimed the Silver Coins it sold to customers, including the 1.25 oz Silver Rose Crown Guinea, had semi-numismatic or numismatic value and sold them to customers at a premium far above Safeguard Metals' acquisition cost and the melt value of the bullion.

30.     In regards to gold coins, Safeguard Metals, by and through its sales representatives or other agents, most frequently sold the 0.1 oz Gold American Eagle to customers.  Contrary to Silver Coins, which Safeguard Metals claimed to have semi-numismatic or numismatic value, most gold coins were sold as common bullion products that lacked external value above and beyond their melt value.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

31.     Consequently, Safeguard Metals pressured customers to purchase Silver Coins and sold vastly more Silver Coins to customers than gold coins. Approximately 97%, or $66 million of the $68 million in total revenue Safeguard Metals fraudulently solicited from customers was used to purchase Silver Coins.

32.     Safeguard Metals also levied transaction fees to liquidate the Precious Metals held in SDIRA accounts.  So after fraudulently overcharging customers on the front end when the Precious Metals transaction was executed, Safeguard Metals also imposed storage fees and commissions up to 10%, often exceeding the 1% to 3% in liquidation fees quoted to customers as the only charges imposed on Precious Metals transactions within SDIRA accounts, significantly contributing to customers' overall transaction costs.

**B.    Defendants Defrauded Mostly Elderly Customers into Establishing SDIRAs and Cash Accounts to Purchase Precious Metals.**

33.     Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons.  Many of these individuals had little experience investing in Precious Metals.  Nonetheless, Defendants fraudulently solicited them to open SDIRAs or Cash Accounts in order to purchase Precious Metals.

34.     Defendants instructed their sales representatives or other agents to concentrate their fraudulent solicitations on elderly or retirement-aged persons in order to gain access to their retirement savings, including but not limited to, money market accounts and retirement savings held in tax advantaged accounts such as: Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift Savings Plans; annuities; and other long-term retirement savings vehicles ("Qualified Retirement Savings").

35.     As part of the scheme to gain access to customers' retirement accounts and other savings, Defendants published misinformation on Safeguard Metals' website in 2019 and 2020.  Defendants made numerous false and misleading statements of material fact, omitted material facts necessary to make the statements

made not untrue or misleading, or made statements in reckless disregard about the firm's business activities on their website, including, but not limited to, the following:

    a.    Safeguard Metals is rated number one among wealth protection firms (with no basis for this assertion);

    b.    Safeguard Metals oversees more than $11 billion in assets under its management (when, in reality, the firm has sold substantially less than $75 million in Precious Metals and Silver Coins since it has been in business);

    c.    Safeguard Metals has been in business for more than twenty years (when, in truth, the startup formed in 2017, but did not appear to have significant operations until 2019);

    d.    the number and location of Safeguard Metals' offices, including office locations in London, England and Beverly Hills, California (when in actuality, the firm only has offices in Woodland Hills, California); and

    e.    the use of false and fictitious employee names, touting non-existent employees on LinkedIn, misrepresenting employee job titles, and exaggerating employee qualifications and years of industry experience.

36. Defendants admitted the foregoing statements and blatant website misrepresentations are false.

37. Based on information and belief, Defendants removed the foregoing statements and blatant website misrepresentations in or about January 2021 after becoming informed of a law enforcement investigation, and began to rely on other more nuanced misrepresentations, half-truths and omissions as part their solicitation scheme, as discussed further below.

38. Safeguard Metals utilized fraudulent solicitations designed to build trust with customers based on representations of political affinity, and through references to and statements from financial gurus.

39. In furtherance of the scheme, Santulan personally solicited customers, misrepresenting that Safeguard Metals was "the #1 name in precious metals and lead the industry as the fastest growing house, offering the cheapest and purest bullion in the country for the benefit of our clients and we hold all proper and full accreditation

1  from the state, federal government, and distributors alike," with no basis for these

2  material misstatements, half-truths or omissions, and in reckless disregard for the

3  truth.  Santulan also created sales scripts that were used to solicit customers.

4      40.    Defendants instructed its sales representatives or other agents to employ

5  fraudulent solicitations designed to instill fear in elderly and retirement aged

6  investors and other customers.  To frighten those customers about the risk and safety

7  of their investments in Qualified Retirement Savings and traditional accounts,

8  Safeguard Metals made repeated material misrepresentations, half-truths, and

9  omissions regarding the Money Market Fund Reform regulation promulgated by the

10  Securities and Exchange Commission, Money Market Fund Reform Amendments to

11  Form PF, 70 Fed. Reg. 47,736 (Aug. 14, 2014), and more recently, the Orderly

12  Liquidation Authority promulgated pursuant to Dodd Frank, 12 U.S.C. §§ 5381-5394.

13  Safeguard Metals played on the customers' fears and materially misrepresented these

14  provisions, omitting to disclose which asset classes the Money Market Fund Reform

15  applies to, and making false and misleading statements about each law's or

16  regulation's effects, and the extent to which these and other investor protections

17  applied.  For example, during fraudulent solicitations over the telephone, via email

18  and in its sales scripts, Safeguard Metals and/or Santulan made the following

19  misrepresentations:

20          a.    financial institutions can "freeze you out of your retirement
              accounts if there was ever a market crash or correction again," and
21              either "confiscate" or freeze all of the holdings in your retirement
              or investment accounts, particularly during either a liquidity or
22              financial crisis.  "Banks then will use people's money to bail
              themselves out.";
23

24

25          b.    an investor is "just a beneficial owner" and "leases" securities and
              funds held in Qualified Retirement Savings, and further, the
26              government "owns" the certificates on securities and funds held in
              these accounts; and
27

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER
EQUITABLE RELIEF

c.  "you're pretty much in these [Qualified Retirement Savings] accounts with no types of insurance," but "the good news is that there are loopholes within the law to help protect . . . from it" through safe and conservative investments in Precious Metals purchased through SDIRAs.

41.  Defendants misrepresented that the Money Market Fund Reform and/or the Orderly Liquidation Authority regulations apply to stocks and certain bonds held in Qualified Retirement Savings.  They do not.

42.  Safeguard Metals misrepresented that the government, not the investor, owns the certificates on securities and funds held in a Qualified Retirement Savings account.  This is false.  The beneficial owner is the true owner of an asset or security that is under a different legal name and the government does not own the certificates on securities and funds held in these accounts.

43.  Safeguard Metals misrepresented that Qualified Retirement Savings are uninsured.  In reality, investor protections and insurance are offered through the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation.

44.  In 2021, Safeguard Metals misrepresented to customers that a change to Rule 22e-3 under the Money Market Fund Reform permits financial institutions to permanently freeze the liquidity in accounts, confiscate funds and will never pay participants back if the market fails.  Furthermore, Safeguard Metals has maintained the goal of investment firms is "to stop you from being able to redeem your shares, or redeem the funds that you have in your retirement and stock accounts, by any means necessary."

45.  These and similar misrepresentations made by Safeguard Metals and/or Santulan are false and misleading because Defendants failed to disclose to customers the narrow circumstances in which a money market fund can be permanently suspended, and furthermore, that liquidation follows when redemptions are

permanently suspended, thereby returning money to shareholders and allowing investors to recover funds.

46.     Defendants knew, or were reckless in not knowing, that their communications with customers contained material misstatements, half-truths, and omissions described above.

**C.     Safeguard Metals Charged Exorbitant Price Markups on Silver Coins That Bore No Relation to the Ranges Represented to Customers.**

47.     After the SDIRAs and Cash Accounts were opened under false and fraudulent pretenses, Defendants executed their core strategy of selling customers overpriced Silver Coins with enormous price markups, which Defendants referred to as "operating margins" when they communicated about the price markups with customers.  Safeguard Metals grossly misrepresented the "operating margins" that they would charge customers in Precious Metals Shipping and Account Agreements ("Customer Agreements") and representations made during sales confirmation calls.

48.     The Customer Agreements purported to establish the terms and conditions regarding sales of Precious Metals by Defendants to their customers. During the Relevant Period, Safeguard Metals used at least two versions of the Customer Agreements – one version prior to January 2021, and a revised version following purported attempts to implement compliance measures at Safeguard Metals.  Based on information and belief, Safeguard Metals purportedly implemented those compliance measures beginning in or around January 2021 after receiving notice of an investigation by law enforcement.

49.     Prior to January 2021, Safeguard Metals' Customer Agreements represented, in pertinent part, the following relating to Safeguard Metals' "operating margins" on Precious Metals:

a.     "The operating margin is the difference between Safeguard's approximate acquiring cost of the Precious Metals and the price the Client pays."

b.    "Safeguard's operating margin quoted to the Client for most common bullion products . . . is typically four percent (4%) for cash, and seven percent (7%) for IRA purchases."

c.    "Operating margin on coins with semi-numismatic or numismatic value are rare coins . . . is usually twenty percent (20%) and for Proof products is twenty-three percent (23%)."

50.    Despite these representations, Safeguard Metals actually sold Silver Coins to customers at average "operating margins" of 71%. This vastly exceeded the maximum "operating margin" of 23% disclosed in Safeguard Metals' Customer Agreement. These overcharges were material misrepresentations and omissions. Further, Santulan admitted to establishing the price of these exorbitantly priced Precious Metals during Safeguard Metals' initial period of operation.

51.    During purported implementation of compliance measures in or about January 2021, Safeguard Metals revised its sales confirmation scripts, and its Customer Agreements to provide new representations about its "operating margins" for Precious Metals. While Safeguard Metals' representations about its "operating margins" varied between the sales confirmation scripts and Customer Agreements, the actual "operating margins" charged by the firm still far exceeded either representation.

52.    After January 2021, Safeguard Metals represented the following "operating margins" to customers during sales confirmation calls:

SAFEGUARD METAL'S OPERATING MARGIN IS USUALLY 1% - 23%[.] THIS MAY VARY AND EXCEED 40% BASED ON MARKET CONDITIONS.

53.    After January 2021, Safeguard Metals' Customer Agreements represented to customers the following relating to "operating margins":

Current operating margins on coins with semi-numismatic or numismatic value . . . is usually 23% - 33%. . . . The actual operating margin on any particular transaction can be any amount usually within, but also could be outside this range, but not exceeding 42%.

54.     Following the purported implementation of compliance measures in January 2021, Safeguard Metals' actual "operating margin" on Silver Coins routinely exceeded 40%, and averaged about 51%.  Consequently, despite the inconsistent disclosures between sales confirmations and Customer Agreements, the "operating margin" on Silver Coins represented in sales confirmations rarely, if ever, fell within the "usual" and customary ranges disclosed to customers and averaged greater than the maximum "operating margin" represented in Customer Agreements.  These overcharges were material misrepresentations and omissions.

55.     Safeguard Metals also provided inconsistent and misleading disclosures to customers during the sales confirmation process.  In at least one instance, an Opener falsely represented to at least one customer that the specified "operating margins" only applied to investments exceeding $1 million, and were therefore inapplicable to that customer's transaction because his investment fell under the threshold.  Later, in contrast, a Closer stated during the sales confirmation call that specified "operating margins" do in fact apply because the customer is an accredited investor, resulting in ambiguous and conflicting disclosures.

56.     Safeguard Metals' core strategy of selling fraudulently overpriced Silver Coins to customers was designed to maximize its profits through "operating margins" and commissions and resulted in substantial and nearly immediate customer losses.  Silver Coin purchases were more than 97%, or $66 million of the $68 million in total revenue fraudulently solicited from customers, of the purchases by Safeguard Metals on behalf of its customers.  The purchase of Silver Coins had significantly higher "operating margins" compared to gold coins.

57.     Safeguard Metals knowingly or recklessly failed to inform customers of the material fact that the exorbitant "operating margins" charged on Silver Coins bore no relation to the figures represented in the Customer Agreements, or otherwise stated to customers.  This had the effect of substantially and immediately depleting

the values of investments held in customers' SDIRAs and Cash Accounts. Nonetheless, Safeguard Metals continued to misrepresent to prospective and current SDIRA and Cash Account customers that Precious Metals were a safe and conservative investment.

**D.   Safeguard Metals Misrepresented to Customers How It Earned Profits and Lulled Customers by Making Misrepresentations About the Value of Customers' Precious Metals.**

58.   As part of the scheme, Safeguard Metals misrepresented and omitted material facts regarding how Safeguard Metals earned profits from Precious Metals transactions.

59.   During telephone sales calls, Safeguard Metals repeatedly misstated that its earnings arose solely from a 1% fee, and later in 2021, a 1% to 3% fee, that applied only when customers liquidated investments in Precious Metals.  During a sales solicitation call with a prospective customer, a Safeguard Metals employee stated, in pertinent part, that "We take 1 percent of what we liquidate . . . .  It's our only way we make money," leaving customers with the impression that Safeguard Metals did not profit in other respects from their Precious Metals transactions.

60.   In reality, Safeguard Metals was paying its sales representatives commissions that far exceeded 1% to 3%, including commissions upwards of 10%, all while misinforming customers that a liquidation fee was the only fee charged.

61.   Also, as discussed above, Safeguard Metals also made money from charging excessive premiums on Silver Coins.  For instance, Safeguard Metals earned an estimated 71% "operating margin" on Silver Coins during the 2019 to 2020 timeframe—about 48% more than the maximum permitted pursuant to the Customer Agreement.  In 2021, Safeguard Metals earned an estimated 51% "operating margin" on Silver Coins, about 9% more than the maximum permitted pursuant to the revised Customer Agreement.

62.     Safeguard Metals also falsely asserted "[i]f our clients are making money, that's when we make money."  In fact, Safeguard Metals made money on Precious Metals notwithstanding whether its customers made money, and customers incurred additional transactional costs far greater than a 1% to 3% liquidation fee. Safeguard Metals failed to disclose the true and accurate transaction costs or provide accurate "operating margins" even when customers specifically inquired.

63.     As part of the scheme to defraud, Safeguard Metals also deceived customers and concealed its fraud by hiding that customers significantly overpaid for their investments.  Instead, Safeguard Metals made further misrepresentations about the value of the Precious Metals in customer accounts to placate and calm investors who were upset about the losses shown on their SDIRA statements.

64.     Customers received account statements from their SDIRA custodians showing account values significantly below the values originally paid to Safeguard Metals.  The account statements were significantly lower because the SDIRA custodians assigned asset values to the coins held based on the melt value of the coin, ignoring any purported numismatic or semi-numismatic value.  When customers confronted Safeguard Metals' sales representatives about the disparity between their original investment and the value assigned by SDIRA custodians, the sales representatives rejected lower valuations and misrepresented to customers that values did not accurately reflect the resale value of the Precious Metals and Silver Coins; instead, they misrepresented that the actual resale value of their investments were much higher than that reported by the SDIRA custodians.  ("Post-Purchase Misrepresentations").

65.     Safeguard Metals, however, knew or recklessly disregarded that the resale price of the Silver Coins that it marketed and promoted was much lower than the amount customers paid for the Silver Coins.

66.   To further obfuscate customers' true account values, Safeguard Metals also lulled customers by telling them to wait or give it at least six months, or in some instances, three to five years, to allow their SDIRA accounts to make money.

67.   Due to the acts, omissions, and failures of Safeguard Metals, at least two SDIRA custodians terminated their business relationships with Safeguard Metals and no longer conduct business with the company.

68.   In terminating its contract with Safeguard Metals, one custodian stated, in pertinent part, that:

> It has come to our attention that certain trades made in accounts represented by Safeguard Metals appear to not be in the best interest of the IRA owner as the values of the accounts were significantly less after the trade activity than the values of the accounts prior to the trades.

**E.   Santulan Controlled the Operations of Safeguard Metals and Is Therefore Liable for Its Actions.**

69.   During the Relevant Period, Santulan was the controlling person of Safeguard Metals and held 100% ownership of the company and held exclusive authority over the company's business decisions.

70.   Santulan was the sole member of the limited liability company, and no one else has ever served as a member.  He executed the limited liability company registration using the title of "Principal."

71.   As the controlling person, Santulan initially handled all aspects of Safeguard Metals' operations and made all significant business decisions.  Santulan was responsible for the creation of Safeguard Metals' website and had authority over it, and the website contained numerous false statements.  Santulan initially hired and trained sales representatives, and was authorized to make personnel decisions regarding the hiring and firing of employees.  Santulan initially provided training, created a sales script, and prepared email templates for sales representatives to use,

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

and created the account agreement that Safeguard Metals entered into with customers that contained false information.  Among other things, Santulan emailed sales representatives and instructed them to provide the false information to potential customers that big banks or brokerage firms can freeze retirement accounts in times of financial turmoil.  Santulan determined and set the prices at which Safeguard Metals sold Precious Metals and Silver Coins to the public.

72.    For the entirety of the Relevant Period, Santulan was the only signatory on Safeguard Metals' bank accounts and served as the only person authorized to enter into financial transactions on behalf of the company.

73.    Santulan did not act in good faith or has knowingly induced Safeguard Metals' fraudulent acts.

**F.    Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives and Engaged in Fraud**

74.    The Laws of the States govern the registration of Investment Advisers ("IAs") and Investment Adviser Representatives ("IARs") (collectively, "IAs & IARs").

75.    Collectively, the Laws of the States prohibit (1) fraud in connection with investment advisory services; (2) fraud in connection with the offer, purchase, or sale of securities; (3) fraud in connection with the offer, purchase, or sale of commodities; and (4) financial exploitation of the elderly.

**a.  Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives**

76.    Defendants, either directly or by and through their sales representatives or other agents, offered and provided investment advice to investors for compensation.

77.    Defendants, either directly or by and through their sales representatives or other agents, acted as IAs & IARs, because Defendants, for compensation, engaged in the business of advising another, either directly or through publications or

writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, including, but not limited to:

      a.    Safeguard Metals held itself out as a full-service investment firm, claimed that it was rated number one among wealth protection firms, touted alleged relationships with securities industry professionals, and claimed years of industry experience;

      b.    Defendants, either directly or by and through their sales representatives or other agents, solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling currently held securities, and encouraged investors to liquidate their Qualified Retirement Savings and existing securities holdings;

      c.    Defendants, either directly or by and through their sales representatives sent victims emails highlighting articles that would induce fear in the investors about securities held in preexisting Qualified Retirement Savings;

      d.    Safeguard Metals, either directly or by and through their sales representatives or other agents, aided investors in setting up SDIRAs, including but not limited to, providing assistance with SDIRA applications and facilitating contact with the custodians of their Qualified Retirement Savings to initiate the liquidation and transfer of funds to the SDIRA;

      e.    Defendants, either directly or by and through their sales representatives or other agents, advised about market trends, specifically emphasizing the volatility of the stock market and suggesting that the stock market could crash;

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

f.  Defendants, either directly or by and through their sales representatives or other agents, advised about advantages of investing in securities versus other types of investments, specifically advising that precious metals would be a better or safer investment vehicle than Qualified Retirement Savings;

g.  Defendants, either directly or by and through their sales representative or other agents, provided advice about asset allocation, including advising investors that up to 20% of their assets should be in physical precious metals;

h.  Defendants, either directly or by and through their sales representative or other agents, provided further advice about asset allocation, and selected the type of metals on behalf of the investors, primarily the 1.25 oz Silver Rose Crown Guinea, which constituted over 97% of the total coins sold to investors;

i.  Santulan was a controlling person of Safeguard Metals during the Relevant Period, owned 100% of the company, and was the sole member and Principal of the limited liability company.  Prior to October 2020, Santulan created sales scripts and email templates and distributed customer leads and provided training to sales representatives at Safeguard Metals, and set the prices at which Safeguard Metals sold Precious Metals and Silver Coins to the public.

