JEFF LE RICHE, *admitted pro hac vice*
PAUL M. FLUCKE, CA Bar No. 274913
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108
Telephone: (816) 960-7700
Facsimile: (816) 960-7750
jleriche@cftc.gov
pflucke@cftc.gov

# THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

COMMODITY FUTURES
TRADING COMMISSION et al.,

Plaintiffs,

v.

SAFEGUARD METALS LLC and
JEFFREY IKAHN (a/k/a JEFFREY
S. SANTULAN and JEFF HILL),

Defendants.

Civil No.: 2:22-cv-00691-JFW-SKx

**CONSENT ORDER OF
PERMANENT INJUNCTION AND
OTHER STATUTORY AND
EQUITABLE RELIEF AGAINST
DEFENDANTS**

Hon. John F. Walter Crtrm 7A

Complaint Filed: February 1, 2022
FAC Filed:       May 25, 2022
Trial Date:      November 28, 2023

## I.   INTRODUCTION

On February 1, 2022, Plaintiffs Commodity Futures Trading Commission ("CFTC"), Alabama Securities Commission ("State of Alabama"), Arizona Corporation Commission ("State of Arizona"), Arkansas Securities Department ("State of Arkansas"), California Department of Financial Protection & Innovation ("State of California"), State of Connecticut Department of Banking ("State of Connecticut"), State of Florida, Office of Financial Regulation ("State of Florida"), State of Hawaii, Department of Commerce and Consumer Affairs ("State of Hawaii"), Idaho Department of Finance ("State of Idaho"), Office of the Secretary of State, Illinois Securities Department ("State of Illinois"), Indiana Securities Division ("State of Indiana"), Iowa Insurance Commissioner Douglas M. Ommen ("State of Iowa"), Kentucky Department of Financial Institutions ("Commonwealth of Kentucky"), State of Maryland Ex Rel the Maryland Securities Commissioner ("State of Maryland"), Attorney General Dana Nessel on Behalf of the People of the State of Michigan ("People of the State of Michigan"), Mississippi Secretary of State ("State of Mississippi"), Missouri Commissioner of Securities ("State of Missouri"), Nebraska Department of Banking & Finance ("State of Nebraska"), Securities Division New Mexico Regulation and Licensing Department ("State of New Mexico"), The People of the State of New York by Letitia James, Attorney General of the State of New York ("State of New York"), North Carolina Department of the Secretary of State ("State of North Carolina"), Ohio Department of Commerce,

Division of Securities ("State of Ohio"), Oklahoma Department of Securities ("State of Oklahoma"), State of Oregon, by and through its Department of Consumer and Business Services and Attorney General Ellen F. Rosenblum ("State of Oregon"), State of South Carolina, by and through Alan Wilson, South Carolina Attorney General, and Mark Hammond, South Carolina Secretary of State ("State of South Carolina"), South Dakota Department of Labor & Regulation ("State of South Dakota"), Commissioner of the Tennessee Department of Commerce and Insurance ("State of Tennessee"), Utah Division of Securities ("State of Utah"), Vermont Department of Financial Regulation ("State of Vermont"), Washington State Department of Financial Institutions ("State of Washington"), and the State of Wisconsin ("State of Wisconsin") (collectively "the States"), filed a Complaint against Defendants Safeguard Metals LLC  ("Safeguard Metals") and Jeffrey Ikahn (a/k/a Jeffrey S. Santulan and Jeff Hill) ("Ikahn") (collectively referred to as "Defendants") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26 and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2022), as well as violations of state laws.

## II.   CONSENTS AND AGREEMENTS

To effect partial settlement of the matters alleged in the Complaint, and all amendments to the Complaint (collectively referred to as the "Complaint"), against Defendants Safeguard Metals and Ikahn without a trial on the merits or any further

judicial proceedings, Defendants Safeguard Metals and Ikahn specifically acknowledge the following:

## A. Injunctive Relief

1.      Consent to the entry of this Consent Order of Permanent Injunction and Other Relief Against Defendants Safeguard Metals and Ikahn ("Consent Order");

2.      Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the CFTC, the States, or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledge service of the original and amended Summons and Complaints;

4.      Admit to the jurisdiction of this Court over them and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.      Admit to the jurisdiction of the CFTC and the States over the conduct and transactions at issue in this action pursuant to the Act and the state law violations alleged in the Complaint;

6.      Admit that venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e);

7.      Waive:

    (a)      Any and all claims that Defendants may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the CFTC in conformity

therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2022), relating to, or arising from, this action;

(b)     Any and all claims that Defendants may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C and 15 U.S.C.), relating to, or arising from, this action;

(c)     Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)     Any and all rights of appeal from this Consent Order;

8.     Agree that the CFTC is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996 specified in subparts (a) and (b) of paragraph 7.

9.     Consent to the continued jurisdiction of this Court over them for the purpose of implementing and carrying out the terms and conditions of all orders and decrees, including orders setting the appropriate amounts of restitution, disgorgement, and civil monetary penalty that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, to assure compliance with this Consent Order, and for any other purpose relevant to this action, even if Defendants now or in the future reside outside the jurisdiction of this Court;

10.     Agree that they will not oppose enforcement of this Consent Order by alleging that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and waive any objection based thereon;

11.     Agree that neither Defendants nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect the Defendants': (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the CFTC and the States are not a party.  Defendants shall comply with this agreement, and shall undertake all steps necessary to ensure that all of their agents or employees under their authority or control understand and comply with this agreement; and

12.     Consent to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, which they admit;

13.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the CFTC or to which the

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

CFTC is a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

14.     Consent to the use of the findings and conclusions in this Consent Order in this proceeding and in any other civil or administrative proceeding brought by the States or to which the States are a party or claimant, and agree that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

15.     Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding; and

16.     The issues of necessary relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as well as pursuant to the applicable laws from the States regarding restitution, disgorgement, and appropriate civil monetary penalties to be assessed against Defendants are still unresolved and are hereby reserved for further determination by this Court upon motion of the CFTC and/or the States or by a proposed consent order.

### III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

17.     The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.      Findings of Fact**

**1.      The Parties to this Consent Order**

18.      Plaintiff CFTC is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

19.      The State Plaintiffs are the attorneys general or state regulatory agencies charged with administering and enforcing the commodities and securities laws and regulations of their states.  The State Plaintiffs join the claims asserted by the CFTC and, for the State of Alabama, State of Arkansas, State of California, State of Connecticut, State of Florida, State of Idaho, State of Illinois, State of Kentucky, State of Maryland, State of Mississippi, State of Missouri, State of New Mexico, State of North Carolina, State of Ohio, State of Oklahoma, State of South Carolina, State of Utah, and State of Vermont, have asserted state-specific claims, within their jurisdiction.

20.      Defendant Safeguard Metals initially registered as a Wyoming limited liability company on October 13, 2017, with its principal office located at 30 N Gould St., Suite R, Sheridan, Wyoming.  Subsequently, on March 26, 2019, Safeguard Metals registered as a California limited liability company with its principal place of business located at 21550 Oxnard St., 3rd Floor, Woodland Hills, California. Safeguard Metals has never been registered with the CFTC in any capacity.

21.     Defendant Jeffrey Ikahn (a/k/a Jeffrey S. Santulan and Jeff Hill) is the sole owner and sole manager of Safeguard Metals.  Ikahn is the only signatory on Safeguard Metals' bank accounts.  From at least October 2017 and continuing through at least July 2021 ("Relevant Period"), Ikahn owned and controlled Safeguard Metals, supervised (directly and indirectly) its employees and agents, and made hiring and firing decisions on behalf of the company.  Ikahn is a resident of Tarzana, California, and has never been registered with the CFTC or any of the States in any capacity.  Ikahn used the pseudonym "Jeff Hill" while representing Safeguard Metals to customers and potential customers.  Ikahn's legal name was once Jeffrey Santulan.  In July 2021, his name was legally changed from Jeffrey Santulan to Jeffrey Ikahn.

### 2.     Safeguard Metals' Operations

22.     Safeguard Metals is a company that marketed, promoted, and sold precious metals, primarily consisting of gold and silver coins, that the company marketed and classified as either bullion, semi-numismatic, and numismatic precious metals (collectively "Precious Metals"), including, but not limited to, silver coins that Safeguard Metals claimed possess semi-numismatic and numismatic value ("Silver Coins").  The firm placed advertisements on financial media and websites, and promoted its products on social media platforms and websites linked to media personalities and financial gurus.  Safeguard Metals also marketed and promoted Precious Metals through its company website, https://www.safeguardmetals.com/.

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

23.     Safeguard Metals used the advertisements, social media platforms, and websites to generate leads, which resulted in solicitations by telephone to potential customers.

24.     Safeguard Metals operated a call center located in Woodland Hills, California, staffed by sales representatives known as "Openers" and "Closers." Safeguard Metals distributed lists of potential customers to Openers and Closers, which permitted the sales representatives to contact potential customers by telephone. Using the leads, Openers marketed and promoted Precious Metals to potential customers.  Once an Opener confirmed a potential customer's interest in purchasing Precious Metals, the potential customer was transferred over to the Closer, and the Closer executed the sale of Precious Metals with the customer.

25.     Safeguard Metals operated as an intermediary, essentially controlling all buy and sell aspects of customer transactions to maximize its profits.  Safeguard Metals, by and through its sales representatives or other agents, recommended customers form a self-directed individual retirement account ("SDIRA") for the purchase of Precious Metals ("SDIRA accounts") and hold Precious Metals at a depository instead of taking personal delivery of Precious Metals themselves. Safeguard Metals told customers that storing Precious Metals in a depository was the safest way to store Precious Metals and economically better because the depository was purportedly federally insured.

26.     In reality, these representations disguised the way Safeguard Metals controlled the transactions.  Once a customer opened a SDIRA account, often through a custodian and depository recommended by Safeguard Metals, Safeguard Metals was initially the only party authorized to buy or sell the Precious Metals in the customer's SDIRA.  Unless a customer knew to remove Safeguard Metals as the designated representative on their SDIRA account, the customer was required to use Safeguard Metals to perform any future transactions, including if they chose to liquidate their Precious Metals holdings.

27.     Safeguard Metals' core strategy for profitability was to charge an exorbitant markup on sales of Precious Metals, and in particular, on Silver Coins to customers.  Safeguard Metals purchased Precious Metals from a wholesale distributor, and generated nearly all of its profits through what it represented, though falsely, to customers as its "operating margins," which is the difference between Safeguard Metals' cost of acquiring Precious Metals from a wholesale distributer and the prices paid by customers, i.e., the markup.

28.     To benefit its own self-interest, Safeguard Metals directed the vast majority of SDIRA funds into certain coins that Safeguard Metals marked up excessively, notwithstanding the customer's individual investment needs.  Safeguard Metals accomplished this by pressuring customers to purchase coins that it claimed had "numismatic" or "semi-numismatic" value.