78.  Defendants, either directly or by and through their sales representatives or other agents, received compensation from investors in the form of substantial markups on the coins that were sold.  For example, for the 1.25 oz Silver Rose Crown Guinea which constituted over 97% of the total coins sold to investors, Safeguard Metals charged an average markup of 71% prior to 2021, and 52% during 2021.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

During the Relevant Period, Safeguard Metals obtained approximately $67 million from the sale of gold and silver coins to more than 450 mostly elderly, retail investors.  Safeguard Metals kept approximately $25.5 million of the approximately $67 million paid by investors for itself in the form of markups on the price Safeguard Metals paid for the coins.  Santulan personally received compensation in the form of markups charged on the Precious Metals sold to customers.

79.  By way of example, Defendants, either directly or by and through their sales representatives or other agents, provided investment advice to the following investors:

a.  Alabama Investor #1, aged 61, was contacted by a Safeguard Metals sales representative and pressured to liquidate her and her husband's IRA accounts, which contained securities.  The investor was told that the government could seize her securities at any time and that the stock market was about to crash.  Alabama Investor #1 made 2 purchases with Safeguard Metals in April of 2020.  Another purchase was made in the name of her husband in May of 2020.  The purchases were placed into SDIRAs that a Safeguard Metals sales representative helped her set up, including being on a three-way call with the investor and her brokerage firm.  The Alabama Investor #1 was also told that her purchases would be insured and was never told about the high-risk nature of precious metals investments.  At no time was the investor given the opportunity to choose which metals she was buying or the diversification of the metals she bought.  At no time was she told that Safeguard Metals was collecting a 55% mark-up on the silver coins she bought.  Alabama Investor #1 was unaware of the mark-up until an investigator from the Alabama Securities Commission met with her in August, 2021.

b.  Alabama Investor #2, aged 65, wanted to purchase both silver and gold in equal amounts.  To do so, he liquidated a Thrift Savings Plan that held securities into cash, $89,997.96. Despite his stated desire to split his investment equally between gold and silver, Safeguard Metals sold Alabama Investor #2 two thousand twenty-eight (2,028) 1 ¼ ounce Silver Rose Crown Guineas for $87,467.64 and twelve (12) 1/10 ounce Gold American Eagles for $2,530.32.  The melt price for silver on the date of the sale, April 13, 2020, was $27.47 per ounce.  The melt price for gold on the same date was $1,717.72 per ounce.  Thus, Alabama

Investor #2 incurred a 54% loss upon the purchase of the Silver Guineas. This loss was not disclosed to him at any time.

c.  Arkansas Investor #1 ("AR1") was a retiree and senior citizen that had approximately $1,000,000.00 in bonds in his IRA accounts.  A sales representative from Safeguard Metals stated that precious metals were a safe way to preserve and grow his wealth.  He was advised by the sales representative that the stock market was in for a major correction and was overvalued.  The sales representative also told AR1 how the Federal Reserve was devaluing the dollar by excessive printing and how the rise of inflation was going to make precious metals more valuable.  AR1 was advised to invest his entire retirement portfolio in silver numismatic coins.  The sales representative told AR1 that the purchase price would be market value for the coins, and the only commission charged would be about 5% at the time of liquidation.  AR1 from October 2019 through August 2020 liquidated all his retirement accounts around $1,000,000 in bonds, and purchased precious metals.

d.  Arkansas Investor #2 ("AR2") was age 66 at the time of the transactions and was semi-retired.  She was contacted by a sales representative for Safeguard Metals and liquidated her only retirement account to buy silver numismatic coins.  AR2 was told that those coins were increasing in value and that they would be a good investment.  The sales representative never disclosed to AR2 the manner or amount of compensation the representative or Safeguard Metals would receive on the transaction AR2 liquidated her entire retirement account and invested it into precious metals the sales representative recommended.

e.  California Investor #1 was advised by his sales representative that precious metals were a more stable investment that would hold its value, as opposed to securities held in traditional retirement accounts as the value of the dollar was declining.  California Investor #1 had little experience in investing in metals and coins, and the sales associate assisted in liquidating approximately $111,000 from his traditional IRA, invested in securities, to roll over to a SDIRA account to purchase metals.  California Investor #1 asked the sales representative to select the metals for best value, and the sales associate purchased a little under $100,000 in 1.25 oz. Silver Rose Crown Guineas on his behalf.

f.  California Investor #2 was advised by a sales representative that she could be frozen out of her traditional IRA account that was invested in

securities, emphasized the volatility of the stock market, and advised her that 25 to 50 percent of the money held in her traditional IRA account should be put into precious metals instead. Although California Investor #2 was primarily interested in purchasing gold, her sales representative advised her that the market was better for silver, and convinced her to purchase primarily Silver Coins.

g. Connecticut Investor #1 was 71 years old and retired when he purchased precious metals from Safeguard Metals. A Safeguard Metals sales representative advised him that precious metals are stable unlike the investments he had in his Qualified Retirement Savings account and that the stock market was about to crash. The sales representative also told him his Qualified Retirement Savings account was uninsured and that he could get frozen out of it if there was a market crash. The sales representative advised him to sell everything in the account and buy precious metals. Connecticut Investor #1 had no prior experience or knowledge in investments. The sales representative assisted him with selling approximately $114,000 worth of investments from his Qualified Retirement Savings account which included securities, setting up a SDIRA, and then purchasing precious metals from Safeguard Metals with these funds. The sales representative never told him anything about fees or costs associated with this transaction, and although Connecticut Investor #1 asked for only gold, the sales representative invested almost all of the funds in Silver Rose Crown Guinea coins and told him after the fact this was a better investment for him.

h. Connecticut Investor #2 was 62 years old and planning for retirement when she purchased precious metals from Safeguard Metals. A Safeguard Metals sales representative told her the economy was going to crash and that she could lose everything in her Qualified Retirement Savings account. The sales representative advised her to liquidate the account and invest in precious metals which are stable. Other Safeguard Metals sales representatives kept calling her and telling her to "hurry up" and "make a decision" because time was running out. Connecticut Investor #2 had no prior experience or knowledge in investments. A Safeguard Metals sales representative assisted her with selling approximately $130,000 worth of investments from her Qualified Retirement Savings account which included securities, setting up a SDIRA, and then purchasing precious metals with these funds from Safeguard Metals. The sales representative never told her anything about fees or costs associated with this transaction, and although

Connecticut Investor #2 asked for only gold, the sales representative invested almost all of the funds in Silver Rose Crown Guinea coins.

i.  Florida Investor #1 was over 65 years old when she purchased precious metals from Safeguard Metals. She told the sales representative that she needed more income because of her age. The sales representative assisted her in selling securities she owned to obtain the money she used to purchase precious metals. The sales representative facilitated or assisted Florida Investor #1 in opening a SDIRA and moving money into the SDIRA which she then used to purchase precious metals. Florida Investor #1 relied on the sales representative's advice when she purchased precious metals.

j.  Florida Investor #2 was over 65 years old when she purchased precious metals from Safeguard Metals. She told her sales representative that she did not want to lose any value in her investment. The sales representative gave her a chart that showed that metals had outperformed the "S&P". The sales representative told her that precious metals were secure and low risk. He also said that she would get a high return on metals because "the market" would crash. With the assistance of her sales representative, Florida Investor #2 sold securities she owned to obtain the money she used to purchase precious metals. The sales representative also facilitated or assisted Florida Investor #2 in opening a SDIRA which she then used to purchase precious metals. Florida Investor #2 relied on the sales representative's advice when she purchased precious metals.

k.  Florida Investor #3 was over 65 years old when she purchased precious metals from Safeguard Metals. The sales representative told her that precious metals were better and safer than stocks and leaving her money in a 401(k) plan. He also told her that she would make plenty of money through the purchase of precious metals. The sales representative facilitated or assisted Florida Investor #3 in selling the securities she owned to obtain the money to purchase precious metals. He also facilitated or assisted her in opening a SDIRA which she used to purchase precious metals. Florida Investor #3 relied on the sales representative's advice when she purchased precious metals.

l.  Idaho Investor #1, age 62, was advised by a Safeguard Metals sales representative that the Biden presidency was giving money away and that the dollar would soon be worthless. The Safeguard Metals representative also stated that her 401(k) retirement funds actually

belonged to her former employer, an airline company, and could be taken, like the way that Delta took their pilots' pensions years ago.  The Safeguard Metals representative recommended that she put most of retirement funds into silver and a little bit of gold.  Based on the advice of the Safeguard Metals representative, Idaho Investor #1 liquidated her entire 401(k) account totaling more than $592,000 to purchase precious metals from Safeguard Metals.  Safeguard Metals charged Idaho Investor #1 $567,273.57 for 9,953 1.25 oz. Silver Rose Crown Guinea coins and 52 1/10 oz Gold American Eagle coins.  However, these coins were transferred the same day to the investor's Equity Trust account at a value of only $326,402.83.  This represents a markup of $241,385.75 or 74%.

m.  Illinois Investor #1 is a senior citizen and had a traditional IRA with Fidelity.  The sales representative at Safeguard Metals advised Investor #1 to invest in gold and silver coins because they were more stable than the stock market.  Investor #1 is not an accredited investor and did not have a working knowledge of or experience concerning securities, precious metal bullion, or numismatic coins, investments prior to investing through Safeguard Metals.  The sales representative also recommended investing in Safeguard Metals over Fidelity because it had a higher BBB rating and that Investor #1 would have more control over his investment.  Investor #1 wired $105,000 from his Fidelity IRA account to his Entrust SDIRA in May of 2021.  The sales representative did not inform Investor #1 of any fees or mark-ups associated with investing in precious metals and coins.  Safeguard Metals charged Investor #1 $99,540.81 for 2,181 1.25 oz. Silver Rose Crown Guineas.  However, these 2,181 silver coins were transferred the same day to the investor's Entrust account at a value of only $57,578.40.   This represents a markup of $41,962.41 or 73%.

n.  Illinois Investor #2 is a senior citizen and had a 401(k) with Sentry which included mutual funds.  Investor #2 is not an accredited investor.  The sales representative recommended that Investor #2 invest in metals to Safeguard Metals against large swings in the market.   The sales representative recommended that Investor #2 open up a SDIRA account with Equity Trust.  In April of 2021, Investor #2 transferred $64,000 to Equity Trust.  The value of his 401(k) account was approximately $80,000 at the time of the transfer.  Based on the recommendation of the sales representative, Investor #2 purchased 1,015 Silver Coins.  Safeguard Metals charged Investor #2 $59,976.35 for 1,015 1.25 oz. Silver Rose

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Crown Guineas.  However, these 1,015 Silver Coins were transferred the same day to the investor's Entrust account at a value of only $38,235.05. This represents a markup of $21,741.30 or 57%.

o.  Kentucky Investor #1 is a 63-year-old Kentucky resident.  On or around May 2020, Kentucky Investor #1 watched a cable news talk show discussing alternative investments. The commentator insinuated that the stock market was going to crash and advertised for Safeguard Metals. Kentucky Investor #1 filled out a form on the Safeguard Metals website and soon received a call from an account executive at Safeguard Metals. The account executive told Kentucky Investor #1 that investing in precious metals was better than investing in the stock market.  Kentucky Investor #1 told the account executive that he had a 401(k) at Edward Jones and a Thrift Savings Plan.  The account executive told Kentucky Investor #1 that precious metals were a much safer investment and advised him to roll over the money he had in stocks into a SDIRA invested in precious metals. Based on the advice of Safeguard Metals, Kentucky Investor #1 decided to purchase $50,148.88 in metals and, on May 1, 2020, rolled over his stock account with Edward Jones to a SDIRA account at Equity Trust.  Safeguard Metals failed to disclose how the precious metals were valued and how the valuations could differ significantly.  In January 2022, Kentucky Investor #1's metals, which he believed to be worth approximately $50,000, were only valued at the melt value of $18,000.

p.  Kentucky Investor #2 is a 67-year-old Kentucky resident, who on December 2019 was listening to a radio financial program and heard an advertisement for Safeguard Metals.  Kentucky Investor #2 called the number for Safeguard Metals and spoke to a sales representative with Safeguard Metals.  Kentucky Investor #2 told the sales representative that she was concerned about the safety of her 401(k) and wanted a short-term investment with a good return because she and her husband would need to buy a new home in the next few years.  The sales representative told Kentucky Investor #2 that she would make six times what she currently had by investing in precious metals, and that she would not make any money under her current 401(k) and that Safeguard Metals would buy back her metals if she ever needed the money. Kentucky Investor #2 invested as the sales representative advised.  The sales representative informed Kentucky Investor #2 that he was opening a SDIRA for her invested in precious metals, and initiated a three-way call with Fidelity, where Kentucky Investor #2's 401(k) was located, and

assisted with the rollover of the 401(k) to Equity Trust.  On December 23, 2019, Kentucky Investor #2 invested $26,604.21 into a SDIRA backed by precious metals through Safeguard Metals.  Safeguard Metals did not disclose to Kentucky Investor #2 how precious metals were valued and how the valuations could differ significantly.  In June 2019, she discovered that the metals she purchased after liquidating the $26,604.21 from her 401(k) were only worth the melt value of $19,614.78.

q. Maryland Investor #1 was advised by a sales representative claiming extensive experience dealing with precious metals that the investor's money would be safer in precious metals than the stock market; in fact, that the crash of the market was inevitable because the economy is being flooded with printed money. Though Maryland Investor #1 was not interested in coins, he was told that he could only purchase coins and was recommended the 1.25 oz. Silver Rose Crown Guineas as the sales representative advised the coins were limited edition and would appreciate in value quickly. Maryland Investor #1 subsequently decided to liquidate securities and transfer his entire IRA – roughly $240,000 – to invest with Safeguard Metals. These funds represented the entirety of his anticipated retirement savings.

r. Mississippi Investor #1 was advised by a Safeguard Metals sales representative to purchase metals immediately as prices were going up and the securities market was unstable and about to "blow up."   The Safeguard Metals representative told Mississippi Investor #1 that if the economy collapse, the government could come in and take over the banks and credits unions   Defendants advised Mississippi Investor #1 to get out of the market completely and move all his money to precious metals.  The representative called every day.  With Safeguard Metals facilitating, Mississippi Investor #1 rolled 401(k)s and Roth IRAs, all of which contained securities, valued at approximately $737,000 to a SDIRA at Equity Trust.  Mississippi Investor #1 was never informed of any risks of liquidating his securities accounts, was never told of any spread or markup, or informed that precious metals were a long-term investment.  The first account statement showed the precious metals valued at less than half his original investment.

s. Mississippi Investor #2 was contacted by a representative at Safeguard Metals who stated that Mississippi Investor #2 had requested a call from Safeguard Metals (she had not).  The representative stated that the

market was about to crash again, sending articles to her about a pending market crash.  The representative told Mississippi Investor #2 that precious metals would always be safe and the representative did not want to see her lose her "life savings if [she] left it where it was." The representative called multiple times a day.  With Safeguard Metals facilitating, Mississippi Investor #2 liquidated the securities in her 401(k), approximately $29,500, and moved her money to a SDIRA at Equity Trust Company.  Mississippi Investor #2 was not told of any fees, spread, markup, or commissions.  Account statements showed the precious metals valued at $17,500.

t.   Mississippi Investor #3 communicated with Safeguard Metals almost every day, sometimes multiple times a day.  The representative told Mississippi Investor #3 that the stock market was going to crash and it was the time to invest in gold and silver as they were about to go up. The representative stated that Safeguard Metals would double the investment in 12 months. Mississippi Investor #3 was advised to invest in silver because it had the best return.  With Safeguard Metals facilitating, Mississippi Investor #3 rolled his 401(k), with approximately $152,000 in the account, to a SDIRA at Equity Trust. Account statements showed the precious metals valued at approximately $97,000.

u.   Missouri Resident #1 ("MR1"), at the age of 61 and while disabled following a stroke, was contacted by a Safeguard Metals sales representative that identified himself as Michael Roeder ("Roeder") and advised that she should liquidate 100% of her retirement savings of an IRA she had inherited held at Fidelity with the promise that her $85,000 would grow to $100,000 in a very short period of time. Roeder also made disparaging comments that Fidelity was "shady" to further induce MR1's investment through Safeguard Metals. Roeder convinced MR1 that metals investments offered by Safeguard Metals were easier to protect from government confiscation and based his arguments on pro-Republican platform statements. Roeder facilitated the transfer of the funds from Fidelity Investments to Equity Trust and instructed MR1 to remain silent during the call initiating the liquidation and transfer from Fidelity to Equity. Despite investing $85,179.69 in 9 Gold American Eagles and 1,241 Silver Rose Crown Guineas, MR1 lost $15,882.88 when she sold 598 Silver Rose Crown Guineas and has a current estimated value of only $20,000 in the remaining precious metals she purchased through Safeguard Metals.

v. Missouri Resident #2 ("MR2"), at the age of 64, received a cold call from someone at Safeguard Metals identifying themselves as Lyn Chase ("Chase") and convinced MR2 to liquidate and invest nearly $50,000 in precious metals while aware that said amount constituted the entirety of MR2's retirement savings. Chase assisted MR2 with the transfer from her Thrift Savings Plan to a SDIRA at Equity.  Despite investing $46,169.67 in 3 American Gold Eagles and 760 Silver Rose Crown guineas, MR2 lost $17,742.34 after selling all the coins.

w. Missouri Resident #3 ("MR3"), at the age of 72, received a call from Roeder after she left her contact information over the phone after she heard a radio announcement about Safeguard Metals during a Rush Limbaugh show in February, 2021. Roeder used high pressure sales tactics according to MR3 and fear tactics related to claims of government freezes and seizures. Knowing that MR3 only had $74,800 representing the entirety of MR3's retirement assets, Roeder convinced MR3 to invest in precious metals through Safeguard Metals and sent MR3 the paperwork necessary to effectuate the liquidation of MR3's 401(k) and opening of a SDIRA at Equity. Despite investing $76,691.73 in 4 Gold American Eagles and 1,557 Silver Rose Crown Guinea coins, MR3 lost $1,671.88 when MR3 sold 98 Silver Rose Crown Guinea coins and has a current estimated value of only $52,800 in remaining precious metals purchased through Safeguard Metals.