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

29.     Numismatic Precious Metals are rare, of limited availability, and have significant broad-based market demand and therefore have a value substantially more than the prevailing market price of the precious metal contained in the bullion.  Semi-numismatic Precious Metals are bullion that are claimed to exhibit both bullion and numismatic traits, such that the value is derived from the precious metal content, limited circulation, and some recognized exclusive or collectible value.

30.     Safeguard Metals offered coins with purported semi-numismatic or numismatic value in addition to the bullion value and coins with only bullion value. In particular, the 1.25 oz Silver Rose Crown Guinea was the individual coin most frequently sold to customers.  Safeguard Metals claimed the Silver Coins it sold to customers, including the 1.25 oz Silver Rose Crown Guinea, had semi-numismatic or numismatic value and sold them to customers at a premium far above Safeguard Metals' acquisition cost and the melt value of the bullion.

31.     In regards to gold coins, Safeguard Metals, by and through its sales representatives or other agents, most frequently sold the 0.1 oz Gold American Eagle to customers.  Contrary to Silver Coins, which Safeguard Metals claimed to have semi-numismatic or numismatic value, most gold coins were sold as common bullion products that lacked external value above and beyond their melt value.

32.     Consequently, Safeguard Metals pressured customers to purchase Silver Coins and sold vastly more Silver Coins to customers than gold coins.

Approximately 97%, or $66 million of the $68 million in total revenue Safeguard Metals solicited from customers was used to purchase Silver Coins.

33.     Safeguard Metals also levied transaction fees to liquidate the Precious Metals held in SDIRA accounts.  So after fraudulently overcharging customers on the front end when the Precious Metals transaction was executed, Safeguard Metals also imposed storage fees and commissions up to 10% exceeding the 1% to 3% in liquidation fees quoted to customers as the only charges imposed on Precious Metals transactions within SDIRA accounts, significantly contributing to customers' overall transaction costs.

### 3.     Defendants Defrauded Mostly Elderly Customers into Establishing SDIRAs and Cash Accounts to Purchase Precious Metals.

34.     Defendants targeted a vulnerable population of mostly elderly or retirement-aged persons.  Many of these individuals had little experience investing in Precious Metals.  Nonetheless, Defendants fraudulently solicited them to open SDIRAs or cash and credit sales ("Cash Accounts") in order to purchase Precious Metals.

35.     Defendants instructed their sales representatives or other agents to concentrate their fraudulent solicitations on elderly or retirement-aged persons in order to gain access to their retirement savings, including but not limited to, money market accounts and retirement savings held in tax advantaged accounts such as: Individual Retirement Accounts; employer sponsored 401(k) and 457(b) plans; Thrift

Savings Plans; annuities; and other long-term retirement savings vehicles (collectively "Qualified Retirement Savings").

36. As part of the scheme to gain access to customers' retirement accounts and other savings, Defendants published misinformation on Safeguard Metals' website in 2019 and 2020. Defendants made numerous false and misleading statements of material fact, omitted material facts necessary to make the statements made not untrue or misleading, or made statements in reckless disregard about the firm's business activities on their website, including, but not limited to, the following:

   a. Safeguard Metals is rated number one among wealth protection firms (with no basis for this assertion);

   b. Safeguard Metals oversees more than $11 billion in assets under its management (when, in reality, the firm had sold substantially less than $75 million in Precious Metals and Silver Coins since it had been in business);

   c. Safeguard Metals has been in business for more than twenty years (when, in truth, the startup formed in 2017, but did not appear to have significant operations until 2019;

   d. the number and location of Safeguard Metals' offices, including office locations in London, England and Beverly Hills, California (when in actuality, the firm only has offices in Woodland Hills, California); and

   e. the use of false and fictitious employee names, touting non-existent employees on LinkedIn, misrepresenting employee job titles, and exaggerating employee qualifications and years of industry experience.

37. Defendants removed the foregoing statements and blatant website misrepresentations in or about January 2021 after becoming informed of a law

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

enforcement investigation, and began to rely on other more nuanced misrepresentations, half-truths, and omissions as part their solicitation scheme, as discussed further below.

38.     Safeguard Metals utilized fraudulent solicitations designed to build trust with customers based on representations of political affinity and through references to and statements from financial gurus.

39.     In furtherance of the scheme, Ikahn personally solicited customers, misrepresenting that Safeguard Metals was "the #1 name in precious metals and lead [sic] the industry as the fastest growing house, offering the cheapest and purest bullion in the country for the benefit of our clients and we hold all proper and full accreditation from the state, federal government, and distributors alike," with no basis for these material misstatements, half-truths or omissions, and in reckless disregard for the truth.  Ikahn also created sales scripts that were used to solicit customers.

40.     Defendants instructed Safeguard Metals' sales representatives or other agents to employ fraudulent solicitations designed to instill fear in elderly and retirement aged investors and other customers.  To frighten those customers about the risk and safety of their investments in Qualified Retirement Savings and traditional accounts, Safeguard Metals made repeated material misrepresentations, half-truths, and omissions regarding the Money Market Fund Reform regulation promulgated by the Securities and Exchange Commission, Money Market Fund Reform Amendments to Form PF, 70 Fed. Reg. 47,736 (Aug. 14, 2014), and more recently, the Orderly

Liquidation Authority promulgated pursuant to Dodd Frank, 12 U.S.C. §§ 5381-5394. Safeguard Metals played on the customers' fears and materially misrepresented these provisions, omitting to disclose which asset classes the Money Market Fund Reform applies to, and making false and misleading statements about each law's or regulation's effects, and the extent to which these and other investor protections applied.  For example, during fraudulent solicitations over the telephone, via email and in its sales scripts, Safeguard Metals and/or Ikahn made the following misrepresentations:

       a.    financial institutions can "freeze you out of your retirement accounts if there was ever a market crash or correction again," and either "confiscate" or freeze all of the holdings in your retirement or investment accounts, particularly during either a liquidity or financial crisis.  "Banks then will use people's money to bail themselves out.";

       b.    an investor is "just a beneficial owner" and "leases" securities and funds held in Qualified Retirement Savings, and further, the government "owns" the certificates on securities and funds held in these accounts; and

       c.    "you're pretty much in these [Qualified Retirement Savings] accounts with no types of insurance," but "the good news is that there are loopholes within the law to help protect . . . from it" through safe and conservative investments in Precious Metals purchased through SDIRAs.

41.    Defendants misrepresented that the Money Market Fund Reform and/or the Orderly Liquidation Authority regulations apply to stocks and certain bonds held in Qualified Retirement Savings.  They do not.

42.     Safeguard Metals misrepresented that the government, not the investor, owns the certificates on securities and funds held in a Qualified Retirement Savings account.  This is false.  The beneficial owner is the true owner of an asset or security that is under a different legal name and the government does not own the certificates on securities and funds held in these accounts.

43.     Safeguard Metals misrepresented that Qualified Retirement Savings are uninsured.  In reality, investor protections and insurance are offered through the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation.

44.     In 2021, Safeguard Metals misrepresented to customers that a change to Rule 22e-3 under the Money Market Fund Reform permits financial institutions to permanently freeze the liquidity in accounts, confiscate funds and will never pay participants back if the market fails.  Furthermore, Safeguard Metals maintained the goal of investment firms is "to stop you from being able to redeem your shares, or redeem the funds that you have in your retirement and stock accounts, by any means necessary."

45.     These and similar misrepresentations made by Safeguard Metals and/or Ikahn are false and misleading because Defendants failed to disclose to customers the narrow circumstances in which a money market fund can be permanently suspended, and furthermore, that liquidation follows when redemptions are permanently

suspended, thereby returning money to shareholders and allowing investors to recover funds.

46.    Defendants knew, or were reckless in not knowing, that their communications with customers contained material misstatements, half-truths, and omissions described above.

> **4.    Safeguard Metals Charged Exorbitant Price Markups on Silver Coins That Bore No Relation to the Ranges Represented to Customers.**

47.    After the SDIRAs and Cash Accounts were opened under false and fraudulent pretenses, Defendants executed their core strategy of selling customers Silver Coins with enormous price markups, which Defendants referred to as "operating margins" when they communicated with customers about the price markups with customers.  Safeguard Metals grossly misrepresented the "operating margins" that they would charge customers in Shipping and Account Agreements ("Customer Agreements") and representations made during sales confirmation calls.

48.    The Customer Agreements purported to establish the terms and conditions regarding sales of Precious Metals by Defendants to their customers. During the Relevant Period, Safeguard Metals used at least two versions of the Customer Agreements – one version prior to January 2021 and a revised version following purported attempts to implement compliance measures at Safeguard Metals.  Safeguard Metals purportedly implemented those compliance measures

beginning in or around January 2021 after Defendants received notice of an investigation by law enforcement.

49.     Prior to January 2021, Safeguard Metals' Customer Agreements represented, in pertinent part, the following relating to Safeguard Metals' "operating margins" on Precious Metals:

a.     "The operating margin is the difference between Safeguard's approximate acquiring cost of the Precious Metals and the price the Client pays."

b.     "Safeguard's operating margin quoted to the Client for most common bullion products . . . is typically four percent (4%) for cash, and seven percent (7%) for IRA purchases."

c.     "Operating margin on coins with semi-numismatic or numismatic value are rare coins . . . is usually twenty percent (20%) and for Proof products is twenty-three percent (23%)."

50.     Despite these representations, Safeguard Metals actually sold Silver Coins to customers at average "operating margins" of 71%.  This vastly exceeded the maximum "operating margin" of 23% disclosed in Safeguard Metals' Customer Agreement.  These overcharges were material misrepresentations and omissions.  Further, Ikahn admitted to establishing the price of these exorbitantly priced Precious Metals during Safeguard Metals' initial period of operation.

51.     During purported implementation of compliance measures in or about January 2021, Safeguard Metals revised its sales confirmation scripts, and its Customer Agreements to provide new representations about its "operating margins"

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

for Precious Metals.  While Safeguard Metals' representations about its "operating margins" varied between the sales confirmation scripts and Customer Agreements, the actual "operating margins" charged by the firm still far exceeded either representation.

52.    After January 2021, Safeguard Metals represented the following "operating margins" to customers during sales confirmation calls:

> SAFEGUARD METAL'S OPERATING MARGIN IS USUALLY 1% - 23%[.] THIS MAY VARY AND EXCEED 40% BASED ON MARKET CONDITIONS.

53.    After January 2021, Safeguard Metals' Customer Agreements represented to customers the following relating to "operating margins":

> Current operating margins on coins with semi-numismatic or numismatic value . . . is usually 23% - 33% . . . .  The actual operating margin on any particular transaction can be any amount usually within, but also could be outside this range, but not exceeding 42%.