x. Fifteen other Missouri investors purchased precious metals through similar transactions with Safeguard Metals for a total amount of $1,682,463.62. At least half of the Missouri investors liquidated or sold securities in order to make the purchases recommended by Safeguard Metals. Given the high markup and commissions earned on the sales of the precious metals offered by Safeguard Metals, none of the 18 Missouri residents recorded a profit on their precious metals investments. Interviews conducted with the other fifteen Missouri investors confirmed that the same or similar tactics were used to induce their investments in precious metals through Safeguard Metals.

y. New Mexico Investor #1 was never advised by his sales representative of the risks of investing the entirety his 401(k)'s holdings into precious metals.  New Mexico Investor #1 was never advised by his sales representative that his first SDIRA statement would indicate that New Mexico Investor # 1's initial $33,000 investment into precious metals

would decrease in value with the sales representative's only explanation that this decrease was due to "melt value" with no further explanation. New Mexico Investor #1 was advised by his sales representative to invest the entirety of his 401(k)'s holdings into precious metals. New Mexico Investor #1 was advised by his sales representative that Investor #1's 401(k)'s holdings "were in trouble" and Investor #1 needed to transfer his 401(k)'s holdings into precious metals because gold holds its power, gold holds its worth, gold will have gains and "the government is fixing to screw your 401(k)."

z. North Carolina Investor #1, age 69, was advised by a Safeguard Metals sales representative that 401(k) laws were changing and to not invest in securities via an IRA account, but instead to open an SDIRA, established by Safeguard Metals and purchase gold and silver coins. The Safeguard Metals sales representative advised North Carolina Investor #1 that silver was going to double in value, the metals in her account would increase in value and thus would cover future storage fees for her metals. A Safeguard Metals sales representative persuaded North Carolina Investor #1, who had no prior knowledge nor experience investing in metals, to liquidate $65,966 from her IRA that held securities, and open an SDIRA. The Safeguard Metals sales representative, on the investor's behalf, invested 99.5% of available funds in 1.25-oz Silver Rose Crown Guinea coins.

aa. North Carolina Investor #2, aged 60, was advised by a Safeguard Metals sales representative that due to stock market fluctuation, silver was a better opportunity to increase her investment value over the purchase of gold. North Carolina Investor #2 was interested in purchasing gold and silver, but had no prior knowledge or experience in precious metals or with a SDIRA. A Safeguard Metals sales representative called frequently prior to the investment and advised the investment in precious metals would retain the value of the original investment. North Carolina Investor #2 was persuaded to liquidate $101,182 from her traditional IRA account which held securities; and purchase precious metals through a SDIRA account established by Safeguard Metals on her behalf. A Safeguard Metals sales representative invested 97.6% of the investor's available funds in 1.25 oz. Silver Rose Crown Guinea coins.

bb. North Carolina Investor #3, aged 69, was advised by a Safeguard Metals sales representative to liquidate his traditional IRA account because of a pending stock market crash in Spring 2021 and instead purchase

precious metals, specifically silver, as a safe investment against a declining stock market and government confiscation of IRAs. North Carolina Investor # 3 had no prior knowledge or experience in metals or with a SDIRA, but was persuaded by a Safeguard Metals sales representative to liquidate $95,485 from his traditional IRA account which held securities; and purchase precious metals through a SDIRA account established by Safeguard Metals on his behalf. The Safeguard Metals sales representative invested 98% of the investor's available funds in 1.25-oz Silver Rose Crown Guinea coins.

cc. Ohio Investor #1, age 66, was cold-called by a Safeguard Metals sales representative and advised that his retirement accounts at Fidelity were not safe and that he needed to move his retirement out of the stock market. Ohio Investor #1 told the Safeguard Metals sales representative that the Fidelity accounts were all the retirement that he had, and the representative advised him to liquidate the whole account except for $4,000. The sales representative was on the phone with Fidelity and Ohio Investor #1 when the request to liquidate $111,000 was made. The sales representative used high pressure tactics and independently chose the coins which were purchased, and continuously told the investor that he was "getting a good deal" and that he would "make a lot of money." The sales representative also assisted in setting up a SDIRA account with Equity Trust Company to maintain the investment in a tax-deferred account.

dd. Ohio Investor #2, age 63, was cold-called by Safeguard Metals sales representative who told him that the markets were going up and down and that precious metals are expected to only go up. The sales representative advised Ohio Investor #2 to liquidate his IRA account in full and invest the whole amount, $250,000.00 and roughly two-thirds of the investor's entire net worth, into metals. The sales representative helped the investor set up a SDIRA account at Equity Trust and was also on a 3-way call with TD Ameritrade to liquidate the entire IRA account of Ohio Investor #2. Although the investment amount was $250,000.00, the value on the initial statement from Equity Trust was less than $140,000.00. Upon inquiry by the investor, the sales representative advised the investor that "it takes time to balance out."

ee. Safeguard Metals advised Oklahoma Investor #1, age 67, that she should transfer her 401(k) assets into a precious-metals SDIRA because, in part, the securities market was unstable and near collapse; that her assets

would then be untouchable from the federal government's alleged plan to implement policies allowing a government takeover of 401(k) plans; that Safeguard Metals would ensure she would not be charged any fees by her SDIRA custodian; and that her assets would increase in value.  In actuality, the precious-metals SDIRA custodian valued Safeguard Metal's recommended and executed purchases at 49% of Oklahoma Investor #1's purchase price and she was, in fact, charged custodian fees by the SDIRA custodian.

ff. South Carolina Investor #1 ("SC1"), at the age of 64, wanted to boost her savings by investing in precious metals. SC1's experience regarding securities was limited to a guaranteed annuity and a 401(k) retirement account.  SC1 contacted Safeguard Metals after seeing an advertisement on a politically conservative television program and reviewing the Safeguard Metals website.  Subsequently, SC1 had several telephone conversations with Safeguard Metals sales representative "Alex Fisher" who talked with her about the conservative television program and their shared home state of New York. SC1 told the Safeguard Metals sales representative that she needed additional income in order to help defer costs associated with her cancer treatment, and her husband's Alzheimer's disease treatments.  The Safeguard Metals sales representative advised SC1 to invest in gold and silver and promised (i) that SC1's investments would reach $750,000 in value in five years; (ii) that there were IRS tax advantages to purchasing the precious metals; and (iii) that gold and silver were "recession proof." The Safeguard Metals sales representatives wanted her to "hurry up" and asked her rhetorically whether she wanted to have her money in "better investments" or whether she wanted to be a "burden to [her] family" in her retirement.  In November 2019, a Safeguard Metals sales representative assisted SC1 in (i) liquidating $208,000, approximately $33,000 from a traditional IRA and $175,000 from a variable annuity; (ii) opening a SDIRA; and (iii) purchasing gold and silver coins. Safeguard Metals sales representatives never disclosed to SC1 the costs and fees associated with purchasing gold and silver through Safeguard Metal. When SC1 received her first account statement from the SDIRA custodian, SC1 learned that almost 90% of her account was invested in 1.25-oz Silver Rose Crown Guinea coins and that she had instantaneously lost over $97,000 of her $208,000 investment.

gg. South Carolina Investor #2 (SC2), at the age of 62, contacted Safeguard Metals in the fall of 2019, after seeing an advertisement on a politically

conservative television program.  Safeguard Metals sales representative "Alex Fisher" advised SC2 to act quickly to invest his retirement in gold and silver because of the uncertainty of the economy.  The Safeguard Metals sales representative told SC2 that the value of gold was going to "go way up." When SC2 expressed concern about the SDIRA account, Safeguard Metals sales representative "Adam Pressley" assured SC2 that Safeguard Metals was "going to take care of you."  SC2 was promised that he would only be "charged a 3% fee when there was a transaction," and was not informed about other fees or commissions that might be charged.  Despite SC2's hesitance, Safeguard Metals continued its high-pressure sales strategy, involving multiple calls with at least five different Safeguard Metals sales representatives.  SC2 finally relented and liquidated his traditional IRA and rolled it into a SDIRA in order to invest in Safeguard Metal's gold and silver. A Safeguard Metals sales representative joined the telephone call when SC2 liquidated his traditional IRA and moved his retirement money into a SDIRA. SC2 and the Safeguard Metals sales representatives discussed diversifying his money by investing in both gold and silver. However, Safeguard Metals invested 97% of his $261,342.72 in 1.25-oz Silver Rose Crown Guinea coins. SC2 paid the alleged numismatic value of the coins.  SC2's first SDIRA account statement revealed that the value of his account was about $100,000 less than he invested. When he contacted Safeguard Metals about the discrepancy, SC2 was told that the "real value of [his] account [was] $300,000" and that "the IRA custodian used metal values and not the actual value of the coin."  SC2 states that he would not have invested with Safeguard Metals if he was informed that the fees and other casts purchasing the precious metals was higher than 3% or if he was informed that the value calculated in the SDIRA account was different than the value Safeguard Metals assigned to the silver and gold coins.

hh. Vermont Investor #1, age 73, was contacted by a Safeguard Metals sales representative and advised that he and Vermont Investor #2 should liquidate their IRA accounts, both of which contained securities, and buy precious metals, because the stock market was volatile and the metals market more stable, thus transferring their investment to precious metals would result in financial gain.  The Safeguard Metals representative held out Safeguard Metals as an investment adviser.  Vermont Investors #1 and #2 were persuaded to liquidate their entire IRA accounts to buy precious metals.

    ii.  Utah Investor #1 was contacted by Safeguard Metals sales representatives who told him that metals were a good hedge in the event the dollar decreased, that metals were a great place to store assets away from government overreach, that his silver would be held at Delaware Depository, and that the only money made by Safeguard Metals was a 1% sales fee when the investor later sold his silver. The Safeguard Metals sales representative assisted Utah Investor #1 in transferring his thrift savings plan retirement account which contained $200,000 in securities, to third-party administrator Equity Trust.

80.    Safeguard Metals has never been registered as an IA, nor have its agents or Santulan been registered as IARs, as required under state and/or federal law. Defendants never submitted a notice filing with the appropriate state regulator as an IA or IAR, nor are they exempt from state registration as an IA or IAR.

**b. As Investment Advisers or Investment Adviser Representatives, Defendants Engaged in Fraud.**

81.    Defendants, either directly or by and through their sales representatives or other agents, in acting as IAs and IARs, have employed a device, scheme, or artifice to defraud their clients and prospective clients, and/or have engaged in transactions, practices, or courses of business operating as a fraud or deceit upon those clients or prospective clients in providing investment advice to investors to transfer their Qualified Retirement Savings, including divesting themselves of securities, to purchase precious metals from Safeguard Metals, including making material misrepresentations and material omissions which included, but were not limited to, the following:

    a.    Misrepresenting that Safeguard Metals is a full-service investment firm, rated number one among wealth protection firms, has $11 billion in assets under management, with offices in London, England, and Beverly Hills, California, and used false and fictitious employee names, touting non-existent employees on LinkedIn, misrepresenting employee job titles, and exaggerating

1             employee qualifications and years of industry experience—all are

2             false;

3      b.    Misrepresenting the safety and liquidity of investors' securities

4             holdings and Qualified Retirement Accounts and employing scare

5             tactics to induce investors to sell their existing securities holdings;

6      c.    Misrepresenting to investors that the United States stock market is

7             headed for an economic recession or crash, that would result in

8             significant losses to existing Qualified Retirement Accounts;

9      d.    Misrepresenting that investors' Qualified Retirement Accounts

10            were at risk because financial institutions could freeze investors

11            out of their retirement accounts if a market crash or correction

12            were to occur, and that the financial institution could confiscate or

13            freeze all of the holdings in the retirement or investment

14            accounts—this is false;

15      e.    Misrepresenting the effect of certain laws, such as stating that the

16            Money Market Fund Reform would allow the government to

17            freeze the liquidity in Qualified Retirement Accounts, confiscate

18            funds, and never pay participants back if the market fails;

19      f.    Misrepresenting that the government, not the investor, owns the

20            certificates on securities and funds held in a Qualified Retirement

21            Savings account—it does not;

22      g.    Misrepresenting that Qualified Retirement Savings are uninsured,

23            when in reality investor protections and insurance are offered

24            through the Federal Deposit Insurance Corporation and the

25            Securities Investor Protection Corporation;

26      h.    Misrepresenting how Safeguard Metals and its sales

27            representatives and agents were compensated by misrepresenting

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER
EQUITABLE RELIEF

to investors that the only compensation received by Safeguard Metals was by taking a small commission when customers sold their coins, when in fact Safeguard Metals charged high markups on the coins it sold to investors;

i.    Failing to disclose the actual markup to investors—more specifically, stating in Customer Agreements a maximum "operating margin" of 23% prior to 2021, and more recently up to 42% during 2021, when in fact Safeguard Metals charged an average markup of 71% prior to 2021, and 52% during 2021;

j.    Misrepresented to certain investors that Safeguard Metals would invest funds only in gold coins when in fact Safeguard Metals invested most of the victims' funds in Silver Rose Crown Guinea coins, and then misrepresented to these victims that this was a better investment for them than gold;

k.    Misrepresenting and/or omitting that Safeguard Metals charged fees and/or commissions at every stage of the investment process when setting up the SDIRA, when purchasing gold and silver coins, when processing the precious metals, and when selling and/or liquidating the precious metals held in the SDIRA accounts.

82.    The facts, misrepresentations, and omissions as described in paragraphs 79 and 81 are material because there is a substantial likelihood that a reasonable investor would consider them important in deciding whether to sell securities and/or invest in the coins sold by Safeguard Metals.

**c. The Fraud Defendants Engaged in Violates Additional States' Laws**

83.    The foregoing conduct also violates state laws prohibiting: (1) any person from making material misrepresentations or omissions in connection with the

offer, purchase, or sale of securities, (2) material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities, and (3) financial exploitation of the elderly.

84.   The conduct described in the above paragraphs also violates state law governing commodities fraud.

# V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

## COUNT 1
### Fraud
### Violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021)

(*Brought by all Plaintiffs*)

85.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

86.   7 U.S.C. § 9(1) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the commission shall promulgate . . . .

87.   17 C.F.R § 180.1(a) provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

88.     By reason of the conduct described above, Defendants, by and through Santulan, its officers, employees and agents, directly or indirectly, in connection with contracts of sale of commodities in interstate commerce, intentionally or recklessly violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

89.     By reason of the conduct described above, the acts, misrepresentations, omissions, and failures of Santulan and other officers, employees, and agents acting for Safeguard Metals occurred within the scope of their employment, agency, or office with Safeguard Metals.  Safeguard Metals is therefore liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2021), as a principal for Santulan's violations of the CEA and CFTC Regulations.

90.     Santulan controlled Safeguard Metals and has not acted in good faith or has knowingly induced, directly or indirectly, the acts constituting Safeguard Metals' violations alleged in this count.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Santulan is liable for Safeguard Metals' violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), as controlling person.

91.     Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Safeguard Metals'

customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI. VIOLATIONS OF THE CODE OF ALABAMA

(*Brought by Plaintiff State of Alabama*)

### COUNT 2
**Securities Fraud**
**Definitions**

92.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

93.     Section 8-6-2(7), Code of Alabama (1975), defines the term "person" to include a natural person; a corporation created under the laws of this or any other state, country, sovereignty, or political subdivision thereof; a partnership; an association; a joint-stock company; a trust, excluding testamentary trusts, trusts for the benefit of the creator or another, court-created trusts, or public charitable trusts; and any unincorporated organization.

94.     Section 8-6-2(10), Code of Alabama (1975) defines the term "security" broadly to include, but not limit to, any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, as well as any instrument of any kind commonly known as a security.

95.     Section 8-6-2(18), Code of Alabama (1975), defines an investment adviser as any person, who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

96.     Section 8-6-2(19), Code of Alabama (1975), defines an investment adviser representative as any partner, officer, director of (or a person occupying a

similar status or performing similar functions) or other individual employed by or associated with an investment adviser, except clerical or ministerial personnel, who makes any recommendation or otherwise renders advice regarding securities; manages accounts or portfolios of clients; determines which recommendation or advice regarding securities should be given; and/or supervises employees who perform any of the foregoing.

## COUNT 3
### Unregistered Investment Adviser and Investment Adviser Representatives Violations of § 8-6-3(b) and (c), Code of Alabama (1975)

97.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

98.     Section 8-6-3(b) Code of Alabama (1975) makes it unlawful for any person to transact business in the State of Alabama as an investment adviser or as an investment adviser representative unless:

> (1) He or she is so registered under Article 6 of the Alabama Code (1975);
>
> (2) His or her only clients in this state are investment companies as defined in the Investment Company Act of 1940, other investment advisers, broker-dealers, banks, trust companies, savings and loan associations, insurance companies, employee benefit plans with assets of not less than $1,000,000, and governmental agencies or instrumentalities, whether acting for themselves or as trustees with investment control, or other institutional investors as are designated by rule or order of the commission; or
>
> (3) He or she has no place of business in the state and during any period of 12 consecutive months does not direct business communications in this state in any manner to more than five clients, other than those specified in the previous subdivision, whether or not he, she, or any of the persons to whom the communications are directed is then present in the state.

99.     Section 8-6-3(c) Code of Alabama (1975) makes it unlawful for any investment adviser required to be registered to employ an investment adviser representative unless the investment adviser representative is registered under Article 6 of the Code of Alabama (1975).

100.     Safeguard Metals unlawfully acted as investment advisers by, for compensation, engaging in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of selling securities.

101.     Santulan unlawfully acted as investment adviser representative by being a partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with Safeguard Metals, who made recommendations or otherwise rendered advice regarding securities; determined which recommendation or advice regarding securities should be given; and supervised employees, to include sales representatives or other agents, who performed these functions.

102.     During the relevant period, the Defendants were at no time registered as Investment Advisers or Investment Adviser Representatives in the State of Alabama and had not perfected an exemption.

103.     As a result of their conduct, the Defendants violated Sections 8-6-3(b) and (c), Code of Alabama (1975).

**COUNT 4**
**Investment Advice Fraud**
**Violations of § 8-6-17(b)(2), Code of Alabama (1975)**

104.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

105.     Section 8-6-17(b)(2), Code of Alabama (1975), makes it unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or

- 45 -

sale, whether through the issuance of analyses or reports or otherwise, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

106.   During the relevant period, the Defendants, willfully and unlawfully, directly or indirectly, by and through others, including their sales representatives or other agents, received compensation from Alabama investors by fraudulently and deceitfully advising Alabama investors to sell their securities held in Qualified Retirement Savings, and then use those funds to purchase Precious Metals Bullion. The fraudulent and deceitful advice resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

107.   As a result of their conduct, the Defendants violated Section 8-6-17(b)(2), Code of Alabama (1975).

### COUNT 5
**Material Misrepresentations & Omissions in Connection with the Sale of a Security**
**Violations of § 8-6-17(a)(2), Code of Alabama (1975)**

108.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

109.   Section 8-6-17(a)(2) makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

110.   During the relevant period, Defendants, willfully and unlawfully, in connection with the sale of any security, directly or indirectly, by and through others, including their sales representatives or other agents, made untrue statements of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they are made, not misleading, as contained in the complaint. As a result of the material misrepresentations and omissions by the Defendants, Alabama investors sold their securities held in Qualified Retirement Savings, and then used those funds to purchase Precious Metals Bullion. The material misrepresentations and omissions resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

111.   As a result of their conduct, the Defendants violated Section 8-6-17(a)(2), Code of Alabama (1975)

**COUNT 6**
**Financial Exploitation of the Elderly**
**Definitions and Violations of § 13A-6-195, Code of Alabama (1975)**

112.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

113.   Section 13A-6-191(3), Code of Alabama (1975), defines an elderly person as a person 60 years of age or older.

114.   Section 13A-6-191(2), Code of Alabama (1975), defines deception as occurring when a person knowingly:

> (a) Creates or confirms another's impression which is false and which the defendant does not believe to be true;
>
> (b) Fails to correct a false impression which the defendant previously has created or confirmed;
>
> (c) Fails to correct a false impression when the defendant is under a duty to do so;
>
> (d) Prevents another from acquiring information pertinent to the disposition of the property involved;
>
> (e) Sells or otherwise transfers or encumbers property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether that impediment is or is not

valid, or is not a matter of official record;

(f) Promises performance which the defendant does not intend to perform or knows will not be performed.