54.    Following the purported implementation of compliance measures in January 2021, Safeguard Metals' actual "operating margin" on Silver Coins routinely exceeded 40% and averaged about 51%.  Consequently, despite the inconsistent disclosures between sales confirmations and Customer Agreements, the "operating margin" on Silver Coins represented in sales confirmations rarely, if ever, fell within the "usual" and customary ranges disclosed to customers and averaged greater than the maximum "operating margin" represented in Customer Agreements.  These overcharges were material misrepresentations and omissions.

55.     Safeguard Metals also provided inconsistent and misleading disclosures to customers during the sales confirmation process.  In at least one instance, an Opener falsely represented to at least one customer that the specified "operating margins" only applied to investments exceeding $1 million and were therefore inapplicable to that customer's transaction because his investment fell under the threshold.  Later, in contrast, a Closer stated during the sales confirmation call that specified "operating margins" do in fact apply because the customer is an accredited investor, resulting in ambiguous and conflicting disclosures.

56.     Safeguard Metals' core strategy of selling fraudulently overpriced Silver Coins to customers was designed to maximize its profits through "operating margins" and commissions and resulted in substantial and nearly immediate customer losses.  Silver Coin purchases were more than 97%, or $66 million of the $68 million in total revenue fraudulently solicited from customers, of the purchases by Safeguard Metals on behalf of its customers.  The purchase of Silver Coins had significantly higher "operating margins" compared to gold coins.

57.     Safeguard Metals knowingly or recklessly failed to inform customers of the material fact that the exorbitant "operating margins" charged on Silver Coins bore no relation to the figures represented in the Customer Agreements, or otherwise stated to customers.  This had the effect of substantially and immediately depleting the values of investments held in customers' SDIRAs and Cash Accounts.  Nonetheless, Safeguard Metals continued to misrepresent to prospective and current

- 21 -

SDIRA and Cash Account customers that Precious Metals were a safe and conservative investment.

**5.      Safeguard Metals Misrepresented to Customers How It Earned Profits and Lulled Customers by Making Misrepresentations About the Value of Customers' Precious Metals.**

58.      As part of the scheme, Safeguard Metals misrepresented and omitted material facts regarding how Safeguard Metals earned profits from Precious Metals transactions.

59.      During telephone sales calls, Safeguard Metals repeatedly misstated that its earnings arose solely from a 1% fee, and later in 2021, a 1% to 3% fee, that applied only when customers liquidated investments in Precious Metals.  During a sales solicitation call with a prospective customer, a Safeguard Metals employee stated, in pertinent part, that "We take 1 percent of what we liquidate . . . .  It's our only way we make money," leaving customers with the impression that Safeguard Metals did not profit in other respects from their Precious Metals transactions.

60.      In reality, Safeguard Metals was paying its sales representatives commissions that far exceeded 1% to 3%, including commissions upwards of 10%, all while misinforming customers that a liquidation fee was the only fee charged.

61.      Also, as discussed above, Safeguard Metals also made money from charging excessive premiums on Silver Coins.  For instance, Safeguard Metals earned an estimated 71% "operating margin" on Silver Coins during the 2019 to 2020 timeframe—about 48% more than the maximum permitted pursuant to the Customer

Agreement.  In 2021, Safeguard Metals earned an estimated 51% "operating margin" on Silver Coins, about 9% more than the maximum permitted pursuant to the revised Customer Agreement.

62.     Safeguard Metals also falsely asserted "[i]f our clients are making money, that's when we make money."  In fact, Safeguard Metals made money on Precious Metals notwithstanding whether its customers made money, and customers incurred additional transactional costs far greater than a 1% to 3% liquidation fee. Safeguard Metals failed to disclose the true and accurate transaction costs or provide accurate "operating margins" even when customers specifically inquired.

63.     As part of the scheme to defraud, Safeguard Metals also deceived customers and concealed its fraud by hiding that customers significantly overpaid for their investments.  Instead, Safeguard Metals made further misrepresentations about the value of the Precious Metals in customer accounts to placate and calm investors who were upset about the losses shown on their SDIRA statements.

64.     Customers received account statements from their SDIRA custodians showing account values significantly below the values originally paid to Safeguard Metals.  The account statements were significantly lower because the SDIRA custodians assigned asset values to the coins held based on the melt value of the coin, ignoring any purported numismatic or semi-numismatic value.  When customers confronted Safeguard Metals' sales representatives about the disparity between their original investment and the value assigned by SDIRA custodians, the sales

representatives rejected lower valuations and misrepresented to customers that values did not accurately reflect the resale value of the Precious Metals and Silver Coins. Instead, they misrepresented that the actual resale value of their investments was much higher than that reported by the SDIRA custodians.

65.     Safeguard Metals, however, knew or recklessly disregarded that the resale price of the Silver Coins that it marketed and promoted was much lower than the amount customers paid for the Silver Coins.

66.     To further obfuscate customers' true account values, Safeguard Metals also lulled customers by telling them to wait or give it at least six months, or in some instances, three to five years, to allow their SDIRA accounts to make money.

67.     Due to the acts, omissions, and failures of Safeguard Metals, at least two SDIRA custodians terminated their business relationships with Safeguard Metals and no longer conducted business with the company.

68.     In terminating its contract with Safeguard Metals, one custodian stated, in pertinent part, that:

> It has come to our attention that certain trades made in accounts represented by Safeguard Metals appear to not be in the best interest of the IRA owner as the values of the accounts were significantly less after the trade activity than the values of the accounts prior to the trades.

### 6.    Ikahn Controlled the Operations of Safeguard Metals and Is Therefore Liable for Its Actions.

69.    During the Relevant Period, Ikahn was the controlling person of Safeguard Metals and held 100% ownership of the company and held exclusive authority over the company's business decisions.

70.    Ikahn was the sole member of the limited liability company, and no one else has ever served as a member.  He executed the limited liability company registration using the title of "Principal."

71.    As the controlling person, Ikahn initially handled all aspects of Safeguard Metals' operations and made all significant business decisions.  Ikahn was responsible for the creation of Safeguard Metals' website and had authority over it, and the website contained numerous false statements.  Ikahn initially hired and trained sales representatives, and was authorized to make personnel decisions regarding the hiring and firing of employees.  Ikahn initially provided training, created a sales script, and prepared email templates for sales representatives to use, and created the account agreement that Safeguard Metals entered into with customers that contained false information.  Among other things, Ikahn emailed sales representatives and instructed them to provide the false information to potential customers that big banks or brokerage firms can freeze retirement accounts in times of financial turmoil.  Ikahn determined and set the prices at which Safeguard Metals sold Precious Metals and Silver Coins to the public.

72.     For the entirety of the Relevant Period, Ikahn was the only signatory on Safeguard Metals' bank accounts and served as the only person authorized to enter into financial transactions on behalf of the company.

**7.      Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives and Engaged in Fraud**

73.     The Laws of the States govern the registration of Investment Advisers ("IAs") and Investment Adviser Representatives ("IARs") (collectively, "IAs & IARs").

74.     Collectively, the Laws of the States prohibit (1) fraud in connection with investment advisory services; (2) fraud in connection with the offer, purchase, or sale of securities; (3) fraud in connection with the offer, purchase, or sale of commodities; and (4) financial exploitation of the elderly.

**i.   Defendants Acted in the States as Unregistered Investment Advisers or Investment Adviser Representatives**

75.     Defendants, either directly or by and through their sales representatives or other agents, offered and provided investment advice to investors for compensation.

76.     Defendants, either directly or by and through their sales representatives or other agents, acted as IAs & IARs, because Defendants, for compensation, engaged in the business of advising another, either directly or through publications or

writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, including, but not limited to:

    a.   Safeguard Metals held itself out as a full-service investment firm, claimed that it was rated number one among wealth protection firms, touted alleged relationships with securities industry professionals, and claimed years of industry experience;

    b.   Defendants, either directly or by and through their sales representatives or other agents, solicited investors and provided investment advice to investors with respect to the value of securities or to the advisability of selling currently held securities, and encouraged investors to liquidate their Qualified Retirement Savings and existing securities holdings;

    c.   Defendants, either directly or by and through their sales representatives sent victims emails highlighting articles that would induce fear in the investors about securities held in preexisting Qualified Retirement Savings;

    d.   Safeguard Metals, either directly or by and through their sales representatives or other agents, aided investors in setting up SDIRAs, including but not limited to, provided assistance with SDIRA applications and facilitating contact with the custodians of their Qualified Retirement Savings to initiate the liquidation and transfer of funds to the SDIRA;

    e.   Defendants, either directly or by and through their sales representatives or other agents, advised about market trends, specifically emphasizing the volatility of the stock market and suggesting that the stock market could crash;

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

f.    Defendants, either directly or by and through their sales representatives or other agents, advised about advantages of investing in securities versus other types of investments, specifically advising that precious metals would be a better or safer investment vehicle than Qualified Retirement Savings;

g.    Defendants, either directly or by and through their sales representative or other agents, provided advice about asset allocation, including advising investors that up to 20% of their assets should be in physical Precious Metals;

h.    Defendants, either directly or by and through their sales representative or other agents, provided further advice about asset allocation, and selected the type of metals on behalf of the investors, primarily the 1.25 oz Silver Rose Crown Guinea, which constituted over 97% of the total coins sold to investors;

i.    Ikahn was a controlling person of Safeguard Metals during the Relevant Period, owned 100% of the company, and was the sole member and Principal of the limited liability company.  Prior to October 2020, Ikahn created sales scripts and email templates and distributed customer leads and provided training to sales representatives at Safeguard Metals, and set the prices at which Safeguard Metals sold Precious Metals and Silver Coins to the public.

77.    Defendants, either directly or by and through their sales representatives or other agents, received compensation from investors in the form of substantial markups on the coins that were sold.  For example, for the 1.25 oz Silver Rose Crown Guinea which constituted over 97% of the total coins sold to investors, Safeguard

Metals charged an average markup of 71% prior to 2021, and about 51% during 2021.  During the Relevant Period, Safeguard Metals obtained approximately $67 million from the sale of gold and silver coins to more than 450 mostly elderly, retail investors.  Safeguard Metals kept approximately $25.5 million of the approximately $67 million paid by investors for itself in the form of markups on the price Safeguard Metals paid for the coins.  Ikahn personally received compensation in the form of markups charged on the Precious Metals sold to customers.