115.   Section 13A-6-191(5), Code of Alabama (1975), defines financial exploitation as the use of deception, intimidation, undue influence, force, or threat of force to obtain or exert unauthorized control over an elderly person's property with the intent to deprive the elderly person of his or her property or the breach of a fiduciary duty to an elderly person by the person's guardian, conservator, or agent under a power of attorney which results in an unauthorized appropriation, sale, or transfer of the elderly person's property.

116.   Section 13A-6-195 Code of Alabama (1975) makes it unlawful for any person to financially exploit an elderly person in which the value of the property taken exceeds two thousand five hundred dollars ($2,500).

117.   During the relevant period, the Defendants, by and through others, including their sales representatives or other agents, intentionally and knowingly used deception to obtain or exert unauthorized control over the retirement funds of Alabama Investors with the intent to deprive the Alabama Investors of a majority of their retirement funds. Each Alabama Investor was 60 years of age or older and lost more than $2,500.00 dollars.

118.   Due to the deceptive conduct and statements made by the Defendants, by and through others, including their sales representatives or other agents, Alabama investors liquidated Qualified Retirement Savings and purchased Precious Metals Bullion. The deception resulted in the Defendants converting the majority of the investment funds to their own benefit without the knowledge of the Alabama Investors.

119.   As a result of their conduct, the Defendants violated Section 13A-6-195, Code of Alabama (1975).

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

# VII. VIOLATIONS OF THE CODE OF ARKANSAS

### (*Brought by Plaintiff the Arkansas Securities Department*)
### Securities Fraud
### Definitions

120.   Arkansas Code Ann. § 23-42-102(17) defines the term "security" broadly to include, but not limit to, any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, as well as any instrument of any kind commonly known as a security.

121.   Arkansas Code Ann. § 23-42-102(9)(A) defines an investment adviser as any person, who for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

122.   Arkansas Code Ann. § 23-42-102(9)(B) defines an investment adviser to include financial planners or other persons that as an integral component of other financially related services, provides or holds himself, herself, or itself out as providing investment advice to other for compensation and as part of a business.

123.   Arkansas Code Ann. § 23-42-102(14) defines and investment adviser representative as any partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with an investment adviser, except clerical or ministerial personnel, who makes any recommendation or otherwise renders advice regarding securities; manages accounts or portfolios of clients; determines which recommendation or advice regarding securities should be given; and/or supervises employees who perform any of the foregoing.

## COUNT 7
### Unregistered Investment Adviser and Investment Adviser Representative Violations of Ark. Code Ann. § 23-42-301

124.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

125.   Ark. Code Ann. § 23-42-301(c) makes it unlawful for any person to transact business in the State of Arkansas as an investment adviser or as an investment adviser representative unless otherwise permitted under Ark. Code Ann. § 23-42-301(c).

126.   Defendants unlawfully acted as investment advisers and investment adviser representatives by, for compensation, engaging in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of selling securities. Furthermore, Safeguard Metals LLC and agents held themselves out as providing investment advice to other for compensation and as part of a business.

127.   During the relevant period, Defendants were at no time registered as Investment advisers or Investment Adviser Representative in the State of Arkansas and had no exemption under Ark. Code Ann. § 23-42-301(c).

128.   As a result of their conduct, Defendants violated Ark. Code Ann. § 23-42-301(c).

## COUNT 8
### Material Misrepresentation & Omissions in Connection with the Sale of a Security
### Violations of Ark. Code Ann. § 23-42-307(a)(2)

129.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

130.   Ark. Code Ann. § 23-42-307(a)(3) makes it unlawful for any investment adviser or representative, in connection with the offer, sale or purchase of any

security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstance under which they are made, not misleading.

131.    During the relevant period, Defendants, in the connection with the sale of any security, directly or indirectly, by and through others, including their sales representatives or other agents, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as contained in the complaint. As a result of the material misrepresentations and omissions by the Defendants, Arkansas investors sold their securities held in retirement accounts, and the used those to funds to purchase precious metals. The material misrepresentations and omissions resulted in Safeguard Metals converting a large portion of the investment funds to their own benefit without the knowledge of the Arkansas investors.

132.    As a result of their conduct Safeguard Metals LLC violated Ark. Code Ann. § 23-42-307(a)(3).

## VIII. VIOLATIONS OF THE CALIFORNIA STATUTES

*(Brought by Plaintiff State of California)*

### COUNT 9
### Unlicensed Investment Advice
### (Cal. Corp. Code § 25230)

133.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

134.    An "investment adviser" is defined under the Corporate Securities Law of 1968 (CSL) (Corp. Code § 25000 et seq.) section 25009 in relevant part as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of . . . selling securities . . ."

135.   California Corporations Code section 25230 provides, in relevant part:

It is unlawful for any investment adviser to conduct business as an investment adviser in this state unless the investment adviser has first applied for and secured from the commissioner a certificate, then in effect, authorizing the investment adviser to do so or unless the investment adviser is exempted by the provisions of Chapter 1 (commencing with Section 25200) of this part or unless the investment adviser is subject to Section 25230.1.

136.   California Corporations Code section 25403 provides:

(a) Every person who with knowledge directly or indirectly controls and induces any person to violate any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the controlled and induced person.

(b) Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided.

(c) It shall be unlawful for any person directly or indirectly to do any act or thing which would be unlawful for that person to do under any provision of this division or any rule or order thereunder through or by any other person.

(d) Nothing in this section shall be construed to limit the power of the state to punish any person for any conduct which constitutes a crime under any other statute.

137.   At all relevant times, Defendants working from the Woodland Hills, California office conducted business as investment advisers without a certificate from the Commissioner or a valid exemption, in violation of CSL section 25230 by the conduct described in this complaint including holding itself out as a full-service investment firm, representing that Safeguard Metals is rated "number one among

wealth protection firms," and that Safeguard Metals oversees more than $11 billion in assets under management, with fictitious business office locations globally.  Further, Defendants provided advice to investors about market trends, i.e. warning senior citizens of the volatility of the stock market, and advising investors that the government could freeze retirement savings and bank accounts in the event of a crash, but not Precious Metals holdings; advised about disadvantages of investing in securities versus other types of investments, i.e. that Precious Metals were a safer investment than traditional retirement accounts invested in securities and the stock market; and advised about asset allocation, advising investors that up to 20% of their retirement portfolio should be in Precious Metals holdings.

138.   Alternatively, Safeguard Metals violated CSL section 25230 and Santulan, as Safeguard Metals' sole member, owner and principal, knowingly controlled and induced, or knowingly substantially assisted, Safeguard Metals' violations of CSL section 25230, by the conduct described in this complaint including by hiring and training sales representatives or other agents to provide investors with advice about market trends, advising investors about the advantages of investing in Precious Metals over the stock market, and providing advice about asset allocation to customers.

### COUNT 10
### Investment Adviser Fraud
### (Cal. Corp. Code § 25235)

139.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

140.   California Corporations Code section 25235 provides, in relevant part:

It is unlawful for any investment adviser, directly or indirectly, in this state:

(a) To employ any device, scheme, or artifice to defraud any client or prospective client.

(b) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any client or prospective client.

141.   At all relevant times, Defendants violated CSL section 25235 by the conduct described in this complaint including operating a scheme to defraud investors out of their retirement saving by misrepresenting to the elderly and retirement aged investors as to the safety and liquidity of investors' securities holdings and Qualified Retirement Accounts, employing scare tactics to induce investors to liquidate securities holdings to purchase Precious Metals, and misrepresenting the effect of certain laws and that financial institutions and the government could freeze investors' Qualified Retirement Accounts and confiscate funds if the market fails. Inexperienced senior citizens allowed Defendants to choose the Precious Metals they purchased, and Defendants deceptively placed approximately 97 percent of all investors' investments in overpriced Silver Coins.  Defendants failed to disclose the risks associated with investing in Precious Metals and failed to properly disclose the markup on overpriced Precious Metals, including on the Silver Coin, leading to investors' substantial and nearly immediate loss.

142.   Alternatively, Safeguard Metals violated CSL section 25235 and Santulan as Safeguard Metals' sole member, owner and principal, knowingly controlled and induced, or knowingly substantially assisted, Safeguard Metals' violations of CSL section 25235, by the conduct described in this complaint including: (1) by hiring and training sales representative or other agents to provide investors with securities market and Precious Metals advice and to direct investors to sell their Qualified Retirement Savings to purchase Precious Metals; (2) choosing the Precious Metals that inexperienced senior citizens purchased, and placing approximately 97 percent of all investors' investments in overpriced Silver Coins,

and (3) failing to properly disclose Defendants' markup when investors purchased overpriced Precious Metals, leading to investors' substantial and nearly immediate loss.

## COUNT 11
### Commodities Fraud
### (Cal. Corp. Code § 29536)

143.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

144.   California Corporations Code section 29536 provides:

It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to do any of the following:

(a) To willfully employ any device, scheme, or artifice to defraud.

(b) To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(c) To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

(d) To willfully misappropriate or convert the funds, security, or property of any other person

145.   California Corporations Code section 29552 provides:

Any person who materially assists in any violation of this law, or any rule or order of the commissioner under this law, is jointly and severally liable with any other person liable under this law for the violation.

146.   Under California Commodity Law of 1990 (CCL) (Cal. Corp. Code § 29500 et seq.) sections 29504 and 29515, precious metals including gold and silver coins and bullion are "commodities."

147.   Under CCL section 29505, a "commodity contract" means "any account, agreement, or contract for the purchase or sale, primarily for speculation or investment purposes and not for consumption by the offeree or purchaser . . . ."

148.   At all relevant times, Defendants offered to sell and sold, and offered to purchase and purchased, commodities and entered into commodity contracts from its principal place of business in Woodland Hills, California.

149.   CCL section 29536 applies to the transactions, agreements, or contracts offered by Defendants.

150.   At all relevant times Defendants violated CCL section 29536 by the conduct described in this complaint including operating a scheme to defraud investors out of their retirement saving by misrepresenting to the elderly and retirement aged investors as to the safety and liquidity of investors' securities holdings and Qualified Retirement Accounts, employing scare tactics to induce investors to liquidate securities holdings to purchase Precious Metals and misrepresenting the effect of certain laws and that financial institutions and the government could freeze investors' Qualified Retirement Accounts and confiscate funds if the market fails. Inexperienced senior citizens allowed Defendants to choose the Precious Metals they purchased, and Defendants deceptively placed approximately 97 percent of all investors' investments in overpriced Silver Coins.  Defendants failed to disclose the risks associated with investing in Precious Metals and failed to properly disclose the markup on overpriced Precious Metals, including on the Silver Coin, leading to investors' substantial and nearly immediate loss.

151.   Alternatively, Safeguard Metals violated CCL section 29536 and Santulan as Safeguard Metals' founder and owner, knowingly controlled and induced,

or knowingly substantially assisted, Safeguard Metals' violations of CCL section 29536, by the conduct described in this complaint including: (1) by hiring and training sales representative or other agents to provide investors with securities market and Precious Metals advice and to direct investors to sell their Qualified Retirement Savings to purchase Precious Metals; (2) choosing the Precious Metals that inexperienced senior citizens purchased, and placing approximately 97 percent of all investors' investments in overpriced Silver Coins, and (3) failing to properly disclose Defendants' markup when investors purchased overpriced Precious Metals, leading to investors' substantial and nearly immediate loss.

## IX. VIOLATIONS OF CONNECTICUT LAW

(*Brought by Plaintiff State of Connecticut*)

### <u>COUNT 12</u>
### Unregistered Investment Advisor
### Violations of Conn. Gen. Stat. § 36b-6(c)(1)

152.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

153.    Conn. Gen. Stat. section 36b-3 (11) provides in relevant part:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities

154.    Conn. Gen. Stat. section 36b-6(c)(1) provides in relevant part:

> No person shall transact business in this state as an investment adviser unless registered as such by the commissioner as

provided in sections 36b-2 to 36b-34, inclusive, or exempted pursuant to subsection (e) of this section.

155.    Safeguard Metals and Santulan unlawfully acted as investment advisors because they engaged in the business of advising others, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities, for compensation and as part of a regular business.

156.    Safeguard Metals and Santulan are not registered with the Commissioner, they have not submitted a notice filing with the Commissioner, and they are not exempt from State registration.

## COUNT 13
### Unregistered Investment Advisor Agent
### Violations of Conn. Gen. Stat. § 36b-6(c)(2)

157.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

158.    Conn. Gen. Stat. section 36b-3 (12) provides in relevant part:

(A) "Investment advisor agent" includes (i) any individual, including an officer, partner or director of an investment advisor, or an individual occupying a similar status or performing similar functions, employed, appointed or authorized by or associated with an investment advisor to solicit business from any person for such investment advisor in this state and who receives compensation or other renumeration, directly or indirectly, for such solicitation; or (ii) any partner, officer, or director of an investment advisor, or an individual occupying a similar status or performing similar functions, or other individual employed, appointed, or authorized by or associated with an investment advisor, who makes an recommendation or otherwise renders advice regarding securities, to clients and who receives compensation or other renumeration, directly or indirectly, for such advisory services.

159.   Conn. Gen. Stat. section 36b-6(c)(2) provides in relevant part:

> No individual shall transact business in this state as an investment advisor agent unless such individual is registered as an investment advisor agent of the investment advisor for which such individual acts in transacting such business.

160.   Santulan unlawfully acted as an investment advisor agent because Santulan, as a partner, officer or director of Safeguard Metals, or as otherwise associated with Safeguard Metals, solicited business for Safeguard Metals for compensation, directly or through sales representatives, and made recommendations or otherwise rendered advice to others regarding securities for compensation.

161.   By way of example, Santulan, either directly or through sales representatives, provided investment advice to the following investors for compensation as described in paragraph 76 above.

162.   Santulan is not registered with the Commissioner, he has not submitted a notice filing with the Commissioner, and he is not exempt from State registration.

## COUNT 14
### Investment Advisor Fraud
### Violations of Conn. Gen. Stat. § 36b-5(a)

163.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

164.   Conn. Gen. Stat. section 36b-5(a) provides in relevant part:

> No person who directly or indirectly receives compensation or other renumeration for advising another person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise, shall: (1) Employ any device, scheme, or artifice to defraud another person; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

165.    Safeguard Metals and Santulan, who directly or indirectly received compensation for advising other persons as to the value of securities or their purchase or sale have, through the issuance of analysis, reports and/or sales representatives, employed a device, scheme or artifice to defraud other persons, and/or engaged in transactions, practices, or course of business operating as a fraud or deceit upon other persons in providing investment advice to them to liquidate their Qualified Retirement Savings accounts, including selling securities, to purchase precious metals from Safeguard Metals, including making misrepresentations and material omissions as described in paragraph 78 above.

166.    As a result of the foregoing unlawful conduct, Safeguard Metals and Santulan, violated Conn. Gen. Stat. section 36b-5(a).

## COUNT 15
### Dishonest or Unethical Practice
### Violations of Conn. Gen. Stat. § 36b-5(f)

167.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

168.    Conn. Gen. Stat. section 36b-5(f) provides in relevant part:

> No person who directly or indirectly receives compensation or other renumeration for: (1) Advising another person as to the value of securities or their purchase or sale, whether through the issuance of analysis or reports or otherwise; or (2) solicit advisory business on behalf of a person subject to the prohibition contained in subsection (a) of this section shall engage in any dishonest or unethical practice in connection with the rendering of such advice or in connection with such solicitation.

169.    Safeguard Metals and Santulan, who directly or indirectly received compensation for advising other persons as to the value of securities or their purchase or sale, engaged in dishonest and unethical practices in connection with the rendering of such advice or such solicitation, in violation of Conn. Gen. Stat. section 36b-5(f).

## COUNT 16
### Securities Fraud
### Violations of Conn. Gen. Stat. § 36b-4(a)

170.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

171.    Conn. Gen. Stat. section 36b-4(a) provides in relevant part:

> No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly: (1) Employ any device, scheme, or artifice to defraud; (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

172.    Safeguard Metals and Santulan, in connection with the offer, sale, or purchase of any security, have directly or indirectly through sales representatives: (1) employed a device, scheme, or artifice to defraud another person; (2) made untrue statement(s) of material fact or omitted to state material facts necessary in order to make the statement(s) made, in the light of the circumstances under which they were made, not misleading; and (3) engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

173.    As a result of the foregoing unlawful conduct, Safeguard Metals and Santulan, violated Conn. Gen. Stat. section 36b-4(a).

## COUNT 17
### Common Law Fraud/Misrepresentation

174.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

175.    Safeguard Metals and Santulan, either directly or through sales representatives, made material misrepresentations of fact to persons that they knew were untrue and/or omitted known material facts for which they had a duty to

- 61 -

disclose, all for the purpose of inducing such persons to liquidate assets from Qualified Retirement Savings accounts and purchase precious metals from Safeguard Metals, and such persons did so act upon such false representations and/or omissions to his or her injury.

## X. VIOLATIONS OF FLORIDA STATUTES

*(Brought by Plaintiff State of Florida)*

### COUNT 18
### Commodities Prohibited Practices – Fraud
### Violations of Florida Statute 517.275

176.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

177.   Section 517.275, Florida Statutes, provides "[i]t is unlawful and a violation of this chapter for any person to engage in any act or practice in or from this state, which act or practice constitutes a violation of any provision of the Commodity Exchange Act, 7 U.S.C. ss. 1 et seq., as amended, or the rules and regulations of the Commodity Futures Trading Commission adopted under that act as amended."

178.   During the relevant period, Defendants and their agents or employees, individually or as a common enterprise, violated the Commodity Exchange Act as set forth in Count I of this complaint, in forty or more transactions with Florida investors, and thereby violated section 517.275, Florida Statutes, on 40 or more occasions.