78.    By way of example, Defendants, either directly or by and through their sales representatives or other agents, provided investment advice to the following investors:

a.  Alabama Investor #1, aged 61, was contacted by a Safeguard Metals sales representative and pressured to liquidate her and her husband's IRA accounts, which contained securities.  The investor was told that the government could seize her securities at any time and that the stock market was about to crash.  Alabama Investor #1 made 2 purchases with Safeguard Metals in April of 2020.  Another purchase was made in the name of her husband in May of 2020.  The purchases were placed into SDIRAs that a Safeguard Metals sales representative helped her set up, including being on a three-way call with the investor and her brokerage firm.  The Alabama Investor #1 was also told that her purchases would be insured and was never told about the high-risk nature of precious metals investments.  At no time was the investor given the opportunity to choose which metals she was buying or the diversification of the metals she bought.  At no time was she told that Safeguard Metals was collecting a 55% mark-up on the silver coins she bought.  Alabama Investor #1 was unaware of the mark-up until an investigator from the Alabama Securities Commission met with her in August, 2021.

b.  Alabama Investor #2, aged 65, wanted to purchase both silver and gold in equal amounts.  To do so, he liquidated a Thrift Savings Plan that held securities into cash, $89,997.96. Despite his stated desire to split his

investment equally between gold and silver, Safeguard Metals sold Alabama Investor #2 two thousand twenty-eight (2,028) 1¼ ounce Silver Rose Crown Guineas for $87,467.64 and twelve (12) 1/10 ounce Gold American Eagles for $2,530.32.  The melt price for silver on the date of the sale, April 13, 2020, was $27.47 per ounce.  The melt price for gold on the same date was $1,717.72 per ounce.  Thus, Alabama Investor #2 incurred a 54% loss upon the purchase of the Silver Guineas.  This loss was not disclosed to him at any time.

c.  Arkansas Investor #1 ("AR1") was a retiree and senior citizen that had approximately $1,000,000.00 in bonds in his IRA accounts.  A sales representative from Safeguard Metals stated that precious metals were a safe way to preserve and grow his wealth.  He was advised by the sales representative that the stock market was in for a major correction and was overvalued.  The sales representative also told AR1 how the Federal Reserve was devaluing the dollar by excessive printing and how the rise of inflation was going to make precious metals more valuable.  AR1 was advised to invest his entire retirement portfolio in silver numismatic coins.  The sales representative told AR1 that the purchase price would be market value for the coins, and the only commission charged would be about 5% at the time of liquidation.  AR1 from October 2019 through August 2020 liquidated all his retirement accounts around $1,000,000 in bonds, and purchased precious metals.

d.  Arkansas Investor #2 ("AR2") was age 66 at the time of the transactions and was semi-retired.  She was contacted by a sales representative for Safeguard Metals and liquidated her only retirement account to buy silver numismatic coins.  AR2 was told that those coins were increasing in value and that they would be a good investment.  The sales representative never disclosed to AR2 the manner or amount of compensation the representative or Safeguard Metals would receive on the transaction AR2 liquidated her entire retirement account and invested it into precious metals the sales representative recommended.

e.  California Investor #1 was advised by his sales representative that precious metals were a more stable investment that would hold its value, as opposed to securities held in traditional retirement accounts as the value of the dollar was declining.  California Investor #1 had little experience in investing in metals and coins, and the sales associate assisted in liquidating approximately $111,000 from his traditional IRA, invested in securities, to roll over to a SDIRA account to purchase

metals.  California Investor #1 asked the sales representative to select the metals for best value, and the sales associate purchased a little under $100,000 in 1.25 oz. Silver Rose Crown Guineas on his behalf.

f.  California Investor #2 was advised by a sales representative that she could be frozen out of her traditional IRA account that was invested in securities, emphasized the volatility of the stock market, and advised her that 25 to 50 percent of the money held in her traditional IRA account should be put into precious metals instead.  Although California Investor #2 was primarily interested in purchasing gold, her sales representative advised her that the market was better for silver, and convinced her to purchase primarily Silver Coins.

g.  Connecticut Investor #1 was 71 years old and retired when he purchased precious metals from Safeguard Metals.  A Safeguard Metals sales representative advised him that precious metals are stable unlike the investments he had in his Qualified Retirement Savings account and that the stock market was about to crash. The sales representative also told him his Qualified Retirement Savings account was uninsured and that he could get frozen out of it if there was a market crash.  The sales representative advised him to sell everything in the account and buy precious metals. Connecticut Investor #1 had no prior experience or knowledge in investments.  The sales representative assisted him with selling approximately $114,000 worth of investments from his Qualified Retirement Savings account which included securities, setting up a SDIRA, and then purchasing precious metals from Safeguard Metals with these funds.  The sales representative never told him anything about fees or costs associated with this transaction, and although Connecticut Investor #1 asked for only gold, the sales representative invested almost all of the funds in Silver Rose Crown Guinea coins and told him after the fact this was a better investment for him.

h.  Connecticut Investor #2 was 62 years old and planning for retirement when she purchased precious metals from Safeguard Metals.  A Safeguard Metals sales representative told her the economy was going to crash and that she could lose everything in her Qualified Retirement Savings account.  The sales representative advised her to liquidate the account and invest in precious metals which are stable.  Other Safeguard Metals sales representatives kept calling her and telling her to "hurry up"

and "make a decision" because time was running out. Connecticut Investor #2 had no prior experience or knowledge in investments. A Safeguard Metals sales representative assisted her with selling approximately $130,000 worth of investments from her Qualified Retirement Savings account which included securities, setting up a SDIRA, and then purchasing precious metals with these funds from Safeguard Metals. The sales representative never told her anything about fees or costs associated with this transaction, and although Connecticut Investor #2 asked for only gold, the sales representative invested almost all of the funds in Silver Rose Crown Guinea coins.

i.  Florida Investor #1 was over 65 years old when she purchased precious metals from Safeguard Metals. She told the sales representative that she needed more income because of her age. The sales representative assisted her in selling securities she owned to obtain the money she used to purchase precious metals. The sales representative facilitated or assisted Florida Investor #1 in opening a SDIRA and moving money into the SDIRA which she then used to purchase precious metals. Florida Investor #1 relied on the sales representative's advice when she purchased precious metals.

j.  Florida Investor #2 was over 65 years old when she purchased precious metals from Safeguard Metals. She told her sales representative that she did not want to lose any value in her investment. The sales representative gave her a chart that showed that metals had outperformed the "S&P". The sales representative told her that precious metals were secure and low risk. He also said that she would get a high return on metals because "the market" would crash. With the assistance of her sales representative, Florida Investor #2 sold securities she owned to obtain the money she used to purchase precious metals. The sales representative also facilitated or assisted Florida Investor #2 in opening a SDIRA which she then used to purchase precious metals. Florida Investor #2 relied on the sales representative's advice when she purchased precious metals.

k.  Florida Investor #3 was over 65 years old when she purchased precious metals from Safeguard Metals. The sales representative told her that precious metals were better and safer than stocks and leaving her money in a 401(k) plan. He also told her that she would make plenty of money through the purchase of precious metals. The sales representative facilitated or assisted Florida Investor #3 in selling the securities she

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

owned to obtain the money to purchase precious metals.  He also facilitated or assisted her in opening a SDIRA which she used to purchase precious metals.  Florida Investor #3 relied on the sales representative's advice when she purchased precious metals.

l.   Idaho Investor #1, age 62, was advised by a Safeguard Metals sales representative that the Biden presidency was giving money away and that the dollar would soon be worthless.  The Safeguard Metals representative also stated that her 401(k) retirement funds actually belonged to her former employer, an airline company, and could be taken, like the way that Delta took their pilots' pensions years ago.  The Safeguard Metals representative recommended that she put most of retirement funds into silver and a little bit of gold.  Based on the advice of the Safeguard Metals representative, Idaho Investor #1 liquidated her entire 401(k) account totaling more than $592,000 to purchase precious metals from Safeguard Metals.  Safeguard Metals charged Idaho Investor #1 $567,273.57 for 9,953 1.25 oz. Silver Rose Crown Guinea coins and 52 1/10 oz Gold American Eagle coins.  However, these coins were transferred the same day to the investor's Equity Trust account at a value of only $326,402.83.  This represents a markup of $241,385.75 or 74%.

m.  Illinois Investor #1 is a senior citizen and had a traditional IRA with Fidelity.  The sales representative at Safeguard Metals advised Investor #1 to invest in gold and silver coins because they were more stable than the stock market.  Investor #1 is not an accredited investor and did not have a working knowledge of or experience concerning securities, precious metal bullion, or numismatic coins, investments prior to investing through Safeguard Metals.  The sales representative also recommended investing in Safeguard Metals over Fidelity because it had a higher BBB rating and that Investor #1 would have more control over his investment.  Investor #1 wired $105,000 from his Fidelity IRA account to his Entrust SDIRA in May of 2021.  The sales representative did not inform Investor #1 of any fees or mark-ups associated with investing in precious metals and coins.  Safeguard Metals charged Investor #1 $99,540.81 for 2,181 1.25 oz. Silver Rose Crown Guineas.  However, these 2,181 silver coins were transferred the same day to the investor's Entrust account at a value of only $57,578.40.  This represents a markup of $41,962.41 or 73%.

n.  Illinois Investor #2 is a senior citizen and had a 401(k) with Sentry
which included mutual funds.  Investor #2 is not an accredited investor.
The sales representative recommended that Investor #2 invest in metals
to protect against large swings in the market.  The sales representative
recommended that Investor #2 open up a SDIRA account with Equity
Trust.  In April of 2021, Investor #2 transferred $64,000 to Equity Trust.
The value of his 401(k) account was approximately $80,000 at the time
of the transfer.  Based on the recommendation of the sales
representative, Investor #2 purchased 1,015 Silver Coins.  Safeguard
Metals charged Investor #2 $59,976.35 for 1,015 1.25 oz. Silver Rose
Crown Guineas.  However, these 1,015 Silver Coins were transferred the
same day to the investor's Entrust account at a value of only $38,235.05.
This represents a markup of $21,741.30 or 57%.

o.  Kentucky Investor #1 is a 63-year-old Kentucky resident.  On or around
May 2020, Kentucky Investor #1 watched a cable news talk show
discussing alternative investments.  The commentator insinuated that the
stock market was going to crash and advertised for Safeguard Metals.
Kentucky Investor #1 filled out a form on the Safeguard Metals website
and soon received a call from an account executive at Safeguard Metals.
The account executive told Kentucky Investor #1 that investing in
precious metals was better than investing in the stock market.  Kentucky
Investor #1 told the account executive that he had a 401(k) at Edward
Jones and a Thrift Savings Plan.  The account executive told Kentucky
Investor #1 that precious metals were a much safer investment and
advised him to roll over the money he had in stocks into a SDIRA
invested in precious metals. Based on the advice of Safeguard Metals,
Kentucky Investor #1 decided to purchase $50,148.88 in metals and, on
May 1, 2020, rolled over his stock account with Edward Jones to a
SDIRA account at Equity Trust.  Safeguard Metals failed to disclose
how the precious metals were valued and how the valuations could differ
significantly.  In January 2022, Kentucky Investor #1's metals, which he
believed to be worth approximately $50,000, were only valued at the
melt value of $18,000.