### COUNT 19
### Acting as Unregistered Investment Advisers or Associated Persons
### Violations of Florida Statute 517.12(4)

179.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

180.   Subsection 517.12(4), Florida Statutes, entitled *Registration of dealers, associated persons, intermediaries, and investment advisers*, provides:

No investment adviser or associated person of an investment adviser or federal covered adviser shall engage in business from offices in this state, or render investment advice to persons of this state, by mail or otherwise, unless the federal covered adviser has made a notice-filing with the office pursuant to s. 517.1201 or the investment adviser is registered pursuant to the provisions of this chapter and associated persons of the federal covered adviser or investment adviser have been registered with the office pursuant to this section. The office shall not register any person or an associated person of a federal covered adviser or an investment adviser unless the federal covered adviser or investment adviser with which the applicant seeks registration is in compliance with the notice-filing requirements of s. 517.1201 or is lawfully registered with the office pursuant to this chapter. A dealer or associated person who is registered pursuant to this section may render investment advice upon notification to and approval from the office.

181. The Defendants rendered investment advice to persons in the state of Florida on at least 40 occasions in connection with the offer and sale of precious metals by mail or otherwise.  On all such occasions, Defendants were not notice-filed as investment advisers with the Florida Office of Financial Regulation ("OFR"), were not lawfully registered as associated persons of federal covered advisers, and were not registered with the OFR as investment advisers or associated persons of investment advisers, and were not exempt from such registration.

182. By reason of the foregoing, the Defendants violated, and unless enjoined, are likely to continue to violate subsection 517.12(4), Florida Statutes.

183. Pursuant to section 517.191, Florida Statutes, the OFR is entitled to an injunction against the Defendants in this count and other legal and equitable relief against the Defendants.

# XI. VIOLATIONS OF IDAHO CODE

*(Brought by Plaintiff State of Idaho)*

## COUNT 20
### Unregistered Investment Adviser
### (Idaho Code § 30-14-403)

184.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

185.    Idaho Code § 30-14-403 provides in relevant part that:

> It is unlawful for a person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration .
> . . .

186.    Idaho Code § 30-14-102(15) defines "investment adviser" to include a person that, for compensation, engages in the business of advising others as to the value of securities or advisability of purchasing or selling securities.

187.    Defendants, either directly or by and through their sales representatives or other agents, transacted business in Idaho as investment advisers by advising Idaho residents about the value of securities held in Qualified Retirement Savings, and by advising them to sell those securities to effectuate the purchase of precious metals.

188.    Defendants are not now, and have never been, registered as investment advisers in Idaho.

## COUNT 21
### Fraud In Providing Investment Advice
### (Idaho Code § 30-14-502)

189.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

190.    Idaho Code § 30-14-502 provides in relevant part:

It is unlawful for a person that advises others for compensation…as to the value of securities or the advisability of investing in, purchasing or selling securities…:

(1) To employ a device, scheme, or artifice to defraud another person;

(2) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person;…

191.    Defendants, either directly or by and through their sales representatives or other agents, employed a scheme to defraud and a course of business that operated as a fraud or deceit on Idaho residents, as alleged above in the Facts, to induce Idaho residents to sell their securities in Qualified Retirement Savings to effectuate the purchase of precious metals.

## COUNT 22
**Fraud In Connection with a Commodity Contract**
**(Idaho Code § 30-1506)**

192.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

193.    Idaho Code § 30-1501(3) and (13) provide, in relevant part, that the definition of a commodity includes silver and gold coins.

194.    Idaho Code § 30-1501 provides in relevant part:

(4) "Commodity contract" means,…

(a)    Any account, agreement or contract for the purchase or sale, primarily for speculation or investment purposes and not for use or consumption by the offeree or purchaser, of one or more commodities…

195.    Idaho Code § 30-1506 provides in relevant part:

It is unlawful for any person, directly or indirectly, in connection with a commodity contract or commodity option:

(a)    To employ any device, scheme or artifice to defraud;

- 65 -

(b)  To make any false report, enter any false record or make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

(c)  To engage in any transaction, act, practice or course of business which operates or would operate as a fraud or deceit upon any person;…

196.   As alleged above, Defendants' sale of Precious Metals, either directly or by and through their sales representatives or other agents, to Idaho residents and subsequent delivery to a depository to hold for the Idaho residents' benefit is an Idaho commodities contract.

197.   In connection with the commodity contracts, Defendants, either directly or by and through their sales representatives or other agents, employed a scheme to defraud Idaho residents, as alleged above, to induce Idaho residents to purchase the Precious Metals.

198.   As alleged above, Defendants, either directly or by and through their sales representatives or other agents, also made untrue statements about their qualifications and business history and omitted to state material facts about the markups of the Precious Metals offered and sold to Idaho residents that were necessary to make statements made not misleading.

199.   Finally, as alleged above, Defendants, either directly or by and through their sales representatives or other agents, engaged in a course of business that operated as a fraud and deceit upon Idaho residents by targeting retirement age individuals, by using scare tactics in their high-pressure sales presentations, and by making false statements and misrepresentations.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

# XII. VIOLATIONS OF ILLINOIS LAW

(*Brought by Plaintiff State of Illinois*)

## COUNT 23
### Unregistered Investment Adviser and Investment Adviser Representative Violations of 815 ILCS 5, §§ 8.A, 12.C and 12.D

200. The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

201. Section 2.11 of the Illinois Securities Law of 1953 defines an Investment adviser as any person who, for compensation, engages in this State in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities or who, in this State for direct or indirect compensation and as part of a regular advisory business, issues or promulgates analyses or reports concerning securities or any financial planner or other person who, as an integral component of other financially related services, provides investment advisory services to others for compensation and as part of a business, or who holds himself or herself out as providing investment advisory services to others for compensation.

202. Section 2.12b of the Illinois Securities Law defines Investment Adviser Representative as any person associated with an investment adviser required to register under the Illinois Securities Law, who in Illinois:

> (1) makes any recommendations or otherwise renders advice regarding securities or investment products;
>
> (2) manages accounts or portfolios of clients;
>
> (3) determines what recommendation or advice regarding securities or investments should be given;
>
> (4) supervises any employee who performs any of the foregoing; or
>
> (5) solicits, refers, offers, or negotiates for the sale of, or sells, investment advisory services.

203.   That at all relevant times herein, Defendants were acting as an investment adviser and investment adviser representatives as those terms are defined in Sections 2.11 and 2.12b of the Illinois Securities Law.  Defendants rendered investment advice.

204.   That Safeguard Metals has never been registered as an investment adviser nor have its sales representatives been registered as investment adviser representatives in the State of Illinois.

205.   That Jeffery Santulan a/k/a Jeffery Hill has never been registered as an investment adviser or investment adviser representative nor have his sales representatives been registered as investment adviser representatives in the State of Illinois.

206.   That Defendants failed to register their sales representatives as investment adviser representatives.

207.   That Section 8.A of the Illinois Securities Law states, in part, that all persons acting as investment advisers and/or investment adviser representatives are required to be registered as such with the Illinois Secretary of State unless otherwise exempt.

208.   That Section 12.C of the Illinois Securities Law states that it shall be a violation for any person to act as an investment adviser or investment adviser representative unless registered as such, where such registration is required.

209.   That Section 12.D of the Illinois Securities Law states that it shall be a violation for any person to fail to file with the Secretary of State any application, report or document required to be filed under the provisions of the Illinois Securities Law or any rule or regulation made by the Secretary of State pursuant to the Illinois Securities Law.

210.   That by virtue of the Defendants acting as investment advisers and investment adviser representatives by receiving compensation for rendering

investment advice, either directly or through their agents, regarding Illinois investors securities holdings and recommending investments into Safeguard Metals, Defendants violated Sections 8.A, 12.C, and 12.D of the Illinois Securities Law.

### COUNT 24
**Investment Adviser Fraud**
**Violations of 815 ILCS 5, § 12.J**

211.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

212.   Section 12.J of the Illinois Securities Law states that is shall be a violation of the provisions of the Act for any person when acting as an investment adviser or investment adviser representative, by any means or instrumentality, directly or indirectly:

> (1) To employ any device, scheme or artifice to defraud any client or prospective client;
>
> (2) To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or
>
> (3) To engage in any act, practice, or course of business which is fraudulent, deceptive or manipulative.

213.   That by virtue of the Defendants' failure to accurately disclose the exorbitant markups, and commissions and fees associated with the purchase of the gold and silver coins, in conjunction with the misrepresentations made regarding the stability and safety of the investments relative to investors current holdings, Defendants violated Sections 12.J(1)-(3) of the Illinois Securities Law.

# XIII. VIOLATIONS OF KENTUCKY STATUTES

*(Brought by Plaintiff State of Kentucky)*

## <u>COUNT 25</u>
### Unregistered Investment Adviser
### Violations of KRS 292.330(8)

214.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

215.   KRS 292.310(11) defines "Investment adviser" as "any person who, for compensation, directly or indirectly, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities."

216.   KRS 292.310(19) defines "Security", in relevant part, as:

> [A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, life settlement investment, voting-trust certificate, certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; or, in general, any interest or instrument commonly known as a "security."

217.   KRS 292.330(8) makes it "unlawful for any person to transact business in this state as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration under subsection (9) of this section."

218.   Safeguard Metals is not registered as an investment adviser in Kentucky. Nor is there any record of Safeguard Metals filing for an exemption from registration with KDFI.

219.   Based on the facts set forth above, Safeguard Metals, and its agents or representatives, in direct contravention of KRS 292.330(8), transacted business as an investment adviser by advising clients to roll their stock-funded IRAs, which are securities by definition, into SDIRAs invested in precious metals, despite failing to be registered as an investment adviser under KRS Chapter 292.

220.   By reason of the foregoing, Respondents violated KRS 292.330(8) and, unless enjoined, will continue to violate the law.

## XIV. VIOLATIONS OF THE MARYLAND STATUTES

*(Brought by Plaintiff State of Maryland)*

### COUNT 26
### Unregistered Investment Adviser and Investment Adviser Representative Violations of Md. Code, Corps. & Assn's § 11-401(b)(1)

221.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

222.   The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(i)(1) provides in relevant part:

> "Investment adviser" means a person who, for compensation:
>
> (i) Engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities; or

(ii) Provides or offers to provide, directly or indirectly, financial and investment counseling or advice, on a group or individual basis; or

(iii) Holds out as an investment adviser in any way, including indicating by advertisement, card, or letterhead, or un any other manner indicates that the person is, a financial or investment "planner", "counselor," "consultant," or any other similar type of adviser or consultant.

223.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-101(j) provides in relevant part:

"Investment adviser representative" or "representative" means any partner, officer, director of (or a person occupying a similar status or performing similar functions) or other individual who is employed by or associated with an investment adviser, or who has a place of business located in this State and is employed by or associated with a federal covered adviser . . . and who:

(i) Makes any recommendations or otherwise renders investment advice to clients;

(ii) Represents an investment adviser in rendering [investment adviser services];

(iii) Manages accounts or portfolios of clients;

(iv) Determines which recommendation or investment advice should be given with respect to a particular client account;

(v) Solicits, offers, or negotiates for the sale of or sells investment advisory services;

(vi) Directly supervises employees who perform any of the foregoing; or
(vii) Holds out as an investment adviser.

224.    The Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1), provides in relevant part that a person may not transact business in this

State as an investment adviser or as an investment adviser representative unless the person is registered as an investment adviser or an investment adviser representative under this subtitle.

225.   Safeguard Metals has never been registered in Maryland as an investment adviser nor is it exempt from registration.

226.   Safeguard Metals unlawfully acted as investment advisers by: (1) for compensation advising investors regarding the value of securities or as to the advisability of investing in, purchasing, or selling securities, (2) by providing, directly or indirectly, financial and investment counseling to investors, and (3) by holding itself out as an investment adviser.

227.   Santulan has never been registered in Maryland as investment adviser representatives nor is he exempt from registration.

228.   Santulan, as sole owner, sole manager, principal, partner, officer, or director of Safeguard Metals, unlawfully acted as an investment adviser representative by: (1) making any recommendations or otherwise rendering investment advice to clients, (2) representing Safeguard Metals in rendering investment adviser services, (3) determining which recommendation or investment advice should be given with respect to a particular client account, (4) soliciting, offering, or negotiating for the sale of or sells investment advisory services, (5) directly supervising employees who perform any investment adviser representative services, or (6) holding out as an investment adviser.

229.   As a result of the foregoing unlawful conduct, Defendants violated the Maryland Securities Act, Md. Code, Corps. & Assn's § 11-401(b)(1).

## COUNT 27
### Employment of Unregistered Investment Adviser Representative
### Violations of Md. Corps. & Assn's § 11-402(b)(1)

230.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

231.   Md. Code, Corps. & Assn's § 11-402(b)(1) provides that:

> An investment adviser required to be registered may not employ or associate with an investment adviser representative unless the representative is registered under this subtitle.

232.   Safeguard Metals, acting as an investment adviser required to be registered, employed and associated with Santulan, and numerous other individuals as investment adviser representatives.

233.   As a result of the foregoing unlawful conduct, Safeguard Metals violated Md. Code, Corps. & Assn's § 11-402(b)(1).

## COUNT 28
### Securities Fraud
### Violations of Md. Code, Corps. & Assn's § 11-301

234.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

235.   Md. Code, Corps. & Assn's § 11-302(1) provides in relevant part:

> It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
>
> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
>
> (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person

236.   In connection with the sale of securities held by Marylanders primarily for retirement purposes, Safeguard Metals, acting through various officers, employees, or agents, and Santulan, employed a device, scheme, or artifice to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices, and courses of business which operates or would operate as a fraud or deceit on any person.

237.   Based on the foregoing conduct, Defendants violated Md. Code, Corps. & Assn's § 11-302(1).

**<u>COUNT 29</u>**
**Fraud and Unethical Business Practices in Investment Advisory Activities**
**Violations of Md. Code, Corps. & Assn's § 11-302 and COMAR 02.02.05.03**

238.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

239.   Md. Code, Corps. & Assn's § 11-302 provides in relevant part:

> (a) It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under § 11-101(i) and (j) of this title, whether through the issuance of analyses, reports, or otherwise to:
>
> (1) Employ any device, scheme, or artifice to defraud the other person;
> (2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person; [or]
> (3) Engage in dishonest or unethical practices.
> . . .
> (c) In the solicitation of or dealings with advisory clients, it is unlawful for any person willfully to make any untrue statement of a material fact, or omit to state a material fact necessary in

order to make the statements made, in light of the circumstances under which they are made, not misleading.

240.  COMAR 02.02.05.03 provides in relevant part:

(B) An investment adviser is a fiduciary and has a duty to act primarily for the benefit of its clients. While the extent and nature of this duty varies according to the nature of the relationship between an investment adviser and its clients and the circumstances of each case, and investment adviser may not engage in unethical business practices, including the following:

(1) Recommending to a client to whom investment supervisory, management, or consulting services are provided the purchase, sale, or exchange of a security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known or acquired by the investment adviser after reasonable examination of the client's financial records.

. . .

(8) Misrepresenting to an advisory client or prospective advisory client the qualifications of the investment adviser, or an investment adviser representative employed by or associated with the investment adviser or an employee of the investment adviser, or misrepresenting the nature of the advisory services being offered or fees to be charged for that service, or omitting to state a material fact necessary to make the statements made regarding qualifications, services, or fees, in light of the circumstances under which they are made, not misleading.

. . .

(10) Charging a client an unreasonable advisory fee in light of the fees charged by other investment advisers providing essentially the same services.

. . .

(12) Guaranteeing a client that a certain or specific result will be achieved, for example, gain or no loss, as a result of the advice that will be rendered.

241.   Safeguard Metals, acting through various officers, employees, or agents, and Santulan, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives employed a device, scheme, or artifice to defraud, in violation of Md. Code, Corps. & Assn's § 11-302.

242.   Safeguard Metals, acting through various officers, employees, or agents, and Santulan, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as investment advisers or representatives engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit on any person in violation of Md. Code, Corps. & Assn's § 11-302.

243.   Safeguard Metals, acting through various officers, employees, or agents, and Santulan, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, willfully to made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading in violation of Md. Code, Corps. & Assn's § 11-302.

244.   Safeguard Metals, acting through various officers, employees, or agents, and Santulan, while advising Marylanders as to the value of securities for their purchase or sale, or while acting as an investment adviser or representative, engaged in unethical or dishonest business practices in violation of Md. Code, Corps. & Assn's § 11-302 and COMAR 02.02.05.03.

## XV. VIOLATIONS OF MISSISSIPPI STATUTE

*(Brought by Plaintiff Mississippi Secretary of State)*

### <u>COUNT 30</u>
**Unregistered Investment Adviser**
**Miss. Code Ann. §§ 75-71-403 to 75-71-404**

245.   The allegations in the preceding paragraphs are re-alleged and

incorporated herein by reference.

246. Mississippi Code Annotated § 75-71-102(15) provides in relevant part:

"Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analysis or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice to others for compensation as part of a business or that holds itself out as providing investment advice to others for compensation.

247. Mississippi Code Annotated § 75-71-102(16) provides in relevant part:

"Investment adviser representative" means an individual employed by or associated with an investment adviser or federal covered investment adviser who makes any recommendations or otherwise gives investment advice regarding securities, manages accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice or holds herself or himself out as providing investment advice, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice, or supervises employees who perform any of the foregoing.

248. It is unlawful for a person to transact business in Mississippi as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser. Miss. Code Ann. § 75-71-403(a).

249. It is unlawful for an individual to transact business in Mississippi as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser representative. Miss. Code Ann. § 75-71-404(a).

250. Defendant Safeguard Metals unlawfully acted as an investment adviser

because Safeguard Metals, for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities, despite not being registered as an investment adviser under the Act, in violation of Miss. Code Ann. § 75-71-403(a).

251.   Defendants, either directly or by and through their sales representatives, acted as investment adviser representatives because they solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling currently held securities, and encouraged investors to liquidate their Qualified Retirement Savings and existing securities holdings despite not being registered as an investment adviser representative under the Act, in violation of Miss. Code Ann. § 75-71-404(a).

252.   During the relevant period, the Defendants were not registered as an investment adviser or investment adviser representatives in the state.

253.   Therefore, Defendants violated the Mississippi Securities Act of 2010.

## COUNT 31
### Securities Fraud
### Miss. Code Ann. § 75-71-501(1)-(3) and § 75-71-502(a)

254.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

255.   Mississippi Code Annotated. § 75-71-501(1)-(3), provides in relevant part:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

(1)   To employ a device, scheme, or artifice to defraud;

(2)   To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(3)   To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

256.   The Defendants participated in the offer or sale of securities by means of a scheme to defraud, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the buyers not knowing of the untruths or omissions), or engaged in acts, practices, or courses of business that operated as a fraud on the investors. Therefore, Defendants violated Miss. Code Ann. § 75-71-501(1)-(3).