p.  Kentucky Investor #2 is a 67-year-old Kentucky resident, who on
December 2019 was listening to a radio financial program and heard an
advertisement for Safeguard Metals.  Kentucky Investor #2 called the
number for Safeguard Metals and spoke to a sales representative with
Safeguard Metals.  Kentucky Investor #2 told the sales representative

that she was concerned about the safety of her 401(k) and wanted a short-term investment with a good return because she and her husband would need to buy a new home in the next few years.  The sales representative told Kentucky Investor #2 that she would make six times what she currently had by investing in precious metals, and that she would not make any money under her current 401(k) and that Safeguard Metals would buy back her metals if she ever needed the money. Kentucky Investor #2 invested as the sales representative advised.  The sales representative informed Kentucky Investor #2 that he was opening a SDIRA for her invested in precious metals, and initiated a three-way call with Fidelity, where Kentucky Investor #2's 401(k) was located, and assisted with the rollover of the 401(k) to Equity Trust.  On December 23, 2019, Kentucky Investor #2 invested $26,604.21 into a SDIRA backed by precious metals through Safeguard Metals.  Safeguard Metals did not disclose to Kentucky Investor #2 how precious metals were valued and how the valuations could differ significantly.  In June 2019, she discovered that the metals she purchased after liquidating the $26,604.21 from her 401(k) were only worth the melt value of $19,614.78.

q.  Maryland Investor #1 was advised by a sales representative claiming extensive experience dealing with precious metals that the investor's money would be safer in precious metals than the stock market; in fact, that the crash of the market was inevitable because the economy is being flooded with printed money. Though Maryland Investor #1 was not interested in coins, he was told that he could only purchase coins and was recommended the 1.25 oz. Silver Rose Crown Guineas as the sales representative advised the coins were limited edition and would appreciate in value quickly. Maryland Investor #1 subsequently decided to liquidate securities and transfer his entire IRA – roughly $240,000 – to invest with Safeguard Metals. These funds represented the entirety of his anticipated retirement savings.

r.  Mississippi Investor #1 was advised by a Safeguard Metals sales representative to purchase metals immediately as prices were going up and the securities market was unstable and about to "blow up."  The Safeguard Metals representative told Mississippi Investor #1 that if the economy collapses, the government could come in and take over the banks and credits unions.  Defendants advised Mississippi Investor #1 to get out of the market completely and move all his money to precious metals.  The representative called every day.  With Safeguard Metals

facilitating, Mississippi Investor #1 rolled 401(k)s and Roth IRAs, all of which contained securities, valued at approximately $737,000 to a SDIRA at Equity Trust.  Mississippi Investor #1 was never informed of any risks of liquidating his securities accounts, was never told of any spread or markup, or informed that precious metals were a long-term investment.  The first account statement showed the precious metals valued at less than half his original investment.

s.  Mississippi Investor #2 was contacted by a representative at Safeguard Metals who stated that Mississippi Investor #2 had requested a call from Safeguard Metals (she had not).  The representative stated that the market was about to crash again, sending articles to her about a pending market crash.  The representative told Mississippi Investor #2 that precious metals would always be safe and the representative did not want to see her lose her "life savings if [she] left it where it was." The representative called multiple times a day.  With Safeguard Metals facilitating, Mississippi Investor #2 liquidated the securities in her 401(k), approximately $29,500, and moved her money to a SDIRA at Equity Trust Company.  Mississippi Investor #2 was not told of any fees, spread, markup, or commissions.  Account statements showed the precious metals valued at $17,500.

t.  Mississippi Investor #3 communicated with Safeguard Metals almost every day, sometimes multiple times a day.  The representative told Mississippi Investor #3 that the stock market was going to crash and it was the time to invest in gold and silver as they were about to go up. The representative stated that Safeguard Metals would double the investment in 12 months.  Mississippi Investor #3 was advised to invest in silver because it had the best return.  With Safeguard Metals facilitating, Mississippi Investor #3 rolled his 401(k), with approximately $152,000 in the account, to a SDIRA at Equity Trust. Account statements showed the precious metals valued at approximately $97,000.

u.  Missouri Resident #1 ("MR1"), at the age of 61 and while disabled following a stroke, was contacted by a Safeguard Metals sales representative that identified himself as Michael Roeder ("Roeder") and advised that she should liquidate 100% of her retirement savings of an IRA she had inherited held at Fidelity with the promise that her $85,000

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

would grow to $100,000 in a very short period of time.  Roeder also made disparaging comments that Fidelity was "shady" to further induce MR1's investment through Safeguard Metals.  Roeder convinced MR1 that metals investments offered by Safeguard Metals were easier to protect from government confiscation and based his arguments on pro-Republican platform statements.  Roeder facilitated the transfer of the funds from Fidelity Investments to Equity Trust and instructed MR1 to remain silent during the call initiating the liquidation and transfer from Fidelity to Equity.  Despite investing $85,179.69 in 9 Gold American Eagles and 1,241 Silver Rose Crown Guineas, MR1 lost $15,882.88 when she sold 598 Silver Rose Crown Guineas and has a current estimated value of only $20,000 in the remaining precious metals she purchased through Safeguard Metals.

v.  Missouri Resident #2 ("MR2"), at the age of 64, received a cold call from someone at Safeguard Metals identifying themselves as Lyn Chase ("Chase") and convinced MR2 to liquidate and invest nearly $50,000 in precious metals while aware that said amount constituted the entirety of MR2's retirement savings.  Chase assisted MR2 with the transfer from her Thrift Savings Plan to a SDIRA at Equity.  Despite investing $46,169.67 in 3 American Gold Eagles and 760 Silver Rose Crown guineas, MR2 lost $17,742.34 after selling all the coins.

w.  Missouri Resident #3 ("MR3"), at the age of 72, received a call from Roeder after she left her contact information over the phone after she heard a radio announcement about Safeguard Metals during a Rush Limbaugh show in February, 2021.  Roeder used high pressure sales tactics according to MR3 and fear tactics related to claims of government freezes and seizures.  Knowing that MR3 only had $74,800 representing the entirety of MR3's retirement assets, Roeder convinced MR3 to invest in precious metals through Safeguard Metals and sent MR3 the paperwork necessary to effectuate the liquidation of MR3's 401(k) and opening of a SDIRA at Equity.  Despite investing $76,691.73 in 4 Gold American Eagles and 1,557 Silver Rose Crown Guinea coins, MR3 lost $1,671.88 when MR3 sold 98 Silver Rose Crown Guinea coins and has a current estimated value of only $52,800 in remaining precious metals purchased through Safeguard Metals.

x.  Fifteen other Missouri investors purchased precious metals through similar transactions with Safeguard Metals for a total amount of $1,682,463.62.  At least half of the Missouri investors

liquidated or sold securities in order to make the purchases recommended by Safeguard Metals. Given the high markup and commissions earned on the sales of the precious metals offered by Safeguard Metals, none of the 18 Missouri residents recorded a profit on their precious metals investments. Interviews conducted with the other fifteen Missouri investors confirmed that the same or similar tactics were used to induce their investments in precious metals through Safeguard Metals.

y. New Mexico Investor #1 was never advised by his sales representative of the risks of investing the entirety his 401(k)'s holdings into precious metals. New Mexico Investor #1 was never advised by his sales representative that his first SDIRA statement would indicate that New Mexico Investor # 1's initial $33,000 investment into precious metals would decrease in value with the sales representative's only explanation that this decrease was due to "melt value" with no further explanation. New Mexico Investor #1 was advised by his sales representative to invest the entirety of his 401(k)'s holdings into precious metals. New Mexico Investor #1 was advised by his sales representative that Investor #1's 401(k)'s holdings "were in trouble" and Investor #1 needed to transfer his 401(k)'s holdings into precious metals because gold holds its power, gold holds its worth, gold will have gains and "the government is fixing to screw your 401(k)."

z. North Carolina Investor #1, age 69, was advised by a Safeguard Metals sales representative that 401(k) laws were changing and to not invest in securities via an IRA account, but instead to open an SDIRA, established by Safeguard Metals and purchase gold and silver coins. The Safeguard Metals sales representative advised North Carolina Investor #1 that silver was going to double in value, the metals in her account would increase in value and thus would cover future storage fees for her metals. A Safeguard Metals sales representative persuaded North Carolina Investor #1, who had no prior knowledge nor experience investing in metals, to liquidate $65,966 from her IRA that held securities, and open an SDIRA. The Safeguard Metals sales representative, on the investor's behalf, invested 99.5% of available funds in 1.25-oz Silver Rose Crown Guinea coins.

aa. North Carolina Investor #2, aged 60, was advised by a Safeguard Metals sales representative that due to stock market fluctuation, silver was a better opportunity to increase her investment value over the purchase of

gold.  North Carolina Investor #2 was interested in purchasing gold and silver, but had no prior knowledge or experience in precious metals or with a SDIRA.  A Safeguard Metals sales representative called frequently prior to the investment and advised the investment in precious metals would retain the value of the original investment.  North Carolina Investor #2 was persuaded to liquidate $101,182 from her traditional IRA account which held securities, and purchase precious metals through a SDIRA account established by Safeguard Metals on her behalf.  A Safeguard Metals sales representative invested 97.6% of the investor's available funds in 1.25 oz. Silver Rose Crown Guinea coins.

bb. North Carolina Investor #3, aged 69, was advised by a Safeguard Metals sales representative to liquidate his traditional IRA account because of a pending stock market crash in Spring 2021 and instead purchase precious metals, specifically silver, as a safe investment against a declining stock market and government confiscation of IRAs.  North Carolina Investor #3 had no prior knowledge or experience in metals or with a SDIRA, but was persuaded by a Safeguard Metals sales representative to liquidate $95,485 from his traditional IRA account which held securities; and purchase precious metals through a SDIRA account established by Safeguard Metals on his behalf.  The Safeguard Metals sales representative invested 98% of the investor's available funds in 1.25-oz Silver Rose Crown Guinea coins.

cc. Ohio Investor #1, age 66, was cold-called by a Safeguard Metals sales representative and advised that his retirement accounts at Fidelity were not safe and that he needed to move his retirement out of the stock market.  Ohio Investor #1 told the Safeguard Metals sales representative that the Fidelity accounts were all the retirement that he had, and the representative advised him to liquidate the whole account except for $4,000.  The sales representative was on the phone with Fidelity and Ohio Investor #1 when the request to liquidate $111,000 was made.  The sales representative used high pressure tactics and independently chose the coins which were purchased, and continuously told the investor that he was "getting a good deal" and that he would "make a lot of money." The sales representative also assisted in setting up a SDIRA account with Equity Trust Company to maintain the investment in a tax-deferred account.

dd. Ohio Investor #2, age 63, was cold-called by Safeguard Metals sales representative who told him that the markets were going up and down

and that precious metals are expected to only go up.  The sales representative advised Ohio Investor #2 to liquidate his IRA account in full and invest the whole amount, $250,000.00 and roughly two-thirds of the investor's entire net worth, into metals.  The sales representative helped the investor set up a SDIRA account at Equity Trust and was also on a 3-way call with TD Ameritrade to liquidate the entire IRA account of Ohio Investor #2.  Although the investment amount was $250,000.00, the value on the initial statement from Equity Trust was less than $140,000.00. Upon inquiry by the investor, the sales representative advised the investor that "it takes time to balance out."