257.   Mississippi Code Annotated § 75-71-502(a), provides in relevant part:

It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities:

(1)   To employ a device, scheme, or artifice to defraud another person; or

(2)   To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

258.   Defendants, in connection with the rendering of investment advice, (1) employed a device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon another person. Therefore, Defendants violated Miss. Code Ann. § 75-1-502(a).

259.   Therefore, Defendants violated the Mississippi Securities Act of 2010.

## COUNT 32
**Commodities Fraud**
**Miss. Code Ann. § 75-89-13**

260.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

261.   Mississippi Code Annotated § 75-89-13, provides in relevant part that no person, directly or indirectly, in or in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of, a commodity contract or commodity option, may:

> (a) Cheat or defraud, attempt to cheat or defraud, or employ a device, a scheme, or an artifice to defraud;

> (b) Make a false report, enter a false record, or make an untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

> (c) Engage in a transaction, an act, a practice, or a course of business, including without limitation a form of advertising or solicitation, which operates or would operate as a fraud or deceit on Metals customers or potential customers; or

> (d)    Misappropriate or convert the funds, security, or property of a person.

262.   Defendants, acting through representatives, in connection with the solicitation to sell and the sale of precious metals: (1) cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; (2) made a false report, entered a false record, or made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (3) engaged in a transaction, act, practice, or course of business, including, without limitation, any form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another

- 81 -

person; or (4) misappropriated or converted the funds, security, or property of another person, in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

263.  Therefore, the Defendants violated the Mississippi Commodities Enforcement Act, Miss. Code Ann. § 75-89-13, *et. seq.*

## XVI. VIOLATIONS OF MISSOURI STATUTES

*(Brought by Plaintiff State of Missouri)*

### <u>COUNT 33</u>
**Eighteen Violations of Transacting Business as an Unregistered Investment Adviser Pursuant to Missouri Revised Statutes Section 409.4-403[1]**

264.  The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

265.  Section 409.4-403 provides in pertinent part:

(a) It is unlawful for a person to transact business in this state as an investment adviser unless the person is registered under this act as an investment adviser . . .

(d) It is unlawful for an investment adviser to employ or associate with an individual required to be registered under this act as an investment adviser representative who transacts business in this state on behalf of the investment adviser unless the individual is registered under section 409.4-404(a) . . . .

266.  Safeguard Metals, in at least eighteen (18) instances, transacted business in the State of Missouri as an unregistered, non-exempt Investment Adviser by holding itself out as a company offering investment advice regarding the purchase of precious metals.

---

[1] Unless otherwise indicated, Missouri statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2021 Cumulative Supplement.

267.   Safeguard Metals received compensation for its investment advisory services in the form of commissions and fees.

268.   At the time Safeguard Metals engaged in all but one of the violations described in the conduct set forth above, the seventeen (17) Missouri investors involved in those transactions were more than sixty years old and were elderly persons, as that term is defined under Section 409.6-604(d)(3)(B).

269.   Safeguard Metals' violations of Section 409.403(a) constitute illegal acts, or courses of business subject to the Court's authority under the CEA.

## <u>COUNT 34</u>
**Eighteen Violations of Missouri Revised Statutes Section 409.810**

270.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

271.   Section 409.810 provides in pertinent part:

No person shall, directly or indirectly:

(1) Cheat or defraud, attempt to cheat or defraud, or employ any device, scheme or artifice to cheat or defraud, any other person;

(2)  Make any false report, enter any false record, or make any untrue statement of a material fact;

(3)  Engage in any transaction, act, practice or course of business, including, without limitation, any form of advertising or solicitation, which operates or would operate as a fraud or deceit upon any person; or

(4)  Misappropriate or convert the funds, security or property of any other person;

in or in connection with the purchase or sale of, the offer to sell, the offer to enter into, or the entry into of, any commodity contract or commodity option subject to the provisions of section 409.803 or subdivision (2), (3), or (4) of subsection 1 of section 409.806; except that, the provisions of subdivision (2) of this

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

section shall not apply to a commodity contract covered by subdivision (3) of subsection 1 of section 409.806.

272. By engaging in the conduct set forth above, defendants, in connection with the purchase or sale of, the offer to sell, the offer to enter into, or entry into of, any commodity contract in this matter directly or indirectly: (1) cheated or defrauded, attempted to cheat or defraud, employed devices, schemes or artifices to cheat or defraud other people; and (2) engaged in transactions which operated as a fraud or deceit upon other persons, all of which were in violation of Section 409.810 to wit:

    a.    Misrepresenting material facts about Safeguard Metals in marketing the commodities sold to Missouri residents;

    b.    Misrepresenting the safety and liquidity of investors' securities holdings and Qualified Retirement Accounts and employed scare tactics to induce investors to sell their existing securities holdings;

    c.    Misrepresenting or omitting the compensation structure for Safeguard Metals to investors; and

    d.    Failing to disclose the exorbitant actual markup to investors.

273. At the time Safeguard Metals engaged in all but one of the violations described in the conduct set forth above, the seventeen (17) Missouri investors involved in those transactions were more than sixty years old and were elderly persons, as that term is defined under Section 409.6-604(d)(3)(B).

274. Safeguard Metals' violations of Section 409.410 constitute illegal acts, or courses of business subject to the Court's authority under the CEA.

# XVII. VIOLATIONS OF NEW MEXICO LAWS

(*Brought by Plaintiff State of New Mexico*)

## COUNT 35
### Prohibited Conduct in Providing Investment Advice
### Violations of New Mexico Statute, NMSA 1978, § 58-13C-502(A)(2), and NMAC Rules 12.11.7.13(A)(L)(Q) & (R)

275.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

276.   NMSA 1978, section 58-13C-502(A)(2), provides:

> (A) It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to that value of securities or the availability of investing in, purchasing or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities

> (2) to engage in an act, practice or course of business that operates or would operate as a fraud or deceit upon another person

277.   NMAC Rules 12.11.7.13, subsections (A), (L), (Q), & (R) provide:

> The following are deemed to be unlawful, unethical, or dishonest conduct or practice by an investment adviser or investment adviser representative without limiting those terms to the practices specified herein:

> (A) recommending to a client to whom investment supervisory, management or consulting services are provided the purchase, sale or exchange of any security without reasonable grounds to believe that the recommendation is suitable for the client on the basis of information furnished by the client after reasonable inquiry concerning the client's investment objectives, financial situation and needs, and any other information known by the investment adviser;

- 85 -

(L) guaranteeing a client that a specific result will be achieved (e.g. gain or no loss), with advice which will be rendered;

(Q) engaging in any act, practice or course of business which is fraudulent, deceptive or manipulative, contrary to the provisions of or in violation of the New Mexico Uniform Securities Act or any other rule of the director;

(R) engaging in conduct or any act, indirectly or through or by any other person, which would be unlawful for such person to do directly under the provisions of the New Mexico Uniform Securities Act or any rule or regulation thereunder[.]

278.    Safeguard Metals, acting through various officers, employees, or agents, and Santulan, acted as investment advisers, and in connection with the rendering of investment advice, engaged in an act practice or course of business that operates or would operate as a fraud or deceit upon another person.

279.    As a result of the foregoing unlawful conduct, Defendants violated New Mexico Statute, NMSA 1978, § 58-13C-502(A)(2), and NMAC Rules 12.11.7.13(A)(L)(Q) & (R).

## XVIII. VIOLATIONS OF NORTH CAROLINA STATUTES

(*Brought by Plaintiff North Carolina Department of the Secretary of State*)

### <u>COUNT 36</u>
**Material Misrepresentations and Omissions in Connection with the Sale of a Security**
**Violations of N.C.G.S. § 78A**

280.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

281.   A "Person" is defined under N.C.G.S. § 78A-2(7) as an individual, an entity, a partnership in which the interests of the partners are not evidenced by a security, a trust in which the interests of the beneficiaries are not evidenced by a security, or an unincorporated organization.

282.   "Sale" or "sell" as defined under N.C.G.S. § 78A-2(8)(a) includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.

283.   "Offer" or "offer to sell" as defined under N.C.G.S. § 78A-2(8)(b) includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.

284.   As defined under N.C.G.S. § 78A-2(8)(c), any security given or delivered with, or as a bonus on account of, any purchase of securities or any other thing is considered to constitute part of the subject of the purchase and to have been offered and sold for value.

285.   A "Security" is defined broadly under N.C.G.S. § 78A-2(11) to include, but not limit to, any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; and any interest or instrument commonly known as a security.

286.   N.C.G.S. § 78A-8(a)(2) provides, in relevant part, that it is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

287.   During the relevant period, Defendants, in connection with the sale of any security, directly or indirectly, by or through others, including their sales

representatives or agents, made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, as contained in the complaint. As a result of the misrepresentations and omissions by the Defendants, North Carolina investors sold their securities held in traditional retirement accounts, and used those funds to purchase precious metals. The material misrepresentations and omissions resulted in the Defendants converting a large portion of the investment funds to their own benefit without the knowledge of the North Carolina investors.

288.   As such, the Defendants violated N.C.G.S. § 78A-8(a)(2) of the North Carolina Securities Act.

## **COUNT 37**
### **Unregistered Investment Adviser and Investment Adviser Representative Violations of N.C.G.S. § 78C-16**

289.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

290.   An "investment adviser" is defined under N.C.G.S. § 78C-2(1) in relevant part as:

> [A]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities. "Investment adviser" also includes…other persons who, as an integral component of other financially related services, provide the foregoing investment advisory services to others for compensation and as a part of a business or who hold themselves out as providing the foregoing investment advisory services to others for compensation.

291.   An "investment adviser representative" is defined under N.C.G.S. § 78C-2(3) as with respect to any investment adviser registered under this Chapter, any partner, officer, director (or a person occupying a similar status or performing similar

functions) or other individual employed by or associated with an investment adviser, except clerical or ministerial personnel, who:

    a. Makes any recommendations or otherwise renders advice regarding securities directly to clients,

    b. Manages accounts or portfolios of clients,

    c. Determines which recommendations or advice regarding securities should be given; provided, however if there are more than five such persons employed by or associated with an investment adviser, who do not otherwise come within the meaning of section 78C-2(3) a., b., d., or e., then only the direct supervisors of such persons are deemed to be investment adviser representatives under section 78C-2(3) c.,

    d. Solicits, offers or negotiates for the sale of or sells investment advisory services, unless such person is a dealer or salesman registered under Chapter 78A of the General Statutes and the person would not be an investment adviser representative except for the performance of the activities described in section 78C-2(3) d., or

    e. Directly supervises investment adviser representatives as defined in section 78C-2(3) a., b., c. (unless such investment adviser representatives are already required to register due to their role as supervisors by operation of section 78C-2(3) c.), or d. in the performance of the foregoing activities.

    292.  N.C.G.S. § 78C-16(a) of the North Carolina Investment Advisers Act makes it unlawful for any person to transact business in the State of North Carolina as an investment adviser unless:

    1) The person is registered under the North Carolina Investment Advisers Act;

    2) The person's only clients in this State are investment companies as defined in the Investment Company Act of 1940, other investment advisers, investment advisers covered under federal

law, dealers, banks, trust companies, savings institutions, savings and loan associations, insurance companies, employee benefit plans with assets of not less than one million dollars ($1,000,000), and governmental agencies or instrumentalities, whether acting for themselves or as trustees with investment control, or other institutional investors as are designated by rule or order of the Administrator;

3) The person has no place of business in this State, and during the preceding 12-month period has had not more than five clients, other than those specified in subdivision (2) of this subsection, who are residents of the State; or

4) The person, during the course of the preceding 12 months, has had fewer than 15 clients, and neither holds himself or herself out generally to the public as an investment adviser nor acts as an investment adviser to any investment company registered under the Investment Company Act of 1940, or a company that has elected to be a business development company pursuant to section 54 of the Investment Company Act of 1940.

293.   N.C.G.S. § 78C-16(a1) of the North Carolina Investment Advisers Act makes it unlawful for any person to transact business in the State of North Carolina as an investment adviser representative unless:

(1) The person is registered under Article 3 of the North Carolina Investment Advisers Act; or

(2) The person is an investment adviser representative employed by or associated with an investment adviser exempt from registration under subdivision (2), (3), or (4) of subsection (a) of this section; or

(3) The person is an investment adviser representative employed by or associated with an investment adviser covered under federal law that is exempt from the notice filing requirements of N.C.G.S. §78C-17(a1).

294.   N.C.G.S. § 78C-16(b) of the North Carolina Investment Advisers Act

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

makes it unlawful for any person required to be registered as an investment adviser under the North Carolina Investment Advisers Act to employ an investment adviser representative unless the investment adviser representative is registered.

295.   During the relevant period, Defendants unlawfully acted as an investment adviser by, for compensation, engaging in the business of advising others, either directly, indirectly, or through publications or writings, as to the value of securities or as to the advisability of selling securities and held itself out as providing the foregoing investment advisory services to others for compensation.

296.   Santulan unlawfully acted as investment adviser representatives by being a partner, officer, director (or a person occupying a similar status or performing similar functions) or other individual employed by or associated with Defendants, who made recommendations or otherwise rendered advice regarding securities; determined which recommendation or advice regarding securities should be given, created sales scripts and email templates, solicited, offered and set the prices at which Safeguard Metals sold securities to the public, aided; and supervised employees, including sales representatives or other agent, who performed these functions.

297.   During the relevant period, the Defendants were at no time registered as investment advisers or investment adviser representatives under North Carolina law and/or federal law. Defendants have not claimed an exemption from registration in North Carolina nor have they submitted a notice filing with North Carolina as an investment adviser or investment adviser representative

298.   As such, the Defendants violated N.C.G.S. §§ 78C-16(a), (a1) and (b) of the North Carolina Investment Advisers Act.

### COUNT 38
### Fraudulent Advisory Activities:
### Violations of N.C.G.S. §78C-8

299.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

300.   N.C.G.S. § 78C-8(a) provides, in relevant part, that it is unlawful for a person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise,

(1) To employ any device, scheme, or artifice to defraud the other person,

(2) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person.

301.   In connection with the solicitation of advisory clients in North Carolina, the Defendants, directly or indirectly, made untrue statements of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; in violation of N.C.G.S. §78C-8(b).

302.   During the relevant period, Defendants, directly or by way of their sales representatives, misrepresented Safeguard Metal's assets under management; employee qualifications; years of experience; used scare tactics to induce investors to sell their securities; failed to disclose compensation received by Safeguard Metals; and failed to disclose actual markup to investors in violation of N.C.G.S. § 78C-8(a) and (b).

## XIX. VIOLATIONS OF THE OHIO SECURITIES ACT

*(Brought by Plaintiff State of Ohio)*

### <u>COUNT 39</u>
### Acting as an unregistered Investment Adviser
### (O.R.C. § 1707.44(A)(1))

303.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

304.   O.R.C. 1707.44(A) provides:

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

No person shall engage in any act or practice that violates division (A) of section 1707.141 or section 1707.161 of the Revised Code.

305.   R.C. 1707.141(A) provides, in relevant part:

No person shall act as an investment adviser, unless one of the following applies:

(1) The person is licensed as an investment adviser by the division of securities; however, nothing in this section shall be construed to prohibit a person from being licensed by the division as both an investment adviser and a dealer or salesperson.

306.   R.C. 1707.01(X)(1) defines investment adviser as:

"Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of regular business, issues or promulgates analyses or reports concerning securities.

307.   The investments held by the Ohio investors in Qualified Retirement Accounts and in the coins purchased and sold by Defendants are securities as defined by O.R.C. 1707.01(B).

308.   At all times relevant, Defendants engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities in exchange for compensation and were not licensed as an investment adviser by the State of Ohio.

## COUNT 40
### Securities Fraud
### (O.R.C. § 1707.44(G))

309.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

310.   O.R.C. 1707.44(G) provides:

No person in purchasing or selling securities shall knowingly engage in any act or practice that is, in this chapter, declared illegal, defined as fraudulent, or prohibited.

311. O.R.C. 1707.01(C) provides, in relevant part:

(1) "Sale" has the full meaning of "sale" as applied by or accepted in courts of law or equity, and includes every disposition, or attempt to dispose, of a security or of an interest in a security. "Sale" also includes a contract to sell, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a solicitation of an offer to buy, a subscription, or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise.

(2) "Sell" means any act by which a sale is made.

312. Defendants, in selling and purchasing securities, knowingly engaged in acts and practices which are illegal, fraudulent or prohibited.

## COUNT 41
### Misrepresentations in the Sale of Securities
### (O.R.C. § 1707.44(B)(4))

313. The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

314. O.R.C. 1707.44(B)(4) provides:

No person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for any of the following purposes:

(4) Selling any securities in this state.

315. Defendants made or caused to be made false representations concerning material and relevant facts for the purpose of selling securities in Ohio.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

## COUNT 42
**Fraudulent, Manipulative and Deceptive Conduct as an Investment Adviser (O.R.C. §§ 1707.44(M)(1)(a), (b) and (d) and 1707.44(M)(3)**

316.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

317.   O.R.C. 1707.44(M)(1) provides, in relevant part, the following:

> No investment adviser or investment adviser representative shall do any of the following:
>
> (a) Employ any device, scheme, or artifice to defraud any person;
>
> (b) Engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;
>
> …
>
> (d) Engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative. The division of securities may adopt rules reasonably designed to prevent acts, practices, or courses of business that are fraudulent, deceptive, or manipulative.

318.   O.R.C. 1707.44(M)(3) states:

> In the solicitation of clients or prospective clients, no person shall make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in light of the circumstances under which the statements were made.

319.   Defendants, in acting as investment advisers, employed a device, scheme or artifice to defraud Ohio investors and engaged in acts, practices or a course of business that was fraudulent, deceptive, or manipulative or operated as a fraud or deceit upon Ohio investors.

320.   Defendants, in acting as investment advisers, solicited clients and prospective clients to sell and liquidate securities in Qualified Retirement Accounts in order to purchase gold and silver coins from them based on untrue statements of

material facts and further based on omission of material facts necessary in order to make the statements made not misleading.

## XX. VIOLATIONS OF THE OKLAHOMA UNIFORM SECURITIES ACT OF 2004

*(Brought by Plaintiff Oklahoma Department of Securities)*

### <u>COUNT 43</u>
### Unregistered Investment Adviser
### (71 O.S. § 1-403(A))

321.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

322.    Section 1-403(A) of the Oklahoma Uniform Securities Act of 2004 ("OK Act"), Okla. Stat. Ann. tit. 71, §§ 1-101 – 1-701 (West 2021), provides that:

> It is unlawful for a person to transact business in [Oklahoma] as an investment adviser unless the person is registered under [the OK Act] as an investment adviser or is exempt from registration as an investment adviser under subsection B of this section.

323.    By reason of the conduct described above, Safeguard Metals is an "investment adviser" as defined in Section 1-102(17) of the OK Act.