ee. Safeguard Metals advised Oklahoma Investor #1, age 67, that she should transfer her 401(k) assets into a precious-metals SDIRA because, in part, the securities market was unstable and near collapse; that her assets would then be untouchable from the federal government's alleged plan to implement policies allowing a government takeover of 401(k) plans; that Safeguard Metals would ensure she would not be charged any fees by her SDIRA custodian; and that her assets would increase in value.  In actuality, the precious-metals SDIRA custodian valued Safeguard Metal's recommended and executed purchases at 49% of Oklahoma Investor #1's purchase price and she was, in fact, charged custodian fees by the SDIRA custodian.

ff. South Carolina Investor #1 ("SC1"), at the age of 64, wanted to boost her savings by investing in precious metals.  SC1's experience regarding securities was limited to a guaranteed annuity and a 401(k) retirement account.  SC1 contacted Safeguard Metals after seeing an advertisement on a politically conservative television program and reviewing the Safeguard Metals website.  Subsequently, SC1 had several telephone conversations with Safeguard Metals sales representative "Alex Fisher" who talked with her about the conservative television program and their shared home state of New York.  SC1 told the Safeguard Metals sales representative that she needed additional income in order to help defer costs associated with her cancer treatment, and her husband's Alzheimer's disease treatments.  The Safeguard Metals sales representative advised SC1 to invest in gold and silver and promised (i) that SC1's investments would reach $750,000 in value in five years; (ii) that there were IRS tax advantages to purchasing the precious metals; and (iii) that gold and silver were "recession proof."  The Safeguard Metals sales representatives wanted her to "hurry up" and asked her rhetorically whether she wanted to have her money in "better

investments" or whether she wanted to be a "burden to [her] family" in her retirement.  In November 2019, a Safeguard Metals sales representative assisted SC1 in (i) liquidating $208,000, approximately $33,000 from a traditional IRA and $175,000 from a variable annuity; (ii) opening a SDIRA; and (iii) purchasing gold and silver coins.  Safeguard Metals sales representatives never disclosed to SC1 the costs and fees associated with purchasing gold and silver through Safeguard Metal.  When SC1 received her first account statement from the SDIRA custodian, SC1 learned that almost 90% of her account was invested in 1.25-oz Silver Rose Crown Guinea coins and that she had instantaneously lost over $97,000 of her $208,000 investment.

gg. South Carolina Investor #2 (SC2), at the age of 62, contacted Safeguard Metals in the fall of 2019, after seeing an advertisement on a politically conservative television program.  Safeguard Metals sales representative "Alex Fisher" advised SC2 to act quickly to invest his retirement in gold and silver because of the uncertainty of the economy.  The Safeguard Metals sales representative told SC2 that the value of gold was going to "go way up."  When SC2 expressed concern about the SDIRA account, Safeguard Metals sales representative "Adam Pressley" assured SC2 that Safeguard Metals was "going to take care of you."  SC2 was promised that he would only be "charged a 3% fee when there was a transaction," and was not informed about other fees or commissions that might be charged.  Despite SC2's hesitance, Safeguard Metals continued its high-pressure sales strategy, involving multiple calls with at least five different Safeguard Metals sales representatives.  SC2 finally relented and liquidated his traditional IRA and rolled it into a SDIRA in order to invest in Safeguard Metal's gold and silver. A Safeguard Metals sales representative joined the telephone call when SC2 liquidated his traditional IRA and moved his retirement money into a SDIRA.  SC2 and the Safeguard Metals sales representatives discussed diversifying his money by investing in both gold and silver.  However, Safeguard Metals invested 97% of his $261,342.72 in 1.25-oz Silver Rose Crown Guinea coins.  SC2 paid the alleged numismatic value of the coins.  SC2's first SDIRA account statement revealed that the value of his account was about $100,000 less than he invested.  When he contacted Safeguard Metals about the discrepancy, SC2 was told that the "real value of [his] account [was] $300,000" and that "the IRA custodian used metal values and not the actual value of the coin."  SC2 states that he would not have invested with Safeguard Metals if he was informed that the fees and other casts purchasing the precious metals was higher than 3% or if he

was informed that the value calculated in the SDIRA account was different than the value Safeguard Metals assigned to the silver and gold coins.

hh. Vermont Investor #1, age 73, was contacted by a Safeguard Metals sales representative and advised that he and Vermont Investor #2 should liquidate their IRA accounts, both of which contained securities, and buy precious metals, because the stock market was volatile and the metals market more stable, thus transferring their investment to precious metals would result in financial gain. The Safeguard Metals representative held out Safeguard Metals as an investment adviser. Vermont Investors #1 and #2 were persuaded to liquidate their entire IRA accounts to buy precious metals.

ii. Utah Investor #1 was contacted by Safeguard Metals sales representatives who told him that metals were a good hedge in the event the dollar decreased, that metals were a great place to store assets away from government overreach, that his silver would be held at Delaware Depository, and that the only money made by Safeguard Metals was a 1% sales fee when the investor later sold his silver. The Safeguard Metals sales representative assisted Utah Investor #1 in transferring his thrift savings plan retirement account which contained $200,000 in securities, to third-party administrator Equity Trust.

79.     Safeguard Metals has never been registered as an IA, nor have its agents or Ikahn been registered as IARs, as required under state and/or federal law. Defendants never submitted a notice filing with the appropriate state regulator as an IA or IAR, nor are they exempt from state registration as an IA or IAR.

## ii. As Investment Advisers or Investment Adviser Representatives, Defendants Engaged in Fraud.

80.     Defendants, either directly or by and through their sales representatives or other agents, in acting as IAs and IARs, employed a device, scheme, or artifice to defraud their clients and prospective clients, and/or engaged in transactions, practices,

or courses of business operating as a fraud or deceit upon those clients or prospective clients in providing investment advice to investors to transfer their Qualified Retirement Savings, including divesting themselves of securities, to purchase precious metals from Safeguard Metals, including making material misrepresentations and material omissions which included, but were not limited to, the following:

      a.    Misrepresenting that Safeguard Metals is a full-service investment firm, rated number one among wealth protection firms, has $11 billion in assets under management, with offices in London, England, and Beverly Hills, California, and used false and fictitious employee names, touting non-existent employees on LinkedIn, misrepresenting employee job titles, and exaggerating employee qualifications and years of industry experience—all are false;

      b.    Misrepresenting the safety and liquidity of investors' securities holdings and Qualified Retirement Accounts and employing scare tactics to induce investors to sell their existing securities holdings;

      c.    Misrepresenting to investors that the United States stock market is headed for an economic recession or crash, that would result in significant losses to existing Qualified Retirement Accounts;

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

d.    Misrepresenting that investors' Qualified Retirement Accounts were at risk because financial institutions could freeze investors out of their retirement accounts if a market crash or correction were to occur, and that the financial institution could confiscate or freeze all of the holdings in the retirement or investment accounts—this is false;

e.    Misrepresenting the effect of certain laws, such as stating that the Money Market Fund Reform would allow the government to freeze the liquidity in Qualified Retirement Accounts, confiscate funds, and never pay participants back if the market fails;

f.    Misrepresenting that the government, not the investor, owns the certificates on securities and funds held in a Qualified Retirement Savings account—it does not;

g.    Misrepresenting that Qualified Retirement Savings are uninsured, when in reality investor protections and insurance are offered through the Federal Deposit Insurance Corporation and the Securities Investor Protection Corporation;

h.    Misrepresenting how Safeguard Metals and its sales representatives and agents were compensated by misrepresenting to investors that the only compensation received by Safeguard Metals was by taking a small commission when customers sold

- 44 -

their coins, when in fact Safeguard Metals charged high markups on the coins it sold to investors;

i.      Failing to disclose the actual markup to investors—more specifically, stating in Customer Agreements a maximum "operating margin" of 23% prior to 2021, and more recently up to 42% during 2021, when in fact Safeguard Metals charged an average markup of 71% prior to 2021, and about 51% during 2021;

j.      Misrepresenting to certain investors that Safeguard Metals would invest funds only in gold coins when in fact Safeguard Metals invested most of the victims' funds in Silver Rose Crown Guinea coins, and then misrepresented to these victims that this was a better investment for them than gold;

k.      Misrepresenting and/or omitting that Safeguard Metals charged fees and/or commissions at every stage of the investment process when setting up the SDIRA, when purchasing gold and silver coins, when processing the precious metals, and when selling and/or liquidating the precious metals held in the SDIRA accounts.

**B.      Conclusions of Law**

**1.      Jurisdiction and Venue**

81.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission/CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission/CFTC may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

82.      Section 6d(1) of the Act, 7 U.S.C. § 13a-2(1), authorizes the States to bring a suit in the district courts of the United States to seek injunctive and other relief against any person whenever it appears to the Attorneys General and/or Securities Administrator of a State, or such other official that a State may designate, that the interests of the residents of the State have been, are being, or may be threatened or adversely affected because of violations of the Act or CFTC Regulations.

83.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants reside in this jurisdiction and the acts and practices in violation of the Act occurred within this District.

### 2. Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022)

84.     By the conduct described above, Defendants in connection with a contract of sale of commodities in interstate commerce, intentionally or recklessly: (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon their customers in violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) (2022).

85.     Ikahn controlled Safeguard Metals, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Defendant Safeguard Metals' act or acts in violation of the Act and/or Regulations; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ikahn is liable for Defendant Safeguard Metals' violations of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) (2022).

86.     The foregoing acts, omissions, and failures of Ikahn occurred within the scope of his employment, office, or agency with Defendant Safeguard Metals; therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Defendant Safeguard Metals is liable for Ikahn's acts, omissions, and failures in violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) (2022).