324.    Safeguard Metals has not been registered under the OK Act in any capacity.

325.    Safeguard Metals has violated, and unless enjoined may continue to violate, Section 1-403(A) of the OK Act.

326.    Santulan, due to his status and actions as sole owner and sole manager of Safeguard Metals, has engaged in acts, practices or a course of business that materially aided Safeguard Metals' violation of Section 1-403(A) of the OK Act and, unless enjoined, may continue to materially aid a violation of the same.

## COUNT 44
### Employment or Association with an Unregistered Investment Adviser Representative
### (71 O.S. § 1-403(D))

327.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

328.   Section 1-403(D) of the OK Act provides that:

> It is unlawful for an investment adviser to employ or associate with an individual required to be registered under [the OK Act] as an investment adviser representative who transacts business in [Oklahoma] on behalf of the investment adviser unless the individual is registered under subsection A of [Section 1-404 of the OK Act] or is exempt from registration under subsection B of [Section 1-404 of the OK Act.]

329.   By reason of the conduct described above, Safeguard Metals' sales representatives or agents are "investment adviser representatives" as defined in Section 1-102(18) of the OK Act.

330.   Safeguard Metals' sales representatives or agents are not, and have not been, registered under the OK Act as investment adviser representatives.

331.   Safeguard Metals has violated, and unless enjoined may continue to violate, Section 1-403(D) of the OK Act.

332.   Santulan, due to his status and actions as sole owner and sole manager of Safeguard Metals, has engaged in acts, practices or a course of business that materially aided Safeguard Metals' violation of Section 1-403(D) of the OK Act and, unless enjoined, may continue to materially aid a violation of the same.

## COUNT 45
### Fraud
### (71 O.S. § 1-502(A))

333.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

334.   Section 1-502(A) provides, in part:

It is unlawful for [an investment adviser]:

****

2.   To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; or

3.   To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

335.   By reason of the conduct described above, Safeguard Metals made untrue statements of material fact, omitted to state material facts necessary in order to make the statements made not misleading, and engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person in violation of Section 1-502(A) of the OK Act.

336.   Santulan, due to his status and actions as sole owner and sole manager of Safeguard Metals, has engaged in acts, practices or a course of business that materially aided Safeguard Metals' violation of Section 1-502(A) of the OK Act and, unless enjoined, may continue to materially aid a violation of the same.

## XXI. VIOLATIONS OF THE SOUTH CAROLINA CODE

(*Brought by Plaintiff State of South Carolina*)

### <u>COUNT 46</u>
**Unregistered Investment Adviser and Investment Adviser Representative Violations of S.C. Code Ann. § 35-1-403 to 35-1-404**

337.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

338.   South Carolina Code Ann. § 35-1-102(15), provides in relevant part:

"Investment adviser" means a person that, for compensation, engages in the business of advising others, either directly or

through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities. The term includes a financial planner or other person that, as an integral component of other financially related services, provides investment advice regarding securities to others for compensation as part of a business or that holds itself out as providing investment advice regarding securities to others for compensation.

339.   South Carolina Code Ann. § 35-1-102(16), provides in relevant part:

"Investment adviser representative" means an individual employed by or associated with an investment adviser or federal covered investment adviser and who makes any recommendations or otherwise gives investment advice regarding securities, manages securities accounts or portfolios of clients, determines which recommendation or advice regarding securities should be given, provides investment advice regarding securities or holds herself or himself out as providing investment advice regarding securities, receives compensation to solicit, offer, or negotiate for the sale of or for selling investment advice regarding securities, or supervises employees who perform any of the foregoing.

340.   It is unlawful for a person to transact business in South Carolina as an investment adviser unless the person is registered under this chapter as an investment adviser or is exempt from registration as an investment adviser. S.C. Code Ann. § 35-1-403(a).

341.   It is unlawful for an individual to transact business in this South Carolina as an investment adviser representative unless the individual is registered under this chapter as an investment adviser representative or is exempt from registration as an investment adviser representative. S.C. Code Ann. § 35-1-404(a).

342.   It is unlawful for an individual to transact business in this South Carolina as an investment adviser representative unless the individual is registered

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

under this chapter as an investment adviser representative or is exempt from registration as an investment adviser representative. S.C. Code Ann. § 35-1-404(a).

343.   Safeguard Metals unlawfully acted as an investment adviser for compensation, engaged in the business of advising another, directly and/or through publications or writings, with respect to the value of securities or to the advisability of investing in, purchasing, or selling securities, despite not being registered as an investment adviser under the Act, in violation of S.C. Code Ann. § 35-1-403(a).

344.   Santulan, as partner, officer, or director of Safeguard Metals, unlawfully acted as an investment adviser representative because he, directly and through his sales representatives or other agents, made recommendations or otherwise gave investment advice regarding securities; managed securities accounts or portfolios of clients, determined which recommendation or advice regarding securities should be given; provided investment advice regarding securities or held herself or himself out as providing investment advice regarding securities; received compensation to solicit, offer, or negotiate for the sale of or for selling investment advice regarding securities; or supervised employees who perform any of the foregoing, despite not being registered as an investment adviser representative under the South Carolina Uniform Securities Act of 2005, in violation of S.C. Code Ann. § 35-1-404(a).

345.   Therefore, Defendants violated the South Carolina Uniform Securities Act of 2005.

**<u>COUNT 47</u>**
**Securities Fraud**
**Violations of S.C. Code Ann. § 35-1-501(1)-(3) and § 35-1-502(a)**

346.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

347.   South Carolina Code Ann. § 35-1-501(1)-(3), provides in relevant part:

It is unlawful for a person, in connection with the offer,
sale, or purchase of a security, directly or indirectly:

a. to employ a device, scheme or artifice to defraud;

b. to make untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. to engage in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon another person.

348.   The Defendants participated in the offer or sale of securities by means of a scheme to defraud, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the buyers not knowing of the untruths or omissions), or engaged in acts, practices, or courses of business that operated as a fraud on the investors. Therefore, Defendants violated S.C. Code Ann. § 35-1-501(1)-(3).

349.   South Carolina Code Ann. § 35-1-502(a), provides in relevant part:

It is unlawful for a person that advises others for compensation, either directly or indirectly or through publications or writings, as to the value of securities or the advisability of investing in, purchasing, or selling securities or that, for compensation and as part of a regular business, issues or promulgates analyses or reports relating to securities:

(1) to employ a device, scheme, or artifice to defraud another person; or

(2) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person

350.   The Defendants, acting through various officers, employees, or agents, in connection with the rendering of investment advice to South Carolina investors, (1) employed a device, scheme, or artifice to defraud another person; or (2) engaged in an act, practice, or course of business that operated or would operate as a fraud or

deceit upon another person. Therefore, Defendants violated S.C. Code Ann. § 35-1-502(a).

351.   Therefore, Defendants violated the South Carolina Uniform Securities Act of 2005.

## COUNT 48
### Unlawful Solicitation and Sale of Commodities
### Violations of S.C. Code Ann. § 39-73-20

352.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

353.   South Carolina Ann. § 39-73-10(13), provides in relevant part:

(4) "Commodity" means, except as otherwise specified by the administrator . . . a metal or mineral, including a precious metal, a gem, or gemstone whether characterized as precious, semi-precious, or otherwise . . .

(9) "Commodity option" means an account, an agreement, or a contract giving a party the right but not the obligation to purchase or sell one or more commodities or one or more commodity contracts, or all of the foregoing, whether characterized as an option, privilege, indemnity, bid, offer, put, call, advance guaranty, decline guaranty, or otherwise. . . .

(13) "Precious metal" means the following in either coin, bullion, or other form:
    (a) silver;
    (b) gold;
    (c) platinum;
    (d) palladium;
    (e) copper;
    (f) other items the administrator may specify by regulation.

354.   South Carolina Code Ann. § 39-73-20, provides in relevant part:

Except as otherwise provided in Section 39-73-30 or Section 39-73-40 no person may sell or purchase or offer to sell or purchase a commodity under commodity contract or under commodity

option or offer to enter into or enter into as seller or purchaser a commodity contract or a commodity option.

355.   South Carolina Code Ann. § 39-73-70, provides in relevant part:

(A) The act, omission or failure of an official, an agent, or another person acting for an individual, an association, a partnership, a corporation, or a trust within the scope of his employment or office is deemed the act, omission or failure of the individual, association, partnership, corporation, or trust as well as of the official, agent, or other person.

(B) Every person who directly or indirectly controls another person liable under this chapter, every partner, officer, or director of the other person, every person occupying a similar status or performing similar functions, every employee of the other person who materially aids in the violation also is liable jointly and severally with and to the same extent as the other person, unless the person who also is liable by virtue of this section sustains the burden of proof that he did not know and in exercise or reasonable care could not have known of the existence of the facts by reason of which the liability is alleged to exist.

356.   The Defendants, directly and by and through their sales representatives or other agents, unlawfully solicited the sale of precious metals and sold precious metals to South Carolina investors.

357.   As a result of the foregoing conduct, the Defendants violated S.C. Code Ann. § 39-73-20.

358.   Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq*.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

## COUNT 49
**Commodities Fraud**
**Violations of S.C. Code Ann. § 39-73-60(1)-(4)**

359.  The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

360.  South Carolina Code Ann. § 39-73-60(1)-(4), provides in relevant part that no person, directly or indirectly, in or in connection with the purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of, a commodity contract or commodity option, may:

1.  cheat or defraud, attempt to cheat or defraud, or employ a device, a scheme, or an artifice to defraud;

2.  make a false report, enter a false record, or make an untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

3.  engage in a transaction, an act, a practice, or a course of business, including without limitation a form of advertising or solicitation, which operates or would operate as a fraud or deceit on Metals customers or potential customers; or

4.  misappropriate or convert the funds, security, or property of a person.

361.  The Defendants, acting through various officers, employees, or other agents, in connection with the solicitation to sell and the sale of precious metals: (1) cheated or defrauded, or attempted to cheat or defraud, another person or employed a device, scheme, or artifice to defraud another person; (2) made a false report, entered a false record, or made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (3) engaged in a transaction, act, practice, or course of business, including, without limitation, any

form of advertising or solicitation, which operated or would operate as a fraud or deceit upon another person; or (4) misappropriated or converted the funds, security, or property of another person, in connection with the solicitation of a purchase or sale of, the offer to sell, the offer to purchase, the offer to enter into, or the entry into of any commodity contract or commodity option.

362.    Therefore, the Defendants violated the South Carolina State Commodity Code, S.C. Code Ann. § 39-73-10, *et. seq.*

## XXII. VIOLATIONS OF THE UTAH UNIFORM SECURITIES ACT ("UUSA")

*(Brought by Plaintiff State of Utah)*

### COUNT 50
**Securities Fraud**
**(Violations of Sections 61-1-1 and 61-1-2 of the UUSA)**

363.    The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

364.    Section 61-1-1 of the UUSA provides, in relevant part:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:

(1)    employ any device, scheme, or artifice to defraud;

(2)    make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3)    engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

365.    By reason of the conduct described above, Defendants, by and through Santulan and Safeguard Metals' officers, employees and agents, directly or indirectly,

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

in connection with the offer and sale of securities in Utah, violated Section 61-1-1(2) and (3) of the UUSA.

366.   Section 61-1-2 of the UUSA provides, in relevant part:

> It is unlawful for any person who receives any consideration from another person primarily for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise to:
>
> (a)   employ any device, scheme, or artifice to defraud the other person;
>
> (b)   engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person; or
>
> (c)   divide or otherwise split any consideration with any person not licensed under this chapter as an investment adviser or investment adviser representative.

367.   By reason of the conduct described above, Defendants, by and through Santulan and Safeguard Metals' officers, employees and agents, and Safeguard Metals' publications or writings, violated Section 61-1-2(b) of the UUSA.

## COUNT 51
**Unlicensed Investment Advisers or Investment Adviser Representatives**
**(Violations of Section 61-1-3(3) of the UUSA)**

368.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

369.   Section 61-1-3(3) of the UUSA provides, in relevant part:

> It is unlawful for a person to transact business in this state as an investment adviser or as an investment adviser representative unless: . . . the person is licensed under this chapter; . . .

370.   By reason of the conduct described above, Defendants, by and through Santulan and Safeguard Metals' officers, employees and agents, and Safeguard Metals' publications or writings, violated Section 61-1-3(3) of the UUSA.

## XXIII. VIOLATIONS OF THE VERMONT STATUTES

(*Brought by Plaintiff State of Vermont*)

### COUNT 52
**Unregistered Investment Adviser
Violation of 9 V.S.A. § 5403**

371.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

372.   Pursuant to 9 V.S.A. § 5403(a), it is unlawful for a person to transact business in Vermont as an investment adviser unless the person is registered to do so or exempt from registration.

373.   Pursuant to 9 V.S.A. § 5102(15), an investment adviser means a person that, for compensation, engages in the business of advising others, either directly or indirectly, as to the advisability of selling securities.

374.   Through direct solicitation, its website and otherwise, Defendant Safeguard Metals held itself out to Vermont investors as an investment adviser.

375.   By advising Vermont investors to liquidate securities in order to buy precious metals, Defendant Safeguard Metals acted as an investment adviser in Vermont within the meaning of 9 V.S.A. § 5102(15).

376.   Defendant Safeguard Metals is not registered as an investment adviser in Vermont nor exempt from registration.

377.   By transacting business in Vermont as an unregistered investment adviser, Defendant Safeguard Metals violated 9 V.S.A. § 5403(a) and is subject to discipline under 9 V.S.A. §5603.

## <u>COUNT 53</u>
### Unregistered Investment Adviser Representative
### In Violation of 9 V.S.A. § 5404

378.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

379.   Pursuant to 9 V.S.A. §5404(a), it is unlawful for an individual to transact business in Vermont as an investment adviser representative unless the person is registered to do so or exempt from registration.

380.   Pursuant to 9 V.S.A.§5102(16), an investment adviser representative means an individual employed by or associated with an investment adviser who makes any recommendations or otherwise gives investment advice regarding securities.

381.   Through direct solicitation, the Safeguard Metals website and otherwise, sales representatives of Safeguard Metals held themselves out to Vermont investors as investment adviser representatives within the meaning of 9 V.S.A. §5102(16).

382.   By acting on behalf of Safeguard Metals to advise Vermont investors to liquidate securities in order to buy precious metals, sales representatives of Safeguard Metals acted as investment adviser representatives within the meaning of 9 V.S.A. § 5102(16).

383.   Sales representatives of Safeguard Metals are not registered in Vermont as investment adviser representatives nor exempt from registration.

384.   By transacting business in Vermont as unregistered investment adviser representatives, sales representatives of defendant Safeguard Metals violated 9 V.S.A. § 5404(a) and are subject to discipline under 9 V.S.A. § 5603.

### COUNT 54
**Securities Fraud**
**In Violation of 9 V.S.A. § 5501(1)**

385.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

386.   Pursuant to 9 V.S.A. § 5501(1), it is unlawful for a person, in connection with the sale of a security, directly or indirectly, to employ a device, scheme or artifice to defraud.

387.   During the relevant period, Defendants, directly and indirectly, by and through their sales representatives, employed a scheme to target elderly and retired Vermont investors and received compensation from Vermont investors by fraudulently advising them to liquidate retirement accounts containing securities and to  buy precious metals, in part on the false representation that the securities market was volatile and the metals market stable, so they would realize a financial gain, and without disclosing to Vermont investors the markup on metals or the extent of fees charged by Defendants.

388.   In reliance on Defendants' representations, the Vermont investors liquidated their entire retirement accounts to buy precious metals. They did not realize a financial gain.

389.   As a result of the above conduct, Defendants violated 9 V.S.A. §5501(1) and are subject to discipline under 9 V.S.A. §5603.

### COUNT 55
**Securities Fraud**
**In Violation of 9 V.S.A. § 5501(2)**

390.   The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

391.   Pursuant to 9 V.S.A. §5501(2), it is unlawful for a person, in connection with the sale of a security, directly or indirectly, to make an untrue statement of

material fact or to omit to state a material fact necessary, in light of the circumstances under which they were made, not misleading.

392.   During the relevant period, Defendants, directly and indirectly, by and through their sales representatives, advised Vermont investors to liquidate securities and buy precious metals on the false representation that the securities market was volatile and the metals market more stable, such that the Vermont customers would realize a financial gain, and without disclosing to Vermont investors the markup on precious metals or the fees being charged.

393.   In reliance on Defendants' representations, The Vermont investors liquidated their entire retirement accounts to buy precious metals. They did not realize a financial gain.

394.   As a result of the above conduct, Defendants violated 9 V.S.A. §5501(2) and are subject to discipline under 9 V.S.A. §5603.

### COUNT 56
### Financial Exploitation of the Elderly
### In Violation of 9 V.S.A. § 5603(b)(2)(C)

395.   The preceding paragraphs are realleged and incorporated herein by reference.

396.   Pursuant to 9 V.S.A.§5603(b)(2)( C), a court may increase the civil penalty by not more than $5000 per violation of the Vermont Uniform Securities Act for violations involving a vulnerable adult as defined in 33 V.S.A. §6902(14).

397.   Pursuant to 33 V.S.A. §6902(14)(D), a person impaired due to the infirmities of aging is a vulnerable adult.

398.   Vermont investors #1 and #2, both over the age of 70 and retired, are vulnerable adults within the meaning of 33 V.S.A.§6902(14)(D).

399.   As a result, Defendants are subject to the increased penalties set forth in 9 V.S.A.§5603(b)(2)( C) for the violations described in Counts 54 and 55.

# XXIV. RELIEF REQUESTED

400.   The CFTC and the States respectfully request that this Court, as authorized by Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§ 13a-1, 13a-2(1) and pursuant to its own equitable powers:

A.   Find that Defendants violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021);

B.   Find that Defendants violated the laws of the States as set forth above;

C.   Enter an order of permanent injunction enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) and the laws of the States;

D.   Enter an order of permanent injunction restraining and enjoining Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the CEA, 7 U.S.C. § 1a(40));

2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)   Having any commodity interests traded on any Defendants' behalf;

4)   Controlling or directing the trading for or on behalf of any other

1         person or entity, whether by power of attorney or otherwise, in

2         any account involving commodity interests;

3     5)   Soliciting, receiving, or accepting any funds from any person for

4         the purpose of purchasing or selling of any commodity interests;

5     6)   Applying for registration or claiming exemption from registration

6         with the CFTC in any capacity, and engaging in any activity

7         requiring such registration or exemption from registration with the

8         CFTC except as provided for in CFTC Regulation 4.14(a)(9),

9         17 C.F.R. § 4.14(a)(9) (2021);

10     7)   Acting as a principal (as that term is defined in CFTC Regulation

11         3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or

12         employee of any person registered, exempted from registration, or

13         required to be registered with the CFTC except as provided for in

14         17 C.F.R. § 4.14(a)(9);

15     8)   Acting or associating with an investment adviser or investment

16         adviser representative or broker-dealer, in violation of the laws of

17         the States;

18     9)   In connection with offer, sale or purchase of any security,

19         employing any device, scheme, or artifice to defraud another

20         person, making any untrue statement of a material fact or omit to

21         state a material fact necessary in order to make the statement

22         made, in the light of the circumstances under which they were

23         made, not misleading; or engaging in any act, practice, or course

24         of business which operates or would operate as a fraud or deceit

25         upon any person, in violation of the laws of the States.