### 3.   State Law Violations

87.   By the conduct described above, Defendants violated various State laws prohibiting:  (1) unlicensed investment advice; (2) investment advisers from employing a device, scheme or artifice to defraud or engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit; (3) making material misrepresentations or omissions in connection with the offer, purchase, or sale of securities; (4) making material misrepresentations or omissions in connection with the offer, purchase, or sale of commodities; (5) employing any artifice, or scheme to defraud in connection with the offer, purchase, or sale of commodities; and (6) financial exploitation of the elderly in violation of the following:

    a.  Ala. Code §§ 8-6-3(b) and (c), 8-6-17(b)(2), 8-6-17(a)(2), and 13A-6-195 (1975);

    b.  Ark. Code Ann. §§ 23-42-301 and 23-42-307(a)(2);

    c.  Cal. Corp. Code §§ 25230, 25235, and 29536;

    d.  Conn. Gen. Stat. §§ 36b-6(c)(1), 36b-6(c)(2), 36b-5(a), 36b-5(f), and 36b-4(a);

    e.  Fla. Stat. §§ 517.275 and 517.12(4);

    f.  Idaho Code §§ 30-14-403, 30-14-502, and 30-1506;

    g.  815 ILCS 5, § 8.A, 12.C and 12.D, 815 ILCS 5, § 12.J;

    h.  Ky. Rev. Stat. § 292.330(8);

i.  Md. Code, Corps. & Assn's §§ 11-401(b)(1), 11-402(b)(1), 11-301, 11-302 and COMAR 02.02.05.03;

j.  Miss. Code Ann. §§ 75-71-403 to 75-71-404, 75-71-501(1)-(3) and § 75-71-502(a), and 75-89-13;

k.  Mo. Rev. Stat. §§ 409.4-403 and 409.810;

l.  N.M. Stat. Ann. § 58-13C-502(A)(2) (1978), NMAC Rules 12.11.7.13(A)(L)(Q) & (R);

m.  N.C. Gen. Stat. §§ 78A-8, 78C-16, and 78C-8;

n.  Ohio Rev. Code Ann. §§ 1707.44(A)(1), 1707.44(G), 1707.44(B)(4), 1707.44(B)(4);

o.  Okla. Stat. tit. Sess. 71, §§ 1-403(A), 1-403(D), 1-501, and 1-502(A);

p.  S.C. Code Ann. §§ 35-1-403 to 35-1-404, 35-1-501(1)-(3) and § 35-1-502(a), 39-73-20, 39-73-60(1)-(4);

q.  Utah Code Ann. §§ 61-1-1 and 61-1-2, and 61-1-3(3); and

r.  9 V.S.A. §§ 5403, 5404, 5501(1), 5501(2), and 5603(b)(2)(C) (collectively, the "State Laws and Regulations")

88.  The facts, misrepresentations, and omissions described above are material because there is a substantial likelihood that a reasonable investor would consider them important in deciding whether to sell securities and/or invest in the coins sold by Safeguard Metals.

89.     By the conduct described above, Ikahn controlled Safeguard Metals, directly or indirectly, and substantially assisted Safeguard Metals' act or acts in violation of the various State Laws and Regulations; this conduct was not undertaken in good faith or was willful, or was knowing.  Therefore, Ikahn is liable for Safeguard Metals' violations of the State Laws and Regulations.

90.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations and the State Laws and Regulations.

## PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

91.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

a.     in connection with any contract of sale of any commodity in interstate commerce, intentionally or recklessly:  (1) using or employing, or attempting to use or employ, manipulative devices, schemes, or artifices to defraud; (2) making, or attempting to make, any untrue or misleading statements of material fact or omissions of material fact; or (3) engaging, or attempting to engage, in acts, practices, or courses of business, which

operate or would operate as a fraud or deceit upon any person, in

violation of 7 U.S.C. § 9(1) and 17 C.F.R. 180.1(a)(1)-(3) (2022).

92.    Based upon and in connection with the foregoing conduct, pursuant to

the laws of the States, Defendants are also permanently restrained, enjoined and

prohibited from directly or indirectly engaging in any conduct in violation of the

State Laws and Regulations described in paragraph 87.

93.    Defendants are also permanently restrained, enjoined and prohibited

from directly or indirectly:

a.    Trading on or subject to the rules of any registered entity (as that term is

defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

b.    Entering into any transactions involving "commodity interests" (as that

term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022), or Precious

Metals that are commodities (as that term is defined herein), for accounts

held in the name of any Defendant or for any account in which any

Defendant has a direct or indirect interest;

c.    Having any commodity interests, or Precious Metals that are

commodities, traded on any Defendant's behalf;

d.    Controlling or directing the trading for or on behalf of any other person

or entity, whether by power of attorney or otherwise, in any account

involving commodity interests or Precious Metals that are commodities;

e.  Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or Precious Metals that are commodities;

f.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and/or

g.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

## STATE BAR ORDERS

94.  Defendants consent, without admitting or denying the allegations to be contained therein, to the publication of this Consent Order or to the entry of an administrative order by the States that ban or bar Defendants from participation in the commodities or securities industries, including, but not limited to, any position of employment, management, or control of any broker dealer, investment advisor, or commodity advisor.

95.  With respect to the States of Alabama, Arizona, California, Connecticut,

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

Florida, Idaho, Illinois, Kentucky, Maryland, Mississippi, Missouri,  North Carolina, Ohio, Oklahoma, Utah, and Vermont, the Defendants consent and agree to the issuance of administrative bar orders in the form set forth in Attachment 1 to this Order.

96.     With respect to the States of Arkansas, New York, and South Carolina:

a.  IT IS HEREBY ORDERED THAT in the State of Arkansas, pursuant to Ark. Code Ann. § 23-42-209(c), cease and desist from further violations of the Arkansas Securities Act and Rules of the Arkansas Securities Commissioner; waive rights to apply and, consequently, agree to never apply for registration in Arkansas with the Arkansas Securities Department in any capacity, including, but not limited to, as an investment adviser, investment adviser representative, broker-dealer, broker-dealer agent, or agent of an issuer, and to never serve in a position of employment, management, or control with or for any investment adviser, broker-dealer, issuer, or commodity adviser pursuant to the Act.

b.  IT IS HEREBY ORDERED THAT in the State of New York, Defendants are permanently enjoined from engaging in any business related to the offer, issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution of securities or commodities, including any cryptocurrencies or digital assets, within or from New York State; and that Defendant Ikahn is permanently enjoined from serving as an officer or director of any company doing business in New York State.

c.  IT IS HEREBY ORDERED THAT in the State of South Carolina, Defendants are barred from acting as an IA, and IAR, broker dealer, or agent in the connection with the offer, sale, or purchase of any security, directly or indirectly; and barred from selling commodities when not registered with the CFTC as a futures commission merchant or as a leverage transaction merchant, the Securities and Exchange Commission ("SEC") as a broker-dealer, or as an otherwise exempt entity.

97.     Defendants consent to waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to review which may be afforded by the

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

applicable laws of the States, with full knowledge of their rights, voluntarily waive the right to an adjudicative hearing in accordance with applicable state laws, as well as any other appeal rights found therein.  Defendants waive the issuance, lawful service and receipt of any notice of allegations and charges against Defendants and stipulate to the jurisdiction of the state securities regulators in Alabama, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Kentucky, Maryland, Mississippi, Missouri, New York, North Carolina, Ohio, Oklahoma, South Carolina, Utah, and Vermont.

98.     After being fully and adequately apprised of the right to appeal as set forth in applicable state laws, Defendants knowingly and voluntarily consent to waive the right to any notice or hearings, and to any reconsideration, appeal, or other right to review which may be afforded by the applicable laws of Alabama, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Kentucky, Maryland, Mississippi, Missouri, New York, North Carolina, Ohio, Oklahoma, South Carolina, Utah, and/or Vermont. Defendants expressly waive any requirement for the filing of a pleading or accusation. By waiving such rights, Defendants consent to the administrative orders filed by the States that are states referenced in this and the preceding paragraph becoming final.

## STATUTORY AND EQUITABLE RELIEF

99.     The Defendants, CFTC, and the States do not currently seek other specific statutory and equitable relief herein aside from the Permanent Injunctive

Relief and State Bar Orders described above.  Rather, the Defendants, CFTC, and the States consent to the following future procedures regarding the calculation of such other statutory and equitable relief.

100.   Upon motion by the CFTC or the States to either:  (1) confirm an agreement reached between the Defendants, the CFTC, and the States regarding restitution, disgorgement, and civil monetary penalty to be paid by Defendants; or (2) request the Court to determine the restitution, disgorgement, and civil monetary penalty to be paid by Defendants, the Court shall set a hearing to determine the amount of restitution, disgorgement, and/or civil monetary penalties as well as set forth the procedures for payment and distribution of these monetary sanctions by further order.

101.   In connection with any motion filed by the CFTC and/or the States for restitution, disgorgement and/or civil monetary penalties, and at any hearing held on such a motion:  (a) Defendants will be precluded from arguing that they did not violate the federal and state laws as alleged in the Complaint; (b) Defendants may not challenge the validity of their consents and agreements herein or this Consent Order; (c) for the purposes of such motion, the allegations of the Complaint and the Findings of Fact and Conclusions of Law in this Consent Order shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, witness testimony, and documentary evidence, without

regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with a motion filed by the CFTC and/or the States for restitution, disgorgement and/or civil monetary penalties, the parties may take discovery, including discovery from appropriate non-parties.

102.   Defendants shall cooperate fully and expeditiously with the CFTC and/or the States, including the CFTC's Division of Enforcement, in this action, and in any current or future investigation by the CFTC or the States related to the subject matter of this action.  As part of such cooperation, Defendants shall comply, to the full extent of their abilities, promptly and truthfully with any inquiries or requests for information including but not limited to, requests for production of documents and authentication of documents; and shall provide assistance at any trial, proceeding, or investigation related to the subject matter of this action, including but not limited to, requests for testimony, depositions, and/or interviews.  Should the CFTC or the States file any additional action(s) related to the subject matter of this action, Defendants are directed to appear in the judicial district in which such action(s) is pending, or in a

suitable judicial district agreed to by the parties, to provide deposition testimony and trial testimony should such testimony be necessary.

103.   Defendants shall also cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action.

## MISCELLANEOUS PROVISIONS

104.   Until such time as Defendants satisfy in full their restitution, disgorgement, and/or civil monetary penalty obligations that may be imposed in this action, upon the commencement by or against Defendants of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Defendants' debts, all notices to creditors required to be furnished to the CFTC under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership, bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Legal Division
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 20581

All notices required to be sent to the States shall be sent to their counsel of record in these proceedings.

105.   Notice:  All notices required to be given by any provision in this Consent Order, except as set forth in the preceding paragraph, shall be sent certified mail, return receipt requested, as follows:

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

a.      Notice to CFTC, which shall reference the name and docket

number of this action:

Charles Marvine
Deputy Director
2600 Grand Boulevard, Suite 210
Kansas City, MO 64108

b.      Notice to States is required to be sent to the respective counsel of

record for the States in these proceedings.

c.      Notice to Defendants Safeguard Metals and Ikahn:

Paul A. Rigali
Larson LLP
555 S. Flower Street, Suite 4400
Los Angeles, California 90071

106.   <u>Entire Agreement and Amendments</u>:  This Consent Order incorporates

all of the terms and conditions of the settlement among the parties hereto to date.

Nothing shall serve to amend or modify this Consent Order in any respect

whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and

(c) approved by order of this Court.

107.   <u>Invalidation</u>:  If any provision of this Consent Order or if the application

of any provision or circumstance is held invalid, then the remainder of this Consent

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

108.   <u>Waiver</u>:  The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

109.   <u>Continuing Jurisdiction of this Court</u>:  This Court shall retain jurisdiction of this action in order to implement and carry out the terms of all orders and decrees, including orders setting the appropriate amounts of restitution, disgorgement, and civil monetary penalty, that may be entered herein, to entertain any suitable application or motion for additional relief within the jurisdiction of the Court, to assure compliance with this Consent Order and for all other purposes relevant to this action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

110.   <u>Injunctive and Equitable Relief Provisions</u>:  The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise: (1) Defendants; (2) any officer, agent, servant, employee, or attorney of the

Defendants; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

111.   <u>Authority</u>:  Defendant Ikahn hereby warrants that he is the owner of Defendant Safeguard Metals, that this Consent Order has been duly authorized by Defendant Safeguard Metals, and he has been duly empowered to sign and submit this Consent Order on behalf of Defendant Safeguard Metals.

112.   <u>Counterparts and Facsimile Execution</u>:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

113.   <u>Enforceability</u>:  This Consent Order shall be binding upon Defendants, their parents and affiliates, and their respective successors and assigns with respect to the provisions above and all future obligations, responsibilities, undertakings, commitments, limitations, restrictions, events, and conditions.

114.   Defendants agree that, for the purposes of exceptions to discharge set forth in Sections 523, 1141(d)(6), and 1192 of the Bankruptcy Code, 11 U.S.C. §§ 523; 1141(d)(6); 1192, the findings in this Consent Order are true and admitted

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF AGAINST DEFENDANTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and any debt for disgorgement, prejudgment interest, civil penalty, or any other amounts due by Defendants under this Consent Order or any other judgment, order, consent order, decree, or settlement agreement entered in connection with this proceeding, is a debt for violation of state securities laws, including but not limited to securities fraud, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C §523(a)(19), and Section 523(a)(2) of the Bankruptcy Code, 11 U.S.C. §523(a)(2), and incorporated by reference under Section 1192 of the Bankruptcy Code, 11 U.S.C § 1192.

115.    Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings, they may not challenge the validity of this Consent Order.

116.    <u>Agreements and Undertakings</u>:  Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this *Consent Order of Permanent Injunction and Other Statutory and Equitable Relief Against Defendants*.

**IT IS SO ORDERED** on this 20th day of October 2023.



**John F. Walter,**
**UNITED STATES DISTRICT JUDGE**

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1
2
3
**CONSENTED TO AND APPROVED BY:**

4
5                                                    __/s/ Paul M. Flucke_____
                                                     Jeffrey Le Riche – Chief Trial Attorney
6                                                    Paul M. Flucke – Trial Attorney
7                                                    Commodity Futures Trading
                                                     Commission
8   _____             2600 Grand Boulevard, Suite 210
9   Safeguard Metals LLC                           Kansas City, MO 64108
    By: Jeffrey Ikahn                               Telephone: (816)960-7728
10                                                   Facsimile: (816) 960-7751
11  Date: _7/25/2023                                jleriche@cftc.gov
                                                     pflucke@cftc.gov
12
13                                                   Date: _10/16/2023_____

14
15
16
17  _____
    Jeffrey Ikahn (a/k/a Jeffrey S. Santulan
18  and Jeff Hill), individually
    Date: _7/25/2023
19
20
21
22
23
24  **Approved as to form:**

25
26  Larson LLP
27  _____
28  Paul A. Rigali

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jerry A. Behnke
Catherine S. Owens
Chloe N. Coleman

Date: 7/26/2023

*Attorneys for Defendants Safeguard*
*Metals LLC and Jeffrey Ikahn*

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1

2      /s/ Kelly Suk

3      Kelly Suk

4      Date: 8/14/2023

5
       *Attorney for Plaintiff California Department*
6      *of Financial Protection & of Innovation*
       AND *Local Counsel for Counsel appearing*
7      Pro Hac Vice *for:*

8
       *State of Alabama*
9      *State of Arizona*
       *State of Florida*
10     *State of Idaho*
       *State of Indiana*
11     *State of Iowa*
       *Commonwealth of Kentucky*
12     *State of Missouri*
       *State of New Mexico*
13     *State of Oklahoma*
       *State of South Carolina*
14     *State of South Dakota*
       *State of Tennessee*
15     *State of Utah*
       *State of Vermont*
16     *State of Washington*
       *State of Wisconsin*
17

18
       FOR THE STATE OF ARKANSAS
19

20     By: /s/ Joseph Joslin

21     JOSEPH JOSLIN, *admitted pro hac vice*
       Arkansas Bar No. 2014190
22     Joseph.Joslin@arkansas.gov

23
       *Attorney for Plaintiff*
24     *ARKANSAS SECURITIES DEPARTMENT*
       1 Commerce Way, Suite 402
25     Little Rock, AR 72202

26
27
28

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: (501) 683-0806
Facsimile: (501) 324-9268


FOR THE STATE OF CONNECTICUT

By: */s/ James W. Caley*
JAMES W. CALEY*, admitted pro hac vice*
Assistant Attorney General
Connecticut Bar No. 430246
james.caley@ct.gov

*Attorney for Plaintiff*
*STATE OF CONNECTICUT DEPARTMENT*
*OF BANKING*
260 Constitution Plaza
Hartford, CT 06103-1800
Telephone: (860) 808-5461
Facsimile: (860) 808-5387


FOR THE STATE OF HAWAII

By: */s/ Rayni M. Nakamura-Watanabe*
RAYNI M. NAKAMURA-WATANABE,
*admitted pro hac vice*
Supervising Attorney
Hawaii Bar No. 9032-0
rnakamur@dcca.hawaii.gov

*Attorney for Plaintiff*
*STATE OF HAWAII, DEPARTMENT OF*
*COMMERCE AND CONSUMER AFFAIRS*
335 Merchant Street, Room 205
Honolulu, HI  96813
Telephone: (808) 586-2740
Facsimile: (808) 586-3977

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF ILLINOIS

By: /s/ Paula K. Bouldon
PAULA K. BOULDON, *admitted pro hac vice*
pbouldon@ilsos.gov
Illinois Bar No. 6198150
DAVID F. BUYSSE, *admitted pro hac vice*
David.Buysse@ilag.gov
Illinois Bar No. 3126915

*Attorneys for Plaintiff*
*IL SECRETARY OF STATE*
*SECURITIES DEPARTMENT*
69 West Washington
Suite 1220
Chicago, IL  60602
Telephone: (312) 793-3164


FOR THE STATE OF MARYLAND

By: /s/ Max F. Brauer

MAX F. BRAUER, *admitted pro hac vice*
Senior Assistant Attorney General
Maryland State Does Not Use Bar Numbers
mbrauer@oag.state.md.us

*Attorney for Plaintiff*
*STATE OF MARYLAND EX REL MARYLAND*
*SECURITIES COMMISSIONER*
200 Saint Paul Place, 25th Floor
Baltimore, MD  21202
Telephone: (410) 576-6950
Facsimile: (410) 576-6532

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE PEOPLE OF THE STATE OF
MICHIGAN

By: /s/ Michael S. Hill
MICHAEL S. HILL, *admitted pro hac vice*
Assistant Attorney General
Michigan Bar No. P73084
HillM19@michigan.gov

*Attorney for Plaintiff*
*ATTORNEY GENERAL DANA NESSEL ON*
*BEHALF OF THE PEOPLE OF THE STATE*
*OF MICHIGAN*
P.O. Box 30736
Lansing, MI  48909
Telephone: (517) 335-7632
Facsimile: (517) 335-6755

FOR THE STATE OF MISSISSIPPI

By: /s/ James M. Rankin

JAMES M. RANKIN, *admitted pro hac vice*
Mississippi Bar No. 102322
James.Rankin@ago.ms.gov

*Attorney for Plaintiff*
*MISSISSIPPI SECRETARY OF STATE*
Post Office Box 220
Jackson, MS  39205
Telephone: (601) 359-4258
Facsimile: (601) 359-3947

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF NEBRASKA

By: /s/ Joshua Shasserre
JOSHUA SHASSERRE, *admitted pro hac vice*
Assistant Attorney General
Nebraska Bar No. 23885
Joshua.Shasserre@nebraska.gov

*Attorney for Plaintiff*
*NEBRASKA DEPARTMENT OF BANKING &*
*FINANCE*
2115 State Capitol
Lincoln, NE 68509
Telephone: (402) 471-2682
Facsimile: (402) 471-3297

FOR THE PEOPLE OF THE STATE OF
NEW YORK

LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF
NEW YORK

By: /s/ Tatyana Trakht
TATYANA "TANYA" TRAKHT, *admitted*
*pro hac vice*
Senior Enforcement Counsel
New York State Does Not Use Bar Numbers
Tanya.Trakht@ag.ny.gov

*Attorney for Plaintiff*
*ATTORNEY GENERAL OF THE STATE OF*
*NEW YORK*
28 Liberty Street, 21st Floor
New York, NY 10005
Telephone: (212) 416-8457
Facsimile: (212) 416-8816

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOR THE STATE OF NORTH CAROLINA

By: /s/ J. Anthony Penry

J. ANTHONY PENRY
California Bar No. 310929
apenry@sosnc.gov

*Attorney for Plaintiff*
*NORTH CAROLINA DEPARTMENT OF THE*
*SECRETARY OF STATE*
P.O. Box 29622
Raleigh, NC 27626
Telephone: 919-244-3921
Facsimile: (919) 814-5596


FOR THE STATE OF OHIO

DAVE YOST (0056290)
Attorney General of Ohio

By: /s/ Chad M. Kohler
Chad M. Kohler (0074179), *admitted pro hac vice*
Principal Assistant Attorney General
Executive Agencies Section
30 E. Broad St., 26th Floor
Columbus, Ohio 43215
Telephone: (614) 466-5861
Fax: (866) 514-0279
Chad.Kohler@OhioAGO.gov

*Counsel for Ohio Department of Commerce,*
*Division of Securities*

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOR THE STATE OF OREGON

By: /s/ Daniel J. Rice
Daniel J. Rice, *admitted pro hac vice*
Senior Assistant Attorney General
Oregon Bar No. 084536
Daniel.Rice@doj.state.or.us

*Attorney for Plaintiff*
*STATE OF OREGON, by and through its*
*Department of Consumer and Business*
*Services and Attorney General Ellen*
*Rosenblum*
1162 Court Street NE
Salem, OR 97301
Telephone: (503) 934-4400
Facsimile: (503) 373-7067


STATE OF OREGON, by and through its
Department of Consumer and Business
Services


By:    /s/ TK Keen
        TK Keen, Administrator
         Division of Financial Regulation

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS

1  **Certification Pursuant to Local Rule 5-4.3.4(a)(2)(i)**

2      Pursuant to Local Rule 5-4.3.4(a)(2)(i), signatories hereby do attest that all

3  signatories listed, and on whose behalf the filing is submitted, concur in the filing's

4  content and have authorized the filing.

5

6  Dated:  October 16, 2023          COMMODITY FUTURES TRADING
                                     COMMISSION
7

8

9                                    By:  /s/ Paul M. Flucke
                                          Paul M. Flucke
10

11                                   Attorney for Plaintiff
                                     COMMODITY FUTURES TRADING
12                                   COMMISSION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER STATUTORY AND EQUITABLE RELIEF
AGAINST DEFENDANTS