26   E.   Enter an order directing Defendants as well as any third-party transferee

27       and/or successors thereof, to disgorge, pursuant to such procedure as the

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices that constitute violations of the CEA or CFTC Regulations or the laws of the States, as described herein, including pre-judgment and post-judgment interest;

F.     Enter an order requiring Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

G.     Enter an order directing Defendants to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Defendants and any of the customers whose funds were received by Defendants as a result of Defendants' violations of the CEA or CFTC Regulations or the laws of the States as described herein;

H.     Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the CEA, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the CEA or CFTC Regulations, and pay civil monetary penalties and/or damages pursuant to the laws of the States during the Relevant Period, described herein;

I.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) and the laws of the States; and

J.     Enter an order providing such other and further relief as the Court deems

proper.

## XXV. DEMAND FOR JURY TRIAL

401.   Plaintiffs hereby demand a jury trial.

I hereby attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: May 25, 2022

Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

By: /s/ Clemon D. Ashley

JEFF LE RICHE, *admitted pro hac vice*
(Attorney-In-Charge)
Missouri Bar No. 46557
jleriche@cftc.gov

CLEMON D. ASHLEY, *admitted pro hac vice*
Illinois Bar No. 6294839
cashley@cftc.gov

Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
2600 Grand Boulevard, Suite 210
Kansas City, Missouri 64108
Telephone: (816) 960-7700
Facsimile: (816) 960-7750

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF ALABAMA

By: /s/ Stephen P. Feaga

STEPHEN P. FEAGA, *admitted pro hac vice*
Assistant Attorney General
Alabama Bar No. 7374A60S
Steve.Feaga@asc.alabama.gov

ANNE W. GUNTER, *admitted pro hac vice*
Assistant Attorney General
Alabama Bar. No. 4666N91P
Anne.Gunter@asc.alabama.gov

Attorneys for Plaintiff
ALABAMA SECURITIES COMMISSION
445 Dexter Avenue, Suite 12000
Montgomery, AL 36104
Telephone: (334) 242-2984
Facsimile: (334) 242-0240

FOR THE STATE OF ARIZONA

By: /s/ Christopher Nichols

CHRISTOPHER NICHOLS, *admitted pro hac vice*
Enforcement Attorney
Arizona Bar No. 029958
cnichols@azcc.gov

Attorney for Plaintiff
ARIZONA CORPORATION COMMISSION
1300 W. Washington Street, 3rd Floor
Phoenix, AZ 85007
Telephone: (605) 542-0639
Facsimile: (602) 714-8120

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF ARKANSAS

By: /s/ Joseph Joslin

JOSEPH JOSLIN, *admitted pro hac vice*
Arkansas Bar No. 2014190
Joseph.Joslin@arkansas.gov

Attorney for Plaintiff
ARKANSAS SECURITIES DEPARTMENT
1 Commerce Way, Suite 402
Little Rock, AR 72202
Telephone: (501) 683-0806
Facsimile: (501) 324-9268


FOR THE STATE OF CALIFORNIA

By: /s/ Kelly Suk

DANIELLE A. STOUMBOS
California Bar No. 264784
Danielle.Stoumbos@dfpi.ca.gov

KELLY SUK
California Bar No. 301757
Kelly.Suk@dfpi.ca.gov

Attorneys for Plaintiff
CALIFORNIA DEPARTMENT OF
FINANCIAL PROTECTION &
INNOVATION
320 West Fourth Street, Suite 750
Los Angeles, California 90013
Telephone: (213) 503-2046
Facsimile: (213) 576-7181

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF CONNECTICUT

By: /s/ James W. Caley

JAMES W. CALEY, *admitted pro hac vice*
Assistant Attorney General
Connecticut Bar No. 430246
james.caley@ct.gov

Attorney for Plaintiff
STATE OF CONNECTICUT DEPARTMENT
OF BANKING
260 Constitution Plaza
Hartford, CT 06103-1800
Telephone: (860) 808-5461
Facsimile: (860) 808-5387


FOR THE STATE OF FLORIDA

By: /s/ George C. Bedell III

GEORGE C. BEDELL III, *admitted pro hac vice*
Chief Counsel
Florida Bar No. 363685
George.Bedell@flofr.gov

Attorney for Plaintiff
FLORIDA OFFICE OF FINANCIAL
REGULATION
200 East Gaines Street
Tallahassee, FL  32399-0370
Telephone: (813) 218-5353
Facsimile: (813) 272-2498

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF HAWAII

By: /s/ Rayni M. Nakamura-Watanabe

RAYNI M. NAKAMURA-WATANABE,
*admitted pro hac vice*
Acting Supervising Attorney
Hawaii Bar No. 9032-0
rnakamur@dcca.hawaii.gov

Attorney for Plaintiff
STATE OF HAWAII, DEPARTMENT OF
COMMERCE AND CONSUMER AFFAIRS
335 Merchant Street, Room 205
Honolulu, HI 96813
Telephone: (808) 586-2740
Facsimile: (808) 586-3977


FOR THE STATE OF IDAHO

OFFICE OF THE ATTORNEY GENERAL
STATE OF IDAHO
LAWRENCE G. WASDEN

By: /s/ Loren Messerly

LOREN MESSERLY, *admitted pro hac vice*
Deputy Attorney General
Idaho Bar No. 7434
loren.messerly@finance.idaho.gov

Attorney for Plaintiff
STATE OF IDAHO, DEPARTMENT OF
FINANCE
P.O. Box 83720
Boise, ID 83720-0031
Telephone: (208) 332-8093
Facsimile: (208) 332-8099

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF ILLINOIS

By:  /s/ Paula K. Bouldon

PAULA K. BOULDON, *admitted pro hac vice*
Special Assistant Attorney General
Illinois Bar No. 6198150
PBouldon@ILSOS.gov

Attorney for Plaintiff
OFFICE OF THE SECRETARY OF STATE,
ILLINOIS SECURITIES DEPARTMENT
69 W. Washington St., Suite 1220
Chicago, IL 60602
Telephone: (312) 793-3164
Facsimile: (312) 793-1202

FOR THE STATE OF INDIANA

By: /s/ Jefferson S. Garn

JEFFERSON S. GARN, *admitted pro hac vice*
Deputy Attorney General
Indiana Bar No. 29921-49
Jefferson.Garn@atg.in.gov

Attorney for Plaintiff
INDIANA SECURITIES DIVISION
302 W. Washington St.
IGCS—5th Floor
Indianapolis, IN  46204
Telephone: (317) 234-7119
Facsimile: (317) 232-7979

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF IOWA

By: /s/ Amanda K. Robinson

AMANDA K. ROBINSON, *pro hac vice pending*
Iowa Bar No. AT0006753
Compliance Attorney
Telephone: (515) 654-6475
Amanda.robinson@iid.iowa.gov

ADAM KENWORTHY, *pro hac vice pending*
Iowa Bar No. AT0012137
Compliance Attorney
Telephone: (515) 654-6562
Adam.kenworthy@iid.iowa.gov

Attorneys for Plaintiff
IOWA INSURANCE DIVISION
1963 Bell Ave., Suite 100
Des Moines, IA 50315
Facsimile: (515) 654-6500

FOR THE STATE OF KENTUCKY

By: /s/ Gary A. Stephens

GARY A. STEPHENS, *admitted pro hac vice*
Assistant General Counsel
Kentucky Bar No. 87740
Gary.Stephens@ky.gov

Attorney for Plaintiff
KENTUCKY DEPARTMENT OF FINANCIAL INSTITUTIONS
500 Mero St. 2SW19
Frankfort, KY 40601
Telephone: (502) 782-9046
Facsimile: (502) 573-8787

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF MARYLAND

By: /s/ Max F. Brauer

MAX F. BRAUER, *admitted pro hac vice*
Assistant Attorney General
Maryland State Does Not Use Bar Numbers
mbrauer@oag.state.md.us

Attorney for Plaintiff
STATE OF MARYLAND EX REL
MARYLAND SECURITIES
COMMISSIONER
200 Saint Paul Place, 25th Floor
Baltimore, MD  21202
Telephone: (410) 576-6950
Facsimile: (410) 576-6532


FOR THE PEOPLE OF THE STATE OF
MICHIGAN

By: /s/ Michael S. Hill

MICHAEL S. HILL, *admitted pro hac vice*
Assistant Attorney General
Michigan Bar No. P73084
HillM19@michigan.gov

Attorney for Plaintiff
ATTORNEY GENERAL DANA NESSEL
ON BEHALF OF THE PEOPLE OF THE
STATE OF MICHIGAN
P.O. Box 30736
Lansing, MI  48909
Telephone: (517) 335-7632
Facsimile: (517) 335-6755

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF MISSISSIPPI

By: /s/ James M. Rankin

JAMES M. RANKIN, *admitted pro hac vice*
Mississippi Bar No. 102322
James.rankin@ago.ms.gov

Attorney for Plaintiff
MISSISSIPPI SECRETARY OF STATE
Post Office Box 220
Jackson, MS  39205
Telephone: (601) 359-4235
Facsimile: (601) 359-3947


FOR THE STATE OF MISSOURI

By: /s/ Steven M. Kretzer

STEVEN M. KRETZER, *admitted pro hac vice*
Missouri Bar No. 56950
Steven.Kretzer@sos.mo.gov

Attorney for Plaintiff
MISSOURI COMMISSIONER OF SECURITIES
600 W. Main Street
Jefferson City, MO  65102
Telephone: (573) 751-4136
Facsimile: (573) 526-3124


FOR THE STATE OF NEBRASKA

By: /s/ Joshua Shasserre

JOSHUA SHASSERRE, *admitted pro hac vice*
Assistant Attorney General
Nebraska Bar No. 23885

- 122 -

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1   Joshua.Shasserre@nebraska.gov

2   Attorney for Plaintiff

3   NEBRASKA DEPARTMENT OF BANKING & FINANCE

4   2115 State Capitol

5   Lincoln, NE 68509
    Telephone: (402) 471-2682

6   Facsimile: (402) 471-3297

7

8   FOR THE STATE OF NEW MEXICO

9
    By: /s/ Alissa N. Berger
10

11  ALISSA N. BERGER, *admitted pro hac vice*
    New Mexico Bar No. 21769
12  Alissa.Berger@state.nm.us

13
    Attorney for Plaintiff
14  NEW MEXICO SECURITIES DIVISION

15  5500 San Antonio Drive NE
    Albuquerque, NM 87109
16  Telephone: (505) 503-5987

17  Facsimile: (505) 222-9848

18

19  FOR THE PEOPLE OF THE STATE OF NEW YORK

20

21  LETITIA JAMES
    ATTORNEY GENERAL OF THE STATE OF
22  NEW YORK

23
    By: /s/ Tatyana Trakht
24

25  TATYANA "TANYA" TRAKHT, *admitted pro hac vice*

26  Assistant Attorney General

27  New York State Does Not Use Bar Numbers
    Tanya.Trakht@ag.ny.gov

28
    - 123 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Attorney for Plaintiff
ATTORNEY GENERAL OF THE STATE OF NEW YORK
28 Liberty Street, 21st Floor
New York, NY 10005
Telephone: (212) 416-8457
Facsimile: (212) 416-8816


FOR THE STATE OF NORTH CAROLINA

By: /s/ Sherrell Forbes

SHERRELL FORBES, *admitted pro hac vice*
North Carolina Bar No. 42830
sforbes@sosnc.gov

Attorney for Plaintiff
NORTH CAROLINA DEPARTMENT OF THE SECRETARY OF STATE
P.O. Box 29622
Raleigh, NC 27626
Telephone: (919) 814-5532
Facsimile: (919) 814-5596


FOR THE STATE OF OHIO

By: /s/ Chad M. Kohler

CHAD M. KOHLER, *pro hac vice pending*
Senior Assistant Attorney General
Ohio Bar No. 0074179
Chad.Kohler@OhioAGO.gov

Attorney for Plaintiff
OHIO DEPARTMENT OF COMMERCE
DIVISION OF SECURITIES
30 E. Broad Street, 26th Floor
Columbus, Ohio 43215

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Telephone: (614) 466-5861
Facsimile: (866) 514-0279


FOR THE STATE OF OKLAHOMA

By: /s/ Robert Fagnant

ROBERT FAGNANT, *admitted pro hac vice*
Oklahoma Bar No. 30548
rfagnant@securities.ok.gov

Attorney for Plaintiff
OKLAHOMA DEPARTMENT OF
SECURITIES
204 N. Robinson Avenue, Suite 400
Oklahoma City, OK 37243
Telephone: (405) 280-7718
Facsimile: (405) 280-7742


FOR THE STATE OF OREGON

By: /s/ Daniel J. Rice

DANIEL J. RICE, *admitted pro hac vice*
Oregon Bar No. 084536
Daniel.Rice@doj.state.or.us

Attorney for Plaintiff
STATE OF OREGON, BY AND THROUGH
ITS DEPARTMENT OF CONSUMER AND
BUSINESS SERVICES AND ATTORNEY
GENERAL ELLEN F. ROSENBLUM
350 Winter Street NE, Room 410
Salem, OR 97309
Telephone: (503) 378-4140
Facsimile: (503) 947-0088

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Jonathan Williams

JONATHAN WILLIAMS, *admitted pro hac vice*
South Carolina Bar No. 72509
jwilliams@scag.gov

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF ATTORNEY GENERAL
P.O. Box 11549
Columbia, SC 29211
Telephone: (803) 734-7208
Facsimile: (803) 734-7208

FOR THE STATE OF SOUTH CAROLINA

By: /s/ Shannon A. Wiley

SHANNON A. WILEY, *pro hac vice pending*
South Carolina Bar No. 69806
swiley@sos.sc.gov

Attorney for Plaintiff
STATE OF SOUTH CAROLINA
OFFICE OF THE SECRETARY OF STATE
1205 Pendleton Street, Suite 525
Columbia, SC 29201
Telephone: (803) 734-0246
Facsimile: (803) 734-1661

FOR THE STATE OF SOUTH DAKOTA

By: /s/ Clayton Grueb

CLAYTON GRUEB, *admitted pro hac vice*
South Dakota Bar No. 4642

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

1

Clayton.grueb@state.sd.us

2

Attorney for Plaintiff

3

STATE OF SOUTH DAKOTA
DEPARTMENT OF LABOR &

4

REGULATION

5

2330 N. Maple Ave. Suite 2
Rapid City, SD 57701

6

Telephone: (605) 773-3563

7

Facsimile: (605) 773-5369

8

9

FOR THE STATE OF TENNESSEE
HERBERT H. SLATERY III

10

Attorney General and Reporter

11

for the State of Tennessee

12

13

By: /s/ Kevin M. Kreutz

14

KEVIN M. KREUTZ

15

Acting Assistant Attorney General
California Bar No. 264654

16

Kevin.Kreutz@ag.tn.gov

17

18

Attorney for Plaintiff
COMMISSIONER OF THE TENNESSEE

19

DEPARTMENT OF COMMERCE AND
INSURANCE

20

Office of Tennessee Attorney General

21

Financial Division

22

P.O. Box 20207
Nashville, TN  37202-0207

23

Telephone: (615) 253-0694
Facsimile: (615) 741-8151

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER
EQUITABLE RELIEF

FOR THE STATE OF UTAH

By: /s/ Jennifer Korb

JENNIFER KORB, *pro hac vice pending*
Assistant Attorney General
Utah Attorney General's Office
Utah Bar No. 9147
jkorb@agutah.gov

Attorney for Plaintiff
UTAH DIVISION OF SECURITIES
160 East 300 South, 2nd Floor
Salt Lake City, UT 84114-6760
Telephone: (801) 530-6600
Facsimile: (801) 530-6980


FOR THE STATE OF VERMONT

By: /s/ Jennifer Rood

JENNIFER ROOD, *admitted pro hac vice*
Assistant General Counsel
Vermont Bar No. 5515
Jennifer.Rood@vermont.gov

Attorney for Plaintiff
VERMONT DEPARTMENT OF
FINANCIAL REGULATION
89 Main Street
Montpelier, VT  05620
Telephone: (877) 550-3907
Facsimile: (802) 828-1919

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

FOR THE STATE OF WASHINGTON

By: /s/ Stephen S. Manning

STEPHEN S. MANNING, *admitted pro hac vice*
Washington Bar No. 36965
Stephen.Manning@atg.wa.gov

Attorney for Plaintiff
WASHINGTON STATE DEPARTMENT OF FINANCIAL INSTITUTIONS, SECURITIES DIVISION
150 Israel Rd. SW
Tumwater, WA 98501
Telephone: (360) 902-8700
Facsimile: (360) 902-0524

FOR THE STATE OF WISCONSIN
JOSHUA L. KAUL
Attorney General
Wisconsin Department of Justice

By: /s/ Laura E. McFarlane

LAURA E. MCFARLANE, *admitted pro hac vice*
WI State Bar No. 1089358
mcfarlanele@doj.state.wi.us

Attorney for Plaintiff
THE STATE OF WISCONSIN
Post Office Box 7857
Madison, WI 53707-7857
Telephone: (608) 266-8911
Facsimile: (608) 267-2779

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

**Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), signatories hereby do attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: May 25, 2022                   COMMODITY FUTURES TRADING
                                      COMMISSION


                                      By: /s/ Clemon D. Ashley
                                          CLEMON D. ASHLEY

                                      Attorney for Plaintiff
                                      COMMODITY FUTURES TRADING
                                      COMMISSION

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

## **PROOF OF SERVICE**

On May 25, 2022, I caused to be served the document entitled **FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF** on all the parties to this action addressed as stated on the attached service list:

☐ **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐ **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Kansas City, Missouri, with first class postage thereon fully prepaid.

☐ **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐ **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐ **UNITED PARCEL SERVICE:** By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒ **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒ **E-FILING:** By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐ **FAX:** By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

***CFTC, et al. v. Safeguard Metals LLC and Jeffrey Santulan a/k/a Jeffrey Hill***
**United States District Court – Central District of California**
**Case No. 2:22-cv-00691-JFW-SK**

SERVICE LIST

Amanda K. Robinson
Amanda.robinson@iid.iowa.gov
Adam Kenworthy
Adam.kenworthy@iid.iowa.gov
Iowa Insurance Division
1963 Bell Ave., Suite 100
Des Moines, IA 50315

***Attorneys for Plaintiff State of Iowa***

Chad M. Kohler
Chad.Kohler@OhioAGO.gov
Ohio Department of Commerce
Division of Securities
30 E. Broad Street, 26th Floor
Columbus, Ohio 43215

***Attorney for Plaintiff State of Ohio***

Jennifer Korb
jkorb@agutah.gov
Utah Attorney General's Office
Utah Division of Securities
160 East 300 South, 2nd Floor
Salt Lake City, UT 84114-6760

***Attorney for Plaintiff State of Utah***

FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